MONA Z. HANNA (SBN 131439)
  *mhanna@mrllp.com*
JEFFREY D. FARROW (SBN 180019)
  *fjarrow@mrllp.com*
TAYLOR C. FOSS (SBN 253486)
  *tfoss@mrllp.com*
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:   (714) 557-7990
Facsimile:    (714) 557-7991

MARC R. JACOBS (SBN 185924)
  *mjacobs@mrllp.com*
ROBERT D. ESTRIN (SBN 260402)
  *restrin@mrllp.com*
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90024
Telephone:   (310) 299-5500
Facsimile:    (310) 299-5600

Attorneys for Plaintiff
STRATEGIC PARTNERS, INC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STRATEGIC PARTNERS, INC., <br><br> Plaintiff, <br><br> v. <br><br> FIGS, INC., CATHERINE ("TRINA") SPEAR, HEATHER HASSON, <br><br> Defendants. | Case No.: 2:19-cv-02286-GW-KSx <br> **THIRD AMENDED COMPLAINT FOR:** <br> **1. FALSE ADVERTISING IN VIOLATION OF 15 U.S.C. § 1125(a);** <br> **2. UNFAIR BUSINESS PRACTICES (as to Defendant FIGS, Inc.);** <br> **3. UNFAIR BUSINESS PRACTICES (as to All Defendants);** <br> **4. UNTRUE AND MISLEADING ADVERTISING;** <br> **5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** <br> **6. NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** <br> **7. BREACH OF FIDUCIARY DUTY;** <br> **8. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY.** <br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Strategic Partners, Inc. ("SPI" or "Plaintiff") hereby alleges, by the undersigned attorneys, upon personal information as to itself, and upon information and belief as to all other allegations, as follows:

## NATURE OF THE ACTION

1. Defendant FIGS, Inc. ("FIGS"), and its co-founders and current executives Defendant Catherine ("Trina") Spear and Defendant Heather Hasson (collectively "Defendants") crashed into the scrubs market in 2012 under dubious circumstances and has proceeded to recklessly advertise the antimicrobial properties of its scrubs—making false and misleading statements for the sake of gaining market share at any cost.

2. FIGS manufactures and sells various types of scrubs and other apparel, including scrubs, scrub tops, scrub bottoms, under-scrubs, lab coats, shirts, pants, jackets (collectively the "FIGS Products").

3. On information and belief, FIGS, which began as a necktie company, changed its business model into a scrubs company after Defendant Trina Spear accessed confidential information and data regarding the medical apparel industry from her then-employer Blackstone Group Holdings, L.P. ("Blackstone"), and on information and belief, together with Defendant Heather Hasson (and the name from her previous necktie company), used said confidential information to launch FIGS as a scrubs company.  On information and belief, Plaintiff believes this was SPI's confidential information and data because Blackstone was in possession of that information at the time.

4. Furthering FIGS's goal to grow as a company at any cost, FIGS next made unsupportable claims regarding its FIGS Products through its advertising, marketing, and branding that its FIGS Products protect healthcare workers by reducing hospital-acquired infection rates by 66%.

5. FIGS's representations are untrue, misleading, and reasonably likely to deceive consumers, who consist of healthcare executives, hospital executives,

**THIRD AMENDED COMPLAINT**

retailers, and healthcare workers, including medical, dental, and veterinary professionals, who purchase the FIGS Products.  In so doing, FIGS has used its false and misleading representations to obtain media attention, move sales, improve their search results, charge higher prices, and raise capital.  Further compounding the danger of making untrue and misleading claims, FIGS's health claims and public relations efforts have caused media outlets to repeat and disseminate FIGS's false and misleading claims about Defendants' FIGS's Products.  Specifically, Defendants have disseminated false and misleading information through press releases, press interviews, investor materials, online advertisements, social media, and social media influencers, which have induced consumers into purchasing the FIGS' Products.  FIGS's false and misleading claims have helped it obtain tens of millions of dollars in funding enabling FIGS to continue to spread its false claims to the public and unfairly build its brand through additional advertisements.  As a result of FIGS's campaign of misrepresentations, FIGS was able to obtain investment from others, including venture capitalists, such as, for example, Thomas Tull, who invested $75 million into FIGS, further funding FIGS's misrepresentations.

6.   FIGS's untrue health claims are endangering healthcare workers, their patients, and the public, rather than protecting them.  In the current COVID-19 coronavirus pandemic, which is the latest and worst of numerous similar epidemics over the past decade, such as SARS, MERS, N1H1, Ebola, and the like, the danger of untrue health claims, upon which health care professionals and consumers rely, could not be more clear.  Creating a false perception that a certain kind of scrubs can protect the wearer from infectious diseases or bacteria—when they cannot—stands to affect the behavior of those healthcare workers, their patients, and the public who may wrongly rely on their scrubs for protection rather than following other available or proper sanitation procedures.

**THIRD AMENDED COMPLAINT**

7.     Healthcare workers and employers are spending a significant amount of money on products due to FIGS's false and misleading statements. Worse yet, FIGS's false and misleading claims, advertising and marketing are harming consumers by creating an unsafe belief that FIGS's Products can protect the wearer from infectious diseases or bacteria, when they cannot.

8.     On information and belief, a large percentage of wearers of scrubs have little knowledge of antimicrobial technologies and their impact.   By representing that FIGS's scrubs kill bacteria immediately upon contact, or reduce hospital acquired infection rates by 66%, or are hospital-approved, FIGS is misleading consumers and creating a false differentiation between its scrubs and the scrubs of other companies, for the purpose of allowing FIGS to move sales, charge higher prices and gain an unfair competitive advantage.   FIGS's unfair competitive advantage in turn enables FIGS to gain more revenue, raise more capital, and then drive more press, which drives search rankings, and buy more advertising, which further perpetuates the false and misleading claims made by FIGS at the start.

9.     FIGS's actions are also harming competitors in the medical wearing apparel industry such as Plaintiff. Plaintiff manufactures and sells competing medical scrubs, lab coats, and other garments for use in the medical health profession.   Plaintiff is unable to fairly compete due to FIGS's false and misleading claims.

10.     Healthcare executives, retailers, and medical consumers who are exposed to FIGS's false and misleading statements—and believe FIGS's misrepresentations—will likely acquire the incorrect belief that FIGS's products are superior to its competitor's products, including Plaintiff's.

11.     On information and belief, FIGS's false and misleading claims have created a false impression in the minds of consumers that FIGS's products can do

**THIRD AMENDED COMPLAINT**

things that Plaintiff's products cannot, and further that because of those abilities they are better or worth more, when they are not.  In a time of the COVID-10 coronavirus pandemic, as following numerous similar epidemics over the past decade, such as SARS, MERS, N1H1, Ebola, and the like, the danger of untrue health claims, claims upon which health care professionals and consumers rely, could not be more self-evident.

12.    FIGS's false and misleading claims concerning the properties and qualities of the FIGS Products has allowed it to gain market share at the expense of its competitors.  Furthermore, FIGS's false and misleading claims jeopardize the safety of the consumers who purchase the FIGS Products (and the patients they care for) as those consumers are likely to believe the FIGS Products provide them with certain claimed protections which testing has shown that the FIGS Products do not.  Additionally, FIGS's false and misleading claims have enabled it to raise millions of dollars in funding, build public relations campaigns, and obtain the benefits of social influencers.

13.    Additionally, on information and belief, FIGS has made misrepresentations regarding its donations, namely that they have donated hundreds of thousands of scrubs internationally, or that those scrubs are antimicrobial of the same type sold in the United States.  FIGS has produced no evidence as to the number or type of scrubs allegedly donated in their one-for-one donation scheme.  On information and belief, FIGS has not donated one set of the same scrubs for every set of scrubs sold.  Rather, FIGS has donated, if at all, lower cost scrubs that are different than the scrubs consumers are purchasing in the United States. These misrepresentations regarding donations are part of FIGS's broader plan to deceive the public into believing that FIGS and FIGS scrubs are special, when they are not special.  FIGS is making these misrepresentations—both

**THIRD AMENDED COMPLAINT**

as to the amount and the type of scrubs—to increase attention, increase press, increase search rankings, increase sales, increase price, and attract investors.

14.     SPI has been harmed by FIGS's false advertising as FIGS has acquired market share at the expense of SPI due to FIGS's false advertising, thus costing SPI revenues and profits it should have earned.

## THE PARTIES

15.     At all times mentioned herein, Plaintiff was, and now is a resident of California, with a principal place of business at 9800 De Soto Avenue, Chatsworth, California.

16.     SPI was established in 1995 and is the leader in the design, manufacture and distribution of high-quality, fashion-inspired medical apparel, medical footwear, medical accessories and school uniforms, with products sold through uniform shops, Internet retailers, specialty catalogs and mass-market retailers.  As set forth above, Plaintiff manufactures and sells competing antimicrobial medical scrubs, lab coats, and other garments for use in the medical health profession.  The SPI products that are relevant here include medical apparel. SPI designs, manufactures and distributes under the Cherokee®, Dickies®, HeartSoul, Elle, Code Happy®, Scrubstar, and Disney® Brands.

17.     FIGS, Inc. is an online medical apparel retailer based in Los Angeles, California, and founded in 2012. The company sells scrubs in a variety of colors and styles.  Hasson and Spear serve as co-CEOs of FIGS.

18.     On information and belief, Spear and Hasson are both residents of Los Angeles, California. On information and belief, FIGS is a Delaware corporation with a principal place of business located at 11390 West Olympic Boulevard, Studio 280, Los Angeles, CA 90064.

**THIRD AMENDED COMPLAINT**

## **JURISDICTION AND VENUE**

19.     This Court has personal jurisdiction over Defendants because Defendants have extensive contacts with, and conducts business within, the State of California and this judicial district, specifically including selling FIGS Products online and in one or more brick-and-mortar locations within the state of California. Further, on information and belief, Defendants Spear and Hasson are residents of California and reside within this judicial district.

20.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 over Plaintiff's First Cause of Action for violations of 15 U.S.C. § 1125(a), the Lanham Act.

21.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1338 & 1367 over Plaintiff's remaining causes of action, as the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts under Article III of the United States Constitution.

22.     This Court has personal jurisdiction over Defendants because Defendants' principal place of business is in, has extensive contacts with, and conducts business within, the State of California and this judicial district. Further, Defendants have made false and/or misleading statements in its advertising in this district, thereby harming consumers, as well as competitors such as Plaintiff, in this district, and thereby causing injury to Plaintiff in this judicial district.

23.     Venue is proper in this Court because a substantial part of the events giving rise to the claims herein occurred in this district. Defendants made false and/or misleading statements in its advertising in this venue thereby harming consumers, as well as competitors such as Plaintiff, in this venue.  Venue is further appropriate in this Court because Plaintiff's principal place of business is located within this judicial district. 28 U.S.C. § 1391(c). Further still, venue is proper in

**THIRD AMENDED COMPLAINT**

1    this Court because this Court has personal jurisdiction over Defendant. 28 U.S.C.

2    § 1391(b).

3         24.     Further, Defendants intentionally made its untrue and misleading

4    statements to consumers in this district, thereby harming competitors such as

5    Plaintiff in this district, and thereby causing injury to Plaintiff in this judicial

6    district.

7         25.     Venue is proper in this Court because a substantial part of the events

8    giving rise to the claims herein occurred in this district.  Defendants intentionally

9    made false and misleading statements to consumers in this venue, thereby harming

10   competitors such as Plaintiff in this district, and thereby causing injury to Plaintiff

11   in this district.

## CLAIMS COMMON TO ALL COUNTS

### FIGS's Unscrupulous Beginning

14        26.     The medical apparel industry is a multi-billion-dollar industry—

15   approximately $1.5 to 1.7 billion at retail—comprising sales of scrubs, lab coats,

16   and related apparel each year.  Spear decided to enter the medical apparel market

17   while employed at Blackstone.  On information and belief, while employed at

18   Blackstone, Spear improperly obtained information regarding the scrubs industry

19   from Blackstone, in violation Blackstone's Code of Business Conduct and Ethics

20   applicable to its employees to prevent them from doing just what Ms. Spear did:

> Because all Confidential Information constitutes a valuable asset of the Firm, without the prior written consent of the Firm (which may be given or withheld in the Firm's sole discretion) or unless legally mandated, no employee or member of the Firm may, while he or she is employed by or associated with the Firm or at any time thereafter, <u>(a) disclose any Confidential Information to any person</u> except in furtherance of the business of the Firm, <u>(b) make any other use of any Confidential Information except in the business of the Firm</u> and in a

8

**THIRD AMENDED COMPLAINT**

manner which at all times is intended to serve the interests of the Firm. . . .

(Code of Business Conduct and Ethics, The Blackstone Group, L.P. , January 2014, available at https://www.sec.gov/Archives/edgar/data/1516212/000119312514385283/d799412dex99piv.htm, emphasis added.)

27.     Notwithstanding the above, Spear knowingly violated Blackstone's Code of Business Conduct and Ethics and admitted her wrongdoing publicly. Spear has stated publicly on multiple occasions that in advance of launching FIGS as a scrubs company with Hasson that she did so after acquiring a confidential report from her then-employer Blackstone.   Specifically, in the Miami Hustle Series podcast, entitled "042: The FIGS story – Trina Spear and making healthcare more comfortable for everyone," Spear claimed that while at Blackstone, "we were looking to acquire the largest company in the industry, so I had sent Heather the like 300-page report that I had worked on, and she was like 'what is this, how do you have this?' So it was very fascinating for her to see, you know, a lot of information about the market and the players"   This podcast was originally available at https://www.stitcher.com/podcast/fretzie-3/miami-hustle-series/e/48007776?autoplay=true.)  Since this litigation commenced, this podcast is no longer available at that location.   A true and correct copy of this podcast is available through counsel for SPI at https://mrllp.sharefile.com/d-sa7f4c4e06f44a90a.   Spear's admission in the interview occurs at approximately the 5:35 to 6:25 mark of the podcast.

28.     On information and belief that the "largest company in the industry" that Spear was referring to was SPI, and that the 300-page report also related to SPI.

29.     Further , Spear stated in an interview with Refresh Miami on April 8, 2018 that she sent "super confidential" Blackstone materials to Hasson in violation

**THIRD AMENDED COMPLAINT**

of Blackstone's Code of Business Conduct and Ethics.  Specifically, Spear stated in a YouTube video of that interview as follows:

> "I'm in New York, was working at Blackstone.  I did a private equity deal in the medical apparel space. Random.  Sent her [Hasson] all the materials I'd worked on.   That can't leave this room.   They are super confidential.  I will end up somewhere, so, everyone do not Tweet about that . . .  So, we talked on a Monday. Fly out to LA on a Friday.  We start working together. Spent about 6 months.  Wait until I get my bonus at Blackstone.  Liquidate my 401(k).  Move to LA.  Put all my money into the business."

This interview was originally available at https://www.youtube.com/watch?v=OfqPiOn7uBI.   Since this litigation commenced, this podcast is no longer available at that location.  A true and correct copy of this podcast is available through counsel for SPI at https://mrllp.sharefile.com/d-sa7f4c4e06f44a90a.  Spear's admissions in the April 8, 2018 video appear at approximately the 17:50 mark and continue until the 18:50 mark in the interview.

30.   On information and belief, the data obtained by Spear from Blackstone included information, knowledge, facts, and concepts related to the medical apparel industry, namely scrubs (the "Blackstone Information").   On information and belief, Plaintiff believes this was SPI's confidential information and data because Blackstone was in possession of that information at the time.

31.   SPI is informed and believes that the "deal in the medical apparel space" related to a deal involving SPI and Blackstone.

32.   Spear's comments above indicate her awareness and understanding of both Blackstone's Code of Business Conduct and Ethics and her duty of confidentiality to Blackstone.

33.   On information and belief, FIGS, including Spear and Hasson, used

10

**THIRD AMENDED COMPLAINT**

the information they wrongfully obtained from Blackstone to allow FIGS to unfairly compete against Plaintiff and others in the industry, including raising millions of dollars in funding. Specifically, on information and belief, Spear used the information to false present herself as an expert in the industry to gain credibility with investors and raise capital.

## FIGS's False and Misleading Statements

34.     A major concern in the medical health profession is the prevention of the transmission of infectious diseases. Healthcare workers are occupationally exposed to infectious diseases during the performance of their duties. According to the United States Department of Labor, one of the primary routes of transmission in healthcare settings is through contact—both direct and indirect—which involves the transfer of infectious agents from the infected individual through physical contact. (www.osha.gov/SLTC/healthcarefacilities/infectious_diseases.html, last visited January 24, 2019 [TCF].)

35.     Healthcare workers and others in the medical health profession are active participants in the efforts to prevent the transmission of infectious agents. The Department of Labor's Occupational Safety and Health Administration ("OSHA") has several standards and directives that "are directly applicable to protecting workers against transmission of infectious agents." (www.osha.gov/SLTC/healthcarefacilities/infectious_diseases.html, last visited January 24, 2019 [TCF].) Similarly, the Centers for Disease Control and Prevention's Healthcare Infection Control Practices Advisory Committee ("HICPAC") has guidelines that detail routine day-to-day infection control measures, which "focuses primarily on interactions between patients and healthcare providers." (www.cdc.gov/hicpac/pdf/isolation/Isolation2007.pdf, last visited January 24, 2019 [TCF].) The purpose of these guidelines, in combination with others, is to "provide comprehensive guidance on the primary infection

control measures for ensuring a safe environment for patients and healthcare personnel." (*Id.*)

36.    The HICPAC guidelines note that indirect and direct contact are the most common modes of transmission of infectious agents, and that "[c]lothing, uniforms, laboratory coats or isolation gowns used as personal protective equipment (PPE), may become contaminated with potential pathogens after care of a patient colonized or infected with an infectious agent [ ]." (*Id.*)  The guidelines further note that "[a]lthough contaminated clothing has not been implicated directly in transmission, the potential exists for soiled garments to transfer infectious agents to successive patients." (*Id.*)

37.    The CDC guidelines specifically stress that the "prevention and control of [multi-drug resistant organisms] is a national priority." (*Id.*)

38.    FIGS advertises and promotes its FIGS Products online, through its product website at www.wearfigs.com.  FIGS also advertises its FIGS Products online through social media websites, including Instagram®, Facebook®, Twitter® and through other social media avenues.  Additionally, FIGS advertises in physical locations such as on billboards, bus shelters, and subways.

39.    FIGS has distributed and continues to distribute advertisements and promotions that contain false and misleading statements about the qualities and properties of its FIGS Products through, at least, its own websites and social media accounts.  Due to the nature of the Internet, this distribution constitutes interstate commerce.

40.    FIGS sells its products online through its own website, and through online retailers.  Due to the nature of the Internet, these sales constitute interstate commerce.

41.    On information and belief, FIGS has charged and is charging a premium price for its FIGS Products based on its false and misleading statements.

42.     Many healthcare workers wear medical scrubs as part of their daily work uniform.  The claims made by FIGS, including that the FIGS Products reduce hospital acquired infections("HAIs") by 66% deceive, or have a tendency to deceive, a substantial segment of consumers of the FIGS Products.  This deception is material in that it concerns the qualities and properties of this FIGS Products.  FIGS leveraged these claims to garner immense amounts of media and press and that press drove up FIGS's brand in search rankings.  Due to the serious concerns over preventing the transmission of infection diseases, Defendant FIGS's false and misleading statements are likely to influence the purchasing decisions of consumers, particularly healthcare workers and others in the medical health profession who actively seek to reduce the transmission of infectious agents.

43.     On information and belief, FIGS has purchased search terms for "Cherokee," "Dickies," "Scrubs," "Uniforms," among others.

44.     FIGS, through Spear and Hasson, made false statements regarding the antimicrobial properties of Defendants' FIGS Products through FIGS's social media or to traditional media outlets.  Alternatively, FIGS, through Spear and Hasson made false statements regarding the properties and qualities of the FIGS Products through brand partnerships with media outlets, medical referral sources, direct advertisers, advertisements, and/or social media influencers to repeat those false statements, which FIGS knew would be disseminated to consumers.

45.     FIGS has made and continues to make the false and misleading health claim that its FIGS Products will protect healthcare workers and their patients from dangerous contaminants. One such claim FIGS has made is the statement that "FIGS antimicrobial fabric reduces hospital acquired infection rates by 66%."  The claim is false and misleading, yet FIGS has been making the claim for years:

a.    From at least as early as September 2013 through February 2015, FIGS's website (wearfigs.com) included the statement

that: "Many medical professionals in impoverished areas are poorly compensated for their hard work and dedication. They simply do not have enough money for costly medical uniforms. Without the proper medical attire, the spreading of disease and illness increases exponentially. **Clean scrubs reduce the hospital-acquired infection rate by 66%** and result in millions of dollars saved from unnecessary treatments."

b.   From at least as early as April 2015 through January 2017, FIGS's website (http://www.wearfigs.com/pages/threads-for-threads) included the statement that: "Many medical professionals in resource-poor areas do not have access to basic medical supplies including scrubs. **Clean scrubs reduce hospital-acquired infection rates by 66%.**"

c.   From at least as early as May 2018 through February 2019, FIGS's website (https://www.wearfigs.com/pages/threads-for-threads) included the statement that "**FIGS antimicrobial fabric reduces hospital acquired infection rates by 66%.**"

46.   On information and belief, FIGS does not have a study that supports a claim that its antimicrobial fabric/scrubs can reduce HAIs by 66% or any similar claim.

47.   Plaintiff is informed and believe that Defendants, and each of them, knew, or should have known, that the statement regarding this health statement concerning the FIGS Products was false and/or misleading.

14

**THIRD AMENDED COMPLAINT**

48.     Plaintiff has performed testing that contradicts Defendants' statement that "FIGS antimicrobial fabric reduces hospital acquired infection rates by 66%." FIGS's statement is false, misleading, and likely to confuse consumers.

49.     Furthermore, contrary to Defendants' statements, the fabric used in the FIGS Products does not pass tests related to the effectiveness of a fluid barrier according to what FIGS claims is present in the FIGS Products.

50.     Based on the above, Spear's statement in an article published on November 3, 2015 regarding the properties and qualities of the FIGS Products is false and misleading.  In that article in the Miami Herald, Spear stated:

> We were the first company to develop an anti-microbial treatment so that bacteria and infection and fluids aren't seeping through and harming the medical professional. That was important to us," Spear said. "our fabric is stain-repellent and has moisture wicking abilities."

51.     Furthermore, FIGS was not the first company to develop antimicrobial treatments for fabric or for scrubs.  Nor was FIGS the first company to use fluid barrier technology in scrubs.

52.     On information and belief, Defendants, and each of them, knew or should have known that the FIGS Products did not reduce HAIs by 66%.  FIGS's claims about a reduction in HAIs constitute health claims.

53.     An image of one of FIGS's advertising statements, as of January 8, 2019, is as follows:

//

**THIRD AMENDED COMPLAINT**

**Figure 1** - (https://www.wearfigs.com/pages/threads-for-threads, last visited 1/8/2019 [TCF].)

54.     FIGS has made and/or continues to make other misleading claims regarding its FIGS Products, such as the claim FIGS reported on its blog that "We [FIGS] have donated over 90,000 sets of scrubs in 26 countries <u>and have reduced the hospital acquired infection rate by 66% in the areas we have donated to</u>." (*See* https://www.wearfigs.com/blogs/news/why-i-took-on-the-medical-apparel-industry.)

55.     FIGS has made varying claims regarding the number of scrubs it has donated.  At one point, FIGS has claimed to have donated 500,000 sets of scrubs. On information and belief, FIGS's claim to have donated hundreds of thousands of scrubs is false.  On information and belief, FIGS has overstated this number to garner media attention and press.

56.     On information and belief, FIGS's claim to donate one set of scrubs for every set of scrubs purchased is false.  On information and belief, FIGS has overstated this number to garner media attention and press.  On information and belief, FIGS has not donated one set of the same scrubs for every set of scrubs sold.  Rather, FIGS has donated, if at all, lower cost scrubs that are different than the scrubs consumers are purchasing in the United States.  FIGS is making these

false and misleading statements in their advertising to lead consumers to believe that FIGS is donating the same type of scrubs as the consumer is purchasing to gain consumer sales and divert market share to FIGS and away from competitors.

57.     The hangtag on FIGS's products, reproduced below, further includes the language that it is "ANTIMICROBIAL: Kills bacteria and infection immediately on contact." This language is a health claim. On information and belief, FIGS does not have a study to support this health claim. On information and belief, FIGS has knowingly violated EPA regulations regarding this health claim.



**Figure 2 - "FIGS hangtag" stating that the product is "Antimicrobial" and "Kills bacteria and infection immediately on contact."**

58.     Plaintiff knows of testing done on the FIGS Products that shows bacteria is not killed upon contact with the product or even up to 90 minutes after

contact.  Thus, FIGS's claim that the FIGS Products "kill[s] bacteria and infection immediately on contact" is false.

59.     Despite the falsity and lack of support for FIGS's misrepresentations regarding the FIGS Products' properties and qualities, these misrepresentations have been repeated by the blog "Nurse Abnormalities."

60.     Specifically, the Nurse Abnormalities blog states:

> FIGS is not your average scrub company. For every pair of scrubs sold, they provide a pair to healthcare providers in need. Many medical professionals in high-needs areas do not have clean scrubs. **Clean scrubs can reduce hospital-acquired infections by 66%** – this is a company with a mission larger than providing great looking scrubs.

(http://nurseabnormalities.com/2017/08/01/a-love-affair-for-figs-scrubs/.) (Emphasis added.)

61.     This article demonstrates that FIGS's false and misleading statements are being disseminated to potential purchasers of the FIGS Products.  Specifically, this blog repeats the unsupported assertion that the FIGS Products reduce HAIs by 66%.

62.     FIGS's representations regarding the FIGS Products' properties and qualities have also been repeated by the website Nurse.org.  Specifically, this website touts FIGS's scrubs saying "Did you know there are healthcare providers worldwide that have never owned a pair of scrubs? That's why Figs developed their Threads for Threads Initiative - helping to outfit healthcare workers in need and reduce hospital-acquired infection by 66%."  (https://nurse.org/articles/figs-scrubs-men-and-women-review-discount-coupon/.)

**THIRD AMENDED COMPLAINT**

63.     The article further states:

> *By Angelina Gibson, Nurse.org Staff Writer*
>
> Figs scrubs are making big changes to the technology, comfort, and design of medical scrubs. These ain't yo' grandma's scrubs - no more boxy, saggy, germ-infested scrubs.
>
> With wrinkle resistant, pre-shrunk and odor-control material you'll look and feel your best. On top of that, Figs scrubs help nurses to deliver optimal patient care by reducing hospital-acquired infection through their 100% antimicrobial fabric.
>
> Their scrub fabric is literally made of silver - one the leading antimicrobial agents since ancient times.

**Figure 3 – Nurse.org article**.

64.     On information and belief, the Nurse.org operates as a referral website that receives a commission for each referral and/or sale generated from articles on a given brand.   On information and belief, FIGS paid Nurse.org for referrals generated by Nurse.org's.

65.     The above incidents represent only a fraction of the false and misleading statements made or disseminated by FIGS related to the FIGS Products. On information and belief, FIGS has engaged in similar behavior using additional social media influencers and platforms.

66.     FIGS's assertion that the FIGS Products reduce HAIs by 66% or that the FIGS Products kill bacteria and infection immediately on contact is false and misleading.   Testing of FIGS's Products has demonstrated that the FIGS Products do not kill bacteria and infection immediately on contact.

67.     Furthermore, the statements made in the above article that FIGS's fabric is 100% antimicrobial and that the fabric is literally made of silver is false and misleading.   The falsity of FIGS's statements have been shown through testing that Plaintiff is aware of.

68.     On information and belief, FIGS, and specifically Spear and Hasson, knew that FIGS did not have a basis to assert that the FIGS Products reduce HAIs

**THIRD AMENDED COMPLAINT**

by 66%, kills bacteria and infection immediately on contact, and are literally made of silver.

69.    FIGS has made statements, bought advertisements, and disseminated information across a variety of platforms and media pushing variations of its claim that the FIGS's Products and/or its fabric treatments reduce HAIs either knowing that such statements are false or misleading, or with a reckless disregard for whether those statements are false or misleading.

70.    On information and belief, FIGS's misrepresentations that "FIGS antimicrobial fabric reduces hospital acquired infection rates by 66%" or "kills bacteria and infection immediately on contact" (which are health claims) are not supported by competent and reliable scientific data.

71.    Hereinafter, the false and misleading statements set forth above, made by FIGS including (1) that the FIGS Products reduce HAIs by 66%; (2) that the FIGS Products kill bacteria and infection immediately on contact; (3) that the FIGS Products have reduced HAIs by 66% in all of the areas where FIGS has donated scrubs; (4) that the FIGS Products' fabric is 100% antimicrobial and literally made of silver; (5) that the FIGS Products contain an effective fluid barrier; and (6) FIGS donated a like scrub for every scrub consumers purchased (amounting to tens of thousands, if not hundreds of thousands, of donations) will be collectively referred to as "FIGS's False and/or Misleading Claims."

**Testing Done Showing FIGS's Statements Are False**

72.    As stated above, Plaintiff is aware of testing that shows FIGS's False or Misleading Claims are indeed false.  This testing was performed by an independent consultant, Skip Palenik ("Palenik"), who works for Microtrace LLC located in Elgin, Illinois.  Palenik received a Bachelor of Science in Chemistry at the University of Illinois at Chicago.  Palenik founded Microtrace LLC in 1992. He is affiliated with several relevant organizations, has taught courses on

20
**THIRD AMENDED COMPLAINT**

chemistry and microscopy, has received many research grants, authored over a dozen articles on relevant subject matter, and presented over 200 papers at professional meetings and seminars.

73.   Microtrace purchased a set of FIGS scrubs from www.wearfigs.com on April 9, 2019.  Between April 18, 2019 and May 1, 2019, Palenik performed tests on the FIGS scrubs' top to determine if FIGS's claims were true.  The hang tag said that the FIGS's scrubs were antimicrobial and killed bacteria and infection immediately on contact.

74.   Palenik performed testing to evaluate if the FIGS scrubs killed bacteria on contact as FIGS claimed.  Initially, Palenik examined the FIGS scrubs' top's fabric using a field emission SEM-EDS (scanning electron microscopy and energy dispersive x-ray spectroscopy).

75.   Using SEM-EDS, a bulk elemental analysis of the FIGS scrubs' fabric showed no detectable levels of silver.  The fabric was then analyzed using a trace element analysis technique, by means of x-ray fluorescence microspectroscopy (μXRF) which also did not detect silver in the fabric.  These screening methods have detection limits on the orders of ~0.1 wt.-% and 0.00001 wt.-% (~10 ppm) respectively.  Finally, the fabric was examined at high magnifications in the SEM and targeted elemental analysis of individual particles was conducted on the surface of the fabric to screen for silver.  Using this targeted approach, a few particles of silver were detected on the FIGS scrubs' fabric.  Thus, not only was the FIGS scrubs' top not literally made of silver as FIGS claimed, but it hardly contained any silver at all.

76.   Palenik then performed a test to determine how quickly the antimicrobial killed bacteria (if it did at all).  Palenik put three types of bacteria on the FIGS scrubs' top's fibers.  After placing the bacteria on the fibers, Palenik mounted the fibers in a fluorescently tagged viability stain and examined the fibers

**THIRD AMENDED COMPLAINT**

using a fluorescence microscope.  The bacteria were examined in the viability stain to determine if they were dying as a result of being in contact with the fibers from the FIGS scrubs.

77.     Palenik discovered that 10 minutes after the bacteria contacted the fibers all the bacteria were still alive.  Palenik then tested whether the bacteria remained alive after a longer period of time.  After 255 minutes, only one of the hundreds of bacteria cells placed on the fibers died.  Indeed, when the testing was extended to 24 hours after contact (performed by placing fibers directly into bacterial colonies growing in agar on a Petri dish), the size of the bacterial colonies actually increased, indicating the bacteria continued to grow and multiply and were unaffected by the FIGS scrubs' fabric.  Thus, Palenik's testing showed that the FIGS scrubs' top did not kill bacteria upon contact as claimed by FIGS on the product's hang tag and other advertisements.  Because the FIGS scrubs' top did not kill bacteria on contact (and did not even kill bacteria after a 24-hour period) Palenik's testing also showed that the FIGS scrubs' top is not 100% antimicrobial (or antimicrobial at all).

78.     Palenik also tested to see whether FIGS's claim that its scrubs possess an effective fluid barrier was true.  He concluded it was not true.  Palenik tested the FIGS scrubs' top via the AATCC Test Method 22-2014, Water Repellency: Spray Test.  The FIGS scrubs' fabric consistently scored a 0 on this test meaning that any fluid barrier that the FIGS scrubs' top's fabric possessed had minimal to no effect on water repellency.  There were no properties of the FIGS scrubs' top found during Palenik's analyses that would provide fluid barrier protection.

79.     Palenik's testing, as described above, also leads to a conclusion that FIGS's claims regarding its scrubs purported ability to reduce HAIs by 66%, including in all areas where FIGS has donated scrubs, are also false.  Since Palenik's testing showed that the FIGS scrubs' top did not kill bacteria on contact

**THIRD AMENDED COMPLAINT**

(or even after a 24-hour period of constant exposure) and that the FIGS scrubs' top did not provide fluid barrier protection, the FIGS scrubs' top could not have the ability to reduce HAIs by 66% (or likely by any percentage).  Palenik is unaware of any publicly available scientific study that FIGS could be relying on that could support its claims that its scrubs reduce HAIs by 66%.  Thus, based on his testing, Palenik believes that FIGS's claims that its scrubs reduce HAIs by 66% is false.

80.     In sum, Palenik's examination of the FIGS scrubs' top showed that all of FIGS's False or Misleading Claims (as defined in paragraph 61) are false.

### FIGS Has Caused Injury to Consumers

81.     Healthcare workers and others in the medical health profession who are actual and potential consumers of scrubs and healthcare apparel are and have been misled by FIGS's False or Misleading Claims.

82.     On information and belief, consumers in the healthcare industry, namely purchasers of scrubs and healthcare apparel, including but not limited to those individuals that may come in contact with bodily fluids during their workday, make purchasing decisions based on statements made by companies regarding the properties and qualities of the products, including whether such properties and qualities may make them and their patients safer.

83.     On information and belief, consumers have been substantially injured by FIGS's False or Misleading Claims: (a) in the form of paying a premium for the FIGS Products and (b) by exposing and endangering said consumers to a false sense of protection from HAIs, thus jeopardizing the health and safety of these consumers and their patients.

84.     FIGS omitted material facts when it failed to include key facts regarding the scope and truthfulness of its claims regarding the properties and qualities of the FIGS Products.

85.    FIGS omitted key facts from its website, advertising, and promotions. FIGS had exclusive knowledge of material facts not known or reasonably accessible to consumers or to the Plaintiff regarding the properties and qualities of the FIGS Products.

86.    If consumers had known of these non-disclosed facts (as well as the falsity of FIGS's statements) they would have behaved differently and likely not have bought the FIGS Products (especially at a higher price) when the FIGS Products do not provide the properties and qualities claimed. Furthermore, the consumers likely would have acted differently in regard to taking standard safety precautions. Additionally, if these non-disclosed facts were known, FIGS would not have received the press coverage and media attention that it did.

87.    On information and belief, the reasonable consumer buying scrubs would find FIGS's False or Misleading Claims to be material, including FIGS's misrepresentations that the FIGS Products are able to reduce HAIs by 66% or able to kill bacteria and infection immediately on contact.

88.    The injuries to consumers discussed above are the types of injury that consumers could not have reasonably avoided since they were unaware that the statements FIGS made were false and misleading.

89.    FIGS's strategy of pressing the "antimicrobial" aspects of its scrubs is based on fear and seeks to exploit its consumers. Thousands of people have died over the years from SARS in 2002-03, to the N1H1 pandemic in 2009, to the threat of Ebola in Africa from 2013 to the present, or to the current global pandemic of the COVID-19 coronavirus, FIGS's marketing strategy is based on fear. But rather than actually help purchasers of its scrubs, FIGS has overpromised and underdelivered and put its customers in danger as a result.

90.    Furthermore, without injunctive relief from this Court, consumers will continue to suffer the injuries, including a threat to their health and safety (as well

**THIRD AMENDED COMPLAINT**

as the health and safety of their patients).  Healthcare workers need to be able to rely on the representations of companies providing products that claim to protect their health—especially in this time of the COVID-19 coronavirus pandemic. When a company states that a piece of clothing is antimicrobial and kills bacteria upon contact, healthcare workers need to be able to rely upon that statement.

### FIGS Has Caused Injury to Plaintiff

91.    By engaging in the wrongful conduct alleged herein, including the dissemination of FIGS's False or Misleading Claims, FIGS has diverted consumers away from competitors like Plaintiff to FIGS.  Specifically, Plaintiff has lost sales and a share of the market to FIGS because of FIGS's False or Misleading Claim. Thus, Plaintiff has suffered an injury in fact in the form of lost sales and profits due to FIGS's improper actions.

92.    Additionally, FIGS's False or Misleading Claims has tainted the reputation and marketability of its competitors' products, including Plaintiff's, as consumers have been led to believe that the FIGS Products contain superior qualities and properties to that of its competitors.  Any belief by the consuming public that SPI's products are inferior to the FIGS's Products is untrue.  Thus, FIGS's False or Misleading Claims are causing immediate and irreparable injury to Plaintiff, including injury to Plaintiff's business, reputation, and goodwill.

93.    FIGS is taking sales away from scrubs companies that are following the rules and not making false and misleading statements about their scrubs— including statements that are contrary to EPA guidelines.  The perceived value in scrubs that will protect the wearer is even more apparent in light of the current COVID-19 coronavirus pandemic.  In addition to the very real danger to the professional that buys scrubs believing it will protect them—as represented by FIGS—is the unfair diversion of sales away from competitors who are responsibly following the rules.

**THIRD AMENDED COMPLAINT**

94.     Plaintiff has lost revenue, and will continue losing revenue, as consumers purchase the FIGS's Products instead of SPI's products due to FIGS's False or Misleading Claims.

95.     Furthermore, FIGS's wrongful conduct has also allowed it to raise millions of dollars in funding which has enabled it to disseminate its false advertising more profusely.

96.     Furthermore, on information and belief, FIGS wrongfully has used, and is using SPI's confidential information and data taken without permission from Blackstone by Spear.   Thus, FIGS has improperly used SPI's resources and knowledge to compete against SPI.

97.     Without injunctive relief from this Court, Plaintiff will continue to suffer injury in the form of lost sales, lost market share, loss of goodwill, and harm to its reputation all because of Defendants' actions.

## FIRST CAUSE OF ACTION

### False Advertising in Violation of 15 U.S.C. § 1125(a)

### (As to Defendant FIGS, Inc.)

98.     Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

99.     The acts of Defendant FIGS as set forth above and below, including the advertising and dissemination of FIGS's False or Misleading Claims, constitute false advertising in violation of the 15 U.S.C. § 1125(a).   As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, damages in an amount to be determined at trial.   Further, Defendant has caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to Plaintiff's business, reputation and goodwill, for which there is no adequate remedy at law.   Plaintiff is therefore entitled to an injunction under 15 U.S.C.

**THIRD AMENDED COMPLAINT**

§ 1116 restraining Defendant from engaging in future acts of false advertising and ordering removal of all of Defendant's false advertisements.

100.   The acts of Defendant as set forth above and below constitute false or misleading representations of fact in commercial advertising or promotion, in interstate commerce in connection with goods or services, where Defendant's representations misrepresent the nature and/or qualities of Defendant's goods, and Plaintiff has been damaged and is likely to be damaged in the future by Defendant's acts.

101.   The acts of Defendant as set forth above and below, particularly Defendant's false and misleading misrepresentations, caused commercial injury to Plaintiff, such injury harming Plaintiff's ability to compete with the Defendant.

102.   The acts of Defendant as set forth above and below, particularly Defendant's false and misleading misrepresentations in its commercial advertising and promotion of its FIGS Products, are the proximate cause of Plaintiff's injury. Defendant's acts deceived consumers which caused those consumers to withhold trade from Plaintiff.

103.   Pursuant to 15 U.S.C. § 1117, Plaintiff is further entitled to recover from Defendant the damages sustained by Plaintiff because of Defendant's acts in violation of 15 U.S.C. 1125(a).  As a result of the acts complained herein, Plaintiff has suffered damages in excess of this Court's minimum jurisdiction, the precise amount of which will be proven at trial.

104.   Pursuant to 15 U.S.C. § 1117, Plaintiff is further entitled to recover from Defendant the gains, profits, and advantages that Defendant has obtained because of Defendant's acts in violation of 15 U.S.C. § 1125(a), the precise amount of which will be proven at trial.

105.   Pursuant to 15 U.S.C. § 1117, Plaintiff is further entitled to recover the costs of this actions.  Moreover, Defendant's conduct was undertaken willfully

and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Plaintiff to recover additional damages, up to three times the amount of actual damages, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Unfair Business Practices

### in Violation of CAL. BUS. & PROF. CODE § 17200

### (As to FIGS, Inc.)

106.   Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

107.   The acts of Defendants as set forth above and below constitute unfair, unlawful, and/or fraudulent business practices in violation of California Business and Professions Code § 17200.

108.   Defendants' actions described herein constitute unfair business practices as Defendants have made false and misleading misrepresentations about its FIGS Products.  Defendants' actions described herein have injured Plaintiff and others in the marketplace because they have competed using false advertising, thus unfairly acquiring customers through unfair means.

109.   For example, products treated with an antimicrobial agent that make public health claims must be registered with the Environmental Protection Agency ("EPA") to make those claims.  *See* EPA guidelines from Pesticide Notice (PR) 2000-1, Applicability of the Treated Articles Exemption to Antimicrobial Pesticides; *see also* 40 C.F.R. 152, *et seq*.

110.   The EPA provides an exemption from registration for products that contain an antimicrobial agent where the agent is solely included to protect the product from bacteria that cause odor or degrade the product.

111.   However, FIGS claims that its antimicrobial agent does more than protect the product from odor of degradation, so FIGS needed to register its

**THIRD AMENDED COMPLAINT**

products with the EPA.  On information and belief, FIGS has not registered its products with the EPA.

112.   Defendants' actions described herein constitute unlawful business practices, for at least the following violations (listed in paragraphs 101-109 below).

113.   As set forth herein, FIGS has competed unlawfully for purposes of this cause of action on the basis that FIGS has violated 15 U.S.C. § 1125, which prohibits false advertising.

114.   The Federal Trade Commission ("FTC") requires all health claims be supported by "competent and reliable scientific data."  (15 U.S.C. § 45, *et seq*.)  Further, the FTC requires Defendants to be responsible for both express and implied health claims.  Because FIGS's health claims are not supported by "competent and reliable scientific data" FIGS has competed unlawfully for purposes of this cause of action by violating 15 U.S.C. § 45.

115.   Additionally, FIGS needed to register its products with the California Department of Pesticide Regulation ("DPR") because of its health claims.  On information and belief, FIGS has not registered its products with the state of California.

116.   As set forth herein, FIGS has competed unlawfully for purposes of this cause of action on the basis that FIGS has violated 7 U.S.C. §§ 136, *et seq.,* which requires registration of pesticides.

117.   As set forth herein, FIGS has competed unlawfully for purposes of this cause of action on the basis that FIGS has violated 15 U.S.C. § 52, which prohibits the dissemination of false advertisements.

118.   As set forth herein, FIGS has competed unlawfully for purposes of this cause of action on the basis that FIGS has violated 16 C.F.R. §§ 255.0, *et seq*., which governs consumer, expert, and organizational endorsements and requirements related to disclosures of material connections.

**THIRD AMENDED COMPLAINT**

119.   As set forth herein, FIGS, on information and belief, has failed to register its products with the EPA and has violated 40 C.F.R. § 152, *et seq.*

120.   As set forth herein, FIGS has competed unlawfully for purposes of this cause of action on the basis that FIGS has violated Cal. Code of Regulations § 6147, *et seq.*, which requires registration of pesticide products.

121.   On information and belief, and as set forth herein, FIGS has competed unlawfully with SPI by taking and using SPI's confidential information.

122.   Defendants' actions described herein also constitute fraudulent business practices.  Specifically, Defendants' statements about the properties and abilities of Defendants' FIGS Products were false and misleading, and Defendant knew its claims were false and misleading.

123.   FIGS has deceived members of the public in believing that Defendants' FIGS Products will reduce HAIs by 66% or that they kill bacteria on contact.   Specifically, Defendants have made multiple statements through its website, advertising, and promotions directly and indirectly through social media influencers that tout these qualities of Defendants' FIGS Products.  Testing reveals these statements are false.

124.   Defendants' actions constituted a fraudulent misrepresentation that directly resulted in injury to Plaintiff, consumers, and others.  Consumers relied on Defendants' misrepresentations regarding the properties of Defendants' FIGS Products when purchasing those goods to those consumers harm, and the harm of Plaintiff who lost these sales because of Defendants' false and misleading statements.

125.   Defendants' actions resulted in substantial injury to both the Plaintiff and consumers, wherein that injury is not outweighed by any countervailing benefits to consumers or to competition, and, is not an injury that consumers themselves could reasonably have avoided.

**THIRD AMENDED COMPLAINT**

126. As a result of Defendants' actions, consumers will continue to be deceived and purchase FIGS Products when the FIGS Products do not contain the qualities and properties that the consumers are paying for, and consumers will further be endangered by purchasing FIGS Products because Defendants make false and misleading claims about those FIGS Products which relate to the consumers' health. Furthermore, FIGS's false and misleading claims endanger the health and safety of the patients that these consumers care for.

127. As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer injury to its business, reputation, and goodwill. Plaintiff has suffered an injury in fact as a direct result of the unfair competition of Defendants, including lost sales. Plaintiff has also incurred certain costs because of Defendants' unfair competition.

128. Defendants have derived and received, and will continue to derive and receive, gains, profits, and advantages from Defendants' unfair, unlawful, and/or fraudulent business practices in an amount that will be proven at trial.

129. Furthermore, without injunctive relief from this Court, Defendants will continue to derive and receive, gains, profits, and advantages from consumers, and Plaintiff will continue to suffer injury in the form of lost sales, lost market share, and lost goodwill, because of Defendants' actions.

130. Additionally, if injunctive relief is not issued, the public at large will be deceived into purchasing FIGS's products, which could be harmful to the public's health due to the fact Defendant makes false and misleading statements about its FIGS's products ability to reduce hospital acquired infections.

131. As a result of Defendants' unfair, unlawful, and fraudulent business practices, Plaintiff is entitled to injunctive relief to prohibit Defendant from continuing to act in this manner.

132.   As a result of Defendants' unfair, unlawful, and fraudulent business practices, Plaintiff is entitled to restitution at an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**Unfair Business Practices**

**in Violation of CAL. BUS. & PROF. CODE § 17200**

**(As to All Defendants)**

133.   Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

134.   The acts of Defendants as set forth above and below constitute unfair, unlawful, and/or fraudulent business practices in violation of California Business and Professions Code § 17200.

135.   The actions of Defendant Spear in taking and disseminating Blackstone information, and thereafter the use of same by Defendants Spear, Hasson, and FIGS, was immoral, unethical, and/or unscrupulous and as such, constitutes a violation of Section 17200's "unfair" prong.

136.   Defendants have competed unfairly in the medical apparel industry by using information obtained in violation California Penal Code § 502 and California's public policy in favor of ensuring that private data is not intercepted. *See* Cal. Penal Code §§ 502; Cal. Const. art. 1, § 1 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possession, and protecting property, and pursuing and obtaining safety, happiness, and privacy.").

137.   Defendants' actions as pleaded herein (including Spear's taking of the information, and Hasson's use of the information) constituted unlawful business practices, specifically as to California Penal Code § 502.

138.   As set forth herein, Defendants have competed unlawfully because both Spear and Hasson have violated California Penal Code § 502, which prohibits unauthorized access and use of computer systems and/or data.

139.   Spear knowingly accessed Blackstone's computer, computer system, or computer network, and without permission, took, copied, and made use of the Blackstone Information.   Subsequently, Hasson knowingly, and without permission, copied, and made use of the Blackstone Information.

140.   Spear wrongfully disseminated the Blackstone Information to Hasson for the purpose of both Spear and Hasson using the Blackstone Information to raise money and grow their medical apparel company.

141.   The Blackstone Information unlawfully obtained by Spear was sent directly to Hasson who was located in California at the time.  After transmission of the information, both Spear and Hasson used the information in California.

142.   Furthermore, without injunctive relief from this Court, Defendant will continue to derive and receive, gains, profits, and advantages from consumers, and Plaintiff will continue to suffer injury in the form of lost sales, lost market share, and lost goodwill, all as a result of Defendants' actions.

143.   As a result of Defendants' unfair, unlawful, and fraudulent business practices, Plaintiff is entitled to injunctive relief to prohibit Defendant from continuing to act in this manner.

144.   As a result of Defendants' unfair, unlawful, and fraudulent business practices, Plaintiff is entitled to restitution at an amount to be proven at trial.

**THIRD AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION

### Untrue and Misleading Advertising

### In Violation of CAL. BUS. & PROF. CODE §17500

### (As to FIGS, Inc.)

145. Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

146. The acts of Defendant as set forth above and below constitute untrue and misleading advertising in violation of California Business and Professions Code § 17500. As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer injury to its business, reputation, and goodwill.

147. Defendant knew or reasonably should have known that its False or Misleading Claims described above about its products would be disseminated by blogs and social media influencers.

148. The acts of Defendant as set forth above and below, including Defendant's False or Misleading Claims, constitute statements in advertising that are false and misleading, and Defendant knew, or by the exercise of reasonable care should have known, that the statements were false and misleading.

149. Defendant's False or Misleading Claims about the qualities and properties of its FIGS Products, including but not limited to Defendant's misrepresentation that FIGS Products reduce hospital acquired infections, are likely to deceive a reasonable consumer of medical scrubs into purchasing the medical scrubs.

150. At the time that Defendant made the statements about the qualities and properties of its FIGS Products, Defendant knew, or by the exercise of reasonable care, should have known that the statements were untrue or misleading.

151.   Defendant has derived and received, and will continue to derive and receive, gains, profits, and advantages from Defendant's untrue or misleading advertising in an amount to be proven at trial.

152.   Furthermore, without injunctive relief from this Court, Defendant will continue to derive and receive, gains, profits, and advantages from consumers by reason of said conduct, and Plaintiff will continue to suffer injury in the form of lost sales, lost market share, and lost goodwill, all because of Defendant's actions.

153.   Additionally, if injunctive relief is not issued, the public at large will be deceived into purchasing FIGS's products, which could be harmful to the public's health (including healthcare workers and the patients they care for) due to the fact Defendant makes false and misleading statements about the FIGS's Products properties and qualities, including the false statement that the FIGS's Products reduce HAIs by 66%.

154.   As a result of Defendant's false and misleading advertising, Plaintiff is entitled to injunctive relief to prohibit Defendant from continuing to act in this manner.

155.   As a result of Defendant's false and misleading advertising, Plaintiff is entitled to restitution at an amount to be proven at trial

### FIFTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Relations

### (As to All Defendants)

156.   Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

157.   SPI was in an economic relationship with its customers and its retailers/distributors.

158.   Defendants knew SPI was the largest medical apparel company in the country and that its wrongful actions would disrupt the economic relations between

**THIRD AMENDED COMPLAINT**

SPI and its retailers and distributors thereby causing great harm to SPI. Defendants also knew that its wrongful actions, including but not limited to FIGS's false/misleading claims and Spear's taking and using the Blackstone Information, would disrupt SPI's relationships with its customers by making it less likely the consuming public buy SPI products.

159.   Defendants' wrongful actions impacted the sale of SPI's products to the consuming public.  Furthermore, Defendants' wrongful actions impacted SPI's profitable relationships with its retailers/distributors, for example, resulting in SPI's retailers/distributors purchasing less products from SPI.

160.   Defendants intended to disrupt these relationships and/or knew that disruption was certain or substantially certain to occur by its wrongful actions.

161.   SPI's relationships with its end consumers has been disrupted.

162.   SPI has been harmed as a result of Defendants' interference.

163.   Defendants' conduct was a substantial factor in causing SPI's harm.

164.   Plaintiff has suffered damages by reason of the above in an amount in excess of the minimum jurisdiction of this court, to be proven at the time of trial.

165.   Defendants' conduct was undertaken with malice, oppression and/or fraud, and was willfully, maliciously and oppressively committed, warranting the imposition of punitive damages against Defendants for the reasons set forth herein. Plaintiff thus seeks punitive damages against Defendants for their willful, wanton and malicious behavior as set forth herein.

## SIXTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Relations
### (As to All Defendants)

166.   Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

**THIRD AMENDED COMPLAINT**

167.   SPI was in an economic relationship with its customers and its retailers/distributors.

168.   Defendants knew SPI was the largest medical apparel company in the country and knew, or should have known, that its wrongful actions would disrupt the economic relations between SPI and its retailers/distributors thereby causing great harm to SPI.  Defendants also knew, or should have known, that its wrongful actions, including but not limited to FIGS's false/misleading claims and Spear's taking and using the Blackstone Information, would impact SPI's relationships with end consumers by making it less likely the consuming public buy SPI products.

169.   Defendants' wrongful actions impacted the sale of SPI's products to the consuming public.  Furthermore, Defendants' wrongful actions impacted SPI's profitable relationships with its retailers/distributors, for example, resulting in SPI's retailers/distributors purchasing less products from SPI.

170.   Defendants knew, or should have known, that disruption was certain or substantially certain to occur by its wrongful actions.

171.   SPI's relationships with its customers and its retailers/distributors have been disrupted.

172.   SPI has been harmed as a result of Defendants' interference.

173.   Defendants' conduct was a substantial factor in causing SPI's harm.

174.   Plaintiff has suffered damages by reason of the above in an amount in excess of the minimum jurisdiction of this court, to be proven at the time of trial. Defendants' conduct was undertaken with malice, oppression and/or fraud, and was willfully, maliciously and oppressively committed, warranting the imposition of punitive damages against Defendants for the reasons set forth herein. Plaintiff thus seeks punitive damages against Defendants for their willful, wanton and malicious behavior as set forth herein.

**THIRD AMENDED COMPLAINT**

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (As to Trina Spear)

175.   Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

176.   Blackstone owed a fiduciary duty to SPI.

177.   On information and belief, Blackstone voluntarily accepted and assumed Plaintiff's confidence when it received Plaintiff's medical apparel space information and data.  As such, Blackstone and its employees had a duty to act with the utmost good faith in the best interests of Plaintiff and to hold SPI's information in the highest of confidence.

178.   Spear owed a fiduciary duty of loyalty to Blackstone.

179.   Spear owed a fiduciary duty of confidentiality to Blackstone.

180.   On information and belief, at all relevant times, Spear was acting as an agent and/or representative of Blackstone.

181.   Spear's actions, as a fiduciary and agent of Blackstone, breached the fiduciary duty owed by Blackstone to Plaintiff.

182.   Spear has substantial experience in investment banking and the business world to understand and know what a fiduciary duty is, and to whom she and her employers owed such duties.  Spear is a Harvard Business School alumna and has worked for Citi Bank as a Private Equity Associate and an Investment Banking Analyst, in addition to working investment firm Blackstone.

183.   On information and belief, at all relevant times, Spear knew and understood her duties, fiduciary duties, and obligations related to her receipt of SPI information and data, which she received in the highest degree of confidence.

184.   On information and belief, and based upon Spear's own admissions, Spear worked on a Blackstone deal for SPI.  Spear has stated on multiple occasions

**THIRD AMENDED COMPLAINT**

that she was working on the "deal" related to scrubs.  Spear stated in an interview: "I'm in New York, was working at Blackstone.  **I did a private equity deal** in the medical apparel space."  Spear further stated in a podcast that: "we [Blackstone] were looking to acquire the largest company in the [scrubs] industry.  So I had sent Heather the like 300 page report **that I had worked on** and she was like 'what is this?' 'How do you have this?'"

185.   On information and belief, Spear was actively involved and responsible for the transaction, diligence, and/or deal covered by the fiduciary duty owed by Blackstone to SPI, including the 300-page report Spear admits working on.

186.   On information and belief, Spear knowingly participated in the carrying out of the tasks anticipated and required by the fiduciary duty owed by Blackstone to SPI.

187.   On information and belief, Spear was acting in a fiduciary capacity on behalf of Blackstone for SPI when she was working on the private equity deal in the medical apparel space for SPI.

188.   On information and belief, Spear knew that she owed a fiduciary duty to Plaintiff and that her actions constituted a breach of these duties.

189.   Trina Spear acted on behalf of herself and FIGS, Inc., whose interests were (and are) adverse to SPI's in connection with the use of information and data to compete with SPI.

190.   On information and belief, Spear breached her duties of loyalty and confidentiality to Blackstone, and by extension to SPI, by misappropriating and/or misusing SPI's confidential information and data.

191.   On information and belief, Blackstone was Plaintiff's business partner and thus owed a fiduciary duty to Plaintiff.  Blackstone, through Spear, knowingly acted against Plaintiff's interests in connection with the release of data and

**THIRD AMENDED COMPLAINT**

information related to SPI, its business, its finances, its profit margins, its business methods, and the medical apparel industry.

192.   On information and belief, Blackstone, or its agents, representatives, or employees, failed to appropriately supervise Spear and/or to take appropriate measures to ensure that Spear maintained Blackstone's fiduciary duty to SPI.

193.   On information and belief, Spear's actions were not taken at the direction of Blackstone, and Spear acted beyond the scope of the authority given her by Blackstone.

194.   SPI did not give Blackstone informed consent to allow Trina Spear's conduct.

195.   SPI was harmed by Spear's actions, taken in breach of the fiduciary duty owed to SPI.

196.   Spear's duties at Blackstone, as the agent of Blackstone, and the actions required of Spear in that role, that give rise to the same duties owed by Blackstone as the principal.

197.   On information and belief, Spear agreed to abide by Blackstone's Code of Business Conduct and Ethics, which reads:

> Because all Confidential Information constitutes a valuable asset of the Firm, without the prior written consent of the Firm (which may be given or withheld in the Firm's sole discretion) or unless legally mandated, no employee or member of the Firm may, while he or she is employed by or associated with the Firm or at any time thereafter, (a) disclose any Confidential Information to any person except in furtherance of the business of the Firm, (b) make any other use of any Confidential Information except in the business of the Firm and in a manner which at all times is intended to serve the interests of the Firm. . . .

(Code of Business Conduct and Ethics, The Blackstone Group, L.P. , January 2014,                          available                          at

**THIRD AMENDED COMPLAINT**

https://www.sec.gov/Archives/edgar/data/1516212/000119312514385283/d799412dex99piv.htm, emphasis added.)

198.   On information and belief, Spear and Blackstone entered into an employment agreement and/or additional agreements setting forth Spear's obligations to Blackstone as a Blackstone employee.

199.   Despite Spear's agreements with Blackstone, and Blackstone's duties to SPI, Spear admits that she took confidential information from Blackstone, shared that information with Hasson, and that she and Hasson used that information to start and operate FIGS.

200.   Specifically, in the Miami Hustle Series podcast, entitled "042: The FIGS story – Trina Spear and making healthcare more comfortable for everyone," Spear stated regarding the origins of FIGS while she was at Blackstone:

> She [Heather] had just had the idea for it.  And I said Scrubs, that's interesting because we [Blackstone] were looking to acquire the largest company in the industry. **So I had sent Heather the like 300 page report that I had worked on and she was like "what is this?" "how do you have this?"**  So it was very fascinating I think for her to see – you know – a lot of information about the market and the players that are in the market, not from a primary perspective which is mainly what she was working with.

201.   Further, Spear stated in an interview with Refresh Miami on April 8, 2018 that she sent "super confidential" Blackstone materials to Hasson in violation of Blackstone's Code of Ethics.  Specifically, Spear stated in a YouTube video of that interview as follows:

> "**I'm in New York, was working at Blackstone**.  I did a private equity deal in the medical apparel space. Random.  **Sent her [Hasson] all the materials I'd worked on.**  That can't leave this room.  **They are super confidential.**  I will end up somewhere, so, everyone do

41

> not Tweet about that . . .  So, we talked on a Monday.
> Fly out to LA on a Friday.  We start working together.
> Spent about 6 months.  Wait until I get my bonus at
> Blackstone.  Liquidate my 401(k).  Move to LA.  Put all
> my money into the business."

(Emphasis added.)

202.   SPI was harmed as a result of Spear's breach of its fiduciary duty.

203.   Spear's conduct was a substantial factor in causing SPI's harm.

204.   Plaintiff has suffered damages by reason of the above in an amount in excess of the minimum jurisdiction of this court, to be proven at the time of trial.

205.   On information and belief, Spear has gained millions of dollars personally as a result of her wrongful conduct.

206.   Spear's conduct was undertaken with malice, oppression and/or fraud, and was willfully, maliciously and oppressively committed, warranting the imposition of punitive damages against Defendant for the reasons set forth herein. Plaintiff thus seeks punitive damages against Defendant for her willful, wanton and malicious behavior as set forth herein.

**EIGHTH CAUSE OF ACTION**

**Aiding and Abetting Breach of Fiduciary Duty**

**(As to Hasson and FIGS, Inc.)**

207.   Plaintiff re-alleges and incorporates by reference each of the numerical paragraphs both above and below as if fully set forth herein.

208.   At all relevant times, Hasson and FIGS knew or should have known that Blackstone owed a fiduciary duty to Plaintiff.

209.   At all relevant times, Hasson and FIGS knew or should have known that Spear owed a fiduciary duty to Blackstone.

210.   At all relevant times, Hasson and FIGS knew or should have known that Spear was acting on behalf of Blackstone in carrying out Blackstone's fiduciary duty to SPI.

42

**THIRD AMENDED COMPLAINT**

211.   Hasson and FIGS were aware of Blackstone's status as business partner for Plaintiff. Hasson and FIGS knew that Blackstone and Spear were entrusted with handling sensitive information and data owned by Plaintiff.

212.   On information and belief, Hasson and FIGS willingly received and used SPI's information to their own advantage, and on information and belief, at all relevant times, Hasson and FIGS knew they should not possess that information.  In fact, Spear has stated in a podcast interview that after she gave the 300-page confidential Blackstone report she worked on to Hasson, Hasson replied, "what is this?" and "how do you have this?"

213.   Plaintiff is informed and believes, and on that basis alleges, that Hasson and FIGS aided and abetted Spear in releasing Plaintiff's information and data to Hasson and FIGS, and Hasson and FIGS knowingly and willingly received same, for purposes of creating a competing business in the medical apparel industry.

214.   To the extent that Spear committed any wrongdoing in her role as promoter of the business that operates as FIGS, Hasson and Spear, as the founders, owners, and co-CEOs of FIGS, and FIGS itself, are the successors in interest to those wrongful acts and therefore liable.

215.   As a direct and proximate result of the aforementioned breaches of fiduciary obligations, and Hasson and FIGS aiding and abetting those breaches, Plaintiff has sustained and will incur damages, including damages reflecting lost business, lost profits, and damage to its goodwill, in amounts to be proven at trial.

216.   Plaintiff has suffered and will continue to suffer irreparable harm and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

217.   On information and belief, Spear, Hasson, and FIGS have gained millions of dollars personally as a result of their wrongful conduct.

**THIRD AMENDED COMPLAINT**

218.   Plaintiff has suffered damages by reason of the above in an amount in excess of the minimum jurisdiction of this court, to be proven at the time of trial.

219.   Hasson and FIGS's conduct was undertaken with malice, oppression and/or fraud, and was willfully, maliciously and oppressively committed, warranting the imposition of punitive damages against Defendant for the reasons set forth herein. Plaintiff thus seeks punitive damages against Defendant for her willful, wanton and malicious behavior as set forth herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for Judgment against Defendants as follows:

1.   A preliminary and permanent injunction requiring Defendant to discontinue advertising, marketing, packaging, disseminating, using and otherwise making false and misleading statements about Defendant FIGS'S products.

2.   Injunctive relief requiring Defendant to provide citation in future advertisements supporting any scientific or health claims it makes regarding its FIGS Products or the fabric used in its FIGS Products.

3.   Compensatory damages;

4.   Statutory damages pursuant to 15 U.S.C. § 1117;

5.   Punitive damages;

6.   Restitution;

7.   Actual damages;

8.   Disgorgement of profits;

9.   Interest at the legal rate per annum;

10.   All costs of suit;

11.   Such other and further relief as this Court deems just and proper; and

12.   Attorneys' fees.

## **DEMAND FOR JURY TRIAL**

**THIRD AMENDED COMPLAINT**

Plaintiff hereby demands a trial by jury on its claims.

Dated:  March 30, 2020          **MICHELMAN & ROBINSON, LLP**

                              By:     /s/ Marc R. Jacobs
                                      Mona Z. Hanna
                                      Jeffrey D. Farrow
                                      Marc R. Jacobs
                                      Taylor C. Foss
                                      Robert D. Estrin
                                      Attorneys for Plaintiff
                                      STRATEGIC PARTNERS, INC.

45

**THIRD AMENDED COMPLAINT**

1
2
3

# CERTIFICATE OF SERVICE

*Strategic Partners, Inc. v. FIGS, Inc.*
*U.S. District Court, Central District of California - Western Division*
*Case No. 2:19-cv-02286-GW-KSx*

4
5
6

I am a resident of the State of California, over the age of eighteen years and not a party to the action in which the service is made. My business address is 17901 Von Karman Ave., Suite 1000, Irvine, CA 92614-6297.

7

On March 30, 2020, I served the foregoing document(s):

8
9
10
11
12

**THIRD AMENDED COMPLAINT FOR: 1. FALSE ADVERTISING IN VIOLATION OF 15 U.S.C. § 1125(a); 2. UNFAIR BUSINESS PRACTICES (as to Defendant FIGS, Inc.); 3. UNFAIR BUSINESS PRACTICES (as to All Defendants); 4. UNTRUE AND MISLEADING ADVERTISING; 5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; 6. NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; 7. BREACH OF FIDUCIARY DUTY; 8. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY.**

13

on all interested parties as follows:

14
15

## - SEE ATTACHED SERVICE LIST -

16
17

☐ **(BY PERSONAL SERVICE)** I caused to deliver by hand such envelope to the addressee(s) on the date specified above.

18
19
20
21
22

☐ **(BY MAIL)** I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail at Irvine, California. I am readily familiar with the practice of Michelman & Robinson LLP for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is scheduled for collection. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

23
24
25
26

☒ **(BY ELECTRONIC MAIL)** By personally transmitting to the above-named person(s), who has previously agreed to receive documents via electronic mail, to the e-mail address as shown above, on the date and time listed below, originating from the Michelman & Robinson, LLP's electronic mail address, pursuant to the C.R.C. 2060 and Government Code § 11440.20. A true copy of the above-described document(s) was transmitted by electronic

27
28

1

transmission through the Michelman & Robinson, LLP's mail server, which did not report any error in sending the transmission.

☐ **(BY ELECTRONIC FILING WITH THE U.S. DISTRICT COURT)** I certify that on **March 30, 2020**, I electronically transmitted the attached document to the United States District Court and/or the US District Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants/recipients registered with the United States District Court according to Federal District Court Rules requirements.

☐ **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** I declare under penalty of perjury that the above is true and correct.

Executed on March 30, 2020, at Irvine, California.

_____
Christina Reyes

**CERTIFICATE OF SERVICE**

1
2
3

**SERVICE LIST**
*Strategic Partners, Inc. v. FIGS, Inc.*
*U.S. District Court, Central District of California - Western Division*
*Case No. 2:19-cv-02286-GW-KSx*

4
5
6
7
8
9

Fanxi F. Wang
fwang@birdmarella.com
Ekwan E. Rhow
erhow@birdmarella.com
**BIRD, MARELLA, BOXER,**
**WOLPERT, NESSIM, DROOKS,**
**LINCENBERG & RHOW, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, CA  90067
T:  310-201-2100
F:  310-201-2110

*Attorneys for Defendant*
*FIGS, INC.*

10
11
12
13
14

~~Mazda Antia~~
~~mantia@cooley.com~~
~~Scott Dailard~~
~~sdailard@cooley.com~~
~~**COOLEY LLP**~~
~~4401 Eastgate Mall~~
~~San Diego, CA  92121~~
~~T:  858-550-6000~~
~~F:  858-550-6420~~

15
16
17
18

~~Kraig Jennett~~
~~kjennett@cooley.com~~
~~**COOLEY LLP**~~
~~1299 Pennsylvania Ave., NW, Suite 700~~
~~Washington D.C.  20004~~
~~T:  202-728-7013~~
~~F:  202-842-7899~~

19
20
21
22
23
24
25
26
27
28

3