1   MONA Z. HANNA (SBN 131439)
      mhanna@mrllp.com
2   JEFFREY D. FARROW (SBN 180019)
      jfarrow@mrllp.com
3   KEVIN S. KIM (SBN 275200)
      kkim@mrllp.com
4   ALLISON C. AGUIRRE (SBN 312544)
      aaguirre@mrllp.com
5   **MICHELMAN & ROBINSON, LLP**
6   17901 Von Karman Avenue, Suite 1000
    Irvine, CA 92614
7   Telephone:   (714) 557-7990
    Facsimile:    (714) 557-7991
8

    SANFORD L. MICHELMAN (SBN 179702)
      smichelman@mrllp.com
    MARC R. JACOBS (SBN 185924)
      mjacobs@mrllp.com
    JESSE J. CONTRERAS (SBN 190538)
      jcontreras@mrllp.com
    JENNIFER S. GOLDSTEIN (SBN 310335)
      jgoldstein@mrllp.com
    ADAM M. KORN (SBN 333270)
      akorn@mrllp.com
    **MICHELMAN & ROBINSON, LLP**
    10880 Wilshire Boulevard, 19th Floor
    Los Angeles, CA  90024
    Telephone: (310) 299-5500
    Facsimile:  (310) 201-2110

9

10  *Additional Counsel on Next Page*

11  # UNITED STATES DISTRICT COURT

12  ## FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14  STRATEGIC PARTNERS, INC.,

15              Plaintiff,

        v.

16  FIGS, INC., CATHERINE ("TRINA")
17  SPEAR, HEATHER HASSON,

18              Defendants.

19

20

21

22

23

Case No.: 2:19-cv-02286-JWH-KSx

District Judge:  Hon. John W. Holcomb
Magistrate Judge:  Hon. Karen Stevenson

**PLAINTIFF STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

[Filed Concurrently with the Declaration of Jennifer Goldstein]

**Trial Date: October 17, 2022**
**Time:          9:00 a.m.**
**Crtrm.:        9D**

Complaint Filed:  February 22, 2019
Trial Date:  October 17, 2022

24

25

26

27

28

1

*Additional Counsel:*

2

3
KRISTIN J. ACHTERHOF
(*Admitted Pro Hac Vice*)
  kristin.achterhof@katten.com
4
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
5
Chicago, IL 60661-3693
T: (312) 902-5296
6
F: (312) 902-1061

7
RICHARD H. ZELICHOV (SBN 193858)
  richard.zelichov@katten.com
8
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
9
Los Angeles, CA 90067-3012
T: (310) 788-4680
10
F: (310) 788-4471

11
TIMOTHY H. GRAY
(*Admitted Pro Hac Vice*)
12
  timothy.gray@katten.com
KATTEN MUCHIN ROSENMAN LLP
13
2900 K Street NW, North Tower, Suite 200
Washington, DC 20007-5118
14
T: (202) 625-3608
F: (202) 298-7570
15

16
*Attorneys for Plaintiff, STRATEGIC PARTNERS, INC.*

17

18

19

20

21

22

23

24

25

26

27

28

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 2

        A.      SPI Has Adduced Sufficient Evidence to Raise a Reasonable Inference of Causation and Injury As to the Lanham Act Claims, Which Is All the Ninth Circuit Requires.............................................................................................. 2

                1.      Defendants' Contrived Injury Standard Is Unsupported by Ninth Circuit Authority. ................................................................................. 2

                2.      SPI Has Adduced Substantial and Compelling Evidence from Which the Jury May Reasonably Infer Causation and Injury............................ 4

        B.      SPI Has Sufficiently Established That FIGS' One-for-One, Immediate Kill, and Liquid-Repellent Claims Were False or Misleading................................ 7

                1.      The One-for-One Claim ..................................................................... 7

                2.      The Immediate Kill Claim.................................................................. 9

                        a.      Even Taking FIGS' Arguments as True, the Immediate Kill Claim is Literally False and Misleading...................................... 9

                        b.      FIGS' Remaining Arguments Emphasize the Reasons Why its Immediate Kill Claim Cannot be Resolved as a Matter of Law. ...................................................................................... 11

                3.      Liquid Repellent Claim ................................................................... 17

        C.      The Jury Has Ample Evidence to Reasonably Find that FIGS Intentionally Interfered with its Customers. ...................................................................... 19

III.    CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
  2019 WL 4546897 (C.D. Cal. Aug. 2, 2019) ................................................. 3

*Altman v. HO Sports Co.*,
  821 F. Supp. 2d 1178 (E.D. Cal. 2011) ........................................................ 20

*Code Rebel, LLC v. Aqua Connect, Inc.*,
  2013 WL 5405706 (C.D. Cal. Sept. 24, 2013) ............................................ 20

*Eco Elec. Sys., LLC v. Reliaguard, Inc.*,
  2022 WL 1157481 (N.D. Cal. Apr. 19, 2022) ............................................... 2

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
  2019 WL 12074086 (C.D. Cal. July 1, 2019) ........................................ 2, 3, 4

*Gray v. Hudson*,
  28 F.4th 87 (9th Cir. 2022) ............................................................................ 1

*Harper House, Inc. v. Thomas Nelson, Inc.*
  889 F.2d 197 (9th Cir. 1989),) ................................................................ 2, 15

*Krechman v. Cnty. of Riverside*,
  723 F.3d 1104 (9th Cir. 2013) ....................................................................... 1

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
  2019 WL 5320390 (S.D. Cal. Oct. 21, 2019) ......................................... 15, 18

*Roadrunner Intermodal Services, LLC v. T.G.S. Transportation, Inc.*,
  2021 WL 2188138 (E.D. Cal. 2021) ............................................................ 20

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ......................................................... 10, 16, 18

*Strategic Partners Inc. v. Vestagen Protective Techs. Inc.*,
  2016 WL 10611186 (C.D. Cal. Nov. 23, 2016) ........................................... 15

*Taie Weie Enter. Co, Ltd v. Tech. Aquatic Associated Mfg.*,
  2021 WL 8572628 (C.D. Cal. Apr. 23, 2021) ............................................. 22

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
   648 F. App'x 609 (9th Cir. 2016) ............................................................................ 2, 3

**California Cases**

*City of Modesto v. Dow Chemical Co.*,
   19 Cal. App. 5th 130 (2018) ............................................................................ 20

*Fox v. Ethicon Endo-Surgery, Inc.*,
   35 Cal. 4th 797 (2005) ............................................................................ 22

**Federal Statutes**

Lanham Act ............................................................................ 2, 19

**Other Authorities**

Federal Rules of Civil Procedure (Fed. R. Civ. P.)

   Rule 50(a)(1) ............................................................................ 1
   Rule 50(a) ............................................................................ 1
   Rule 50(b) ............................................................................ 3

## I.      **INTRODUCTION**

Defendants' Motion for Judgment as a Matter of Law ("JMOL") highlights *precisely* why this case is one for the jury. In the course of their Motion, Defendants FIGS, Inc., Catherine "Trina" Spear, and Heather Hasson (collectively, "Defendants" or "FIGS") explicitly urge the court to make credibility determinations, selectively and partially weigh certain evidence and testimony, and discount or ignore much of the favorable evidence that SPI presented. FIGS urges the Court to reject out-of-hand expert testimony—in some cases based on an attack on their credentials—and to conclude *as a matter of law* that no customers began purchasing FIGS' scrubs instead of SPI's scrubs because of FIGS' false claims. Defendants' argument is a first draft of their closing argument to the jury—not the substance of a Rule 50(a) Motion.

"In entertaining a motion for judgment as a matter of law, [the Court] may not make credibility determinations or weigh the evidence." (*Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013).) It is only when a party does not offer a "legally sufficient evidentiary basis" to find for them that a JMOL should be granted. (Fed. R. Civ. P. 50(a)(1).) "The applicable standards are essentially the same as those for a summary judgment motion, meaning that [a court] must draw all reasonable inferences in plaintiffs' favor." (*Gray v. Hudson*, 28 F.4th 87, 95–96 (9th Cir. 2022) (citations, quotation marks, and alterations omitted).) "Along these lines, [a court] must disregard all evidence favorable to defendants that the jury is not required to believe." (*Id.* at 96.)

As detailed below, Plaintiff Strategic Partners, Inc. ("SPI") has provided more than sufficient proof for a reasonable jury to find in its favor on each of its claims. Although Defendants understandably seek to take these critical, hotly disputed issues of fact away from the jury, resolving disputed evidence and reaching reasonable inferences is what juries do. Accordingly, SPI respectfully requests that the Court deny FIGS' Motion.

///

///

///

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

II.  **ARGUMENT**

    A.  **SPI Has Adduced Sufficient Evidence to Raise a Reasonable Inference of Causation and Injury As to the Lanham Act Claims, Which Is All the Ninth Circuit Requires.**

        1.  **Defendants' Contrived Injury Standard Is Unsupported by Ninth Circuit Authority.**

FIGS' argument that SPI has failed to adduce sufficient evidence to establish causation and injury under the Lanham Act is unavailing. FIGS' position posits a standard for "actual injury" that would impose an unrealistic and impracticable evidentiary requirement—one that would effectively preclude a plaintiff's showing of causation and injury in a multi-competitor market. Its invented obstacle has no basis in the law. To the contrary, the Ninth Circuit has "repeatedly suggested that Section 43(a)'s injury requirement is lenient and 'express[ed] a distinct preference for those opinions permitting relief based on the totality of the circumstances.'" (*Eco Elec. Sys., LLC v. Reliaguard, Inc.*, 2022 WL 1157481, at *7 (N.D. Cal. Apr. 19, 2022) (quoting *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1410–11 (9th Cir. 1993)).) Consistent with that "lenient" standard, a plaintiff "may establish an injury by creating a chain of inferences showing how defendant's false advertising could harm plaintiff's business." (*Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *7 (C.D. Cal. July 1, 2019) (quotation marks omitted).)

*Harper House, Inc. v. Thomas Nelson, Inc.*, (889 F.2d 197 (9th Cir. 1989),) is not to the contrary. As numerous courts have observed, *Harper House*'s requirement of evidence that injury "result[] from the deception" is not a requirement that a plaintiff produce every deceived customer to testify to being hoodwinked—rather, "*Harper House* held only that a court cannot assume injury without any evidence of causality and consumer deception," and "[c]onsistent with that observation, *TrafficSchool.com* permits a jury to infer injury based on evidence of direct competition (which provides a causal link) and a likelihood of consumer deception." (*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609,

616 (9th Cir. 2016).) FIGS' Motion does not dispute that SPI is a competitor—nor could it, given the ample record evidence showing as much. (*See, e.g.*, Ex. A at 109-21-23) (Hasson admitting Mike Singer is a "competitor"); Ex. B At 110:18-21) (Spear admission that FIGS targeted SPI customers); Ex. C at 17:23-18:1) (Singer testimony that Google AdWords are used to target competitors); TRX-104[1] (Spear forwarding email with list of Cherokee customers); TRX-2281, "Competitors" Sheet (listing "Cherokee" and "Dickies" as two of the top three "Competitors" mentioned in FIGS' customer surveys.)

FIGS contends that *TrafficSchool* (and, by extension, *Grasshopper House*) is inapposite because its holding is "specific to Article III standing," not substantive causation. (ECF 892 at 10:25-27.) That is flat wrong: "the two standards—which are derived from the same statutory language—are one and the same." (*ThermoLife*, 648 F. App'x at 616; *see also, e.g.*, *Allergan USA Inc. v. Imprimis Pharms., Inc.*, 2019 WL 4546897, at *4 (C.D. Cal. Aug. 2, 2019) ("The Court instructed that the parties are in direct competition and consumer deception existed; the jury could therefore infer that the false statements caused some injury to Allergan.").[2]) Allowing a jury to infer causation and injury on this basis is reasonable: "when competitors vie for the same customers, a misleading ad can upset their relative competitive positions and thereby cause injury." (*Id.* at *3.) And a jury is entitled to reach that inference based on "circumstantial evidence that . . . false advertising resulted in at least some deceived customers buying products sufficient to support a finding of . . . actual damages." (*Id.* at *4.)

---

[1] Trail exhibits will be referred to herein as "TRX"

[2] Indeed, in *Allergan*, the court *rejected* a Rule 50(b) argument indistinguishable from FIGS' here—and that plaintiff had produced far *weaker* evidence than SPI. In addition to producing "no direct testimony from a relevant consumer that she purchased from Imprimis rather than Allergan due to the false advertisements," that plaintiff presented no "survey of relevant consumers indicating actual confusion or economic harm." *Allergan*, 2019 WL 4546897, at *4. SPI, by contrast, presents a survey establishing that SPI's customers are more likely to purchase FIGS' scrubs based on exposure to FIGS' false claims; evidence that SPI's customers were targeted for exposure to those claims, and many of them *did* purchase FIGS' scrubs because of the claims; and a damages analysis accounting for SPI's proportion of the total lost sales.

STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW

### 2.    SPI Has Adduced Substantial and Compelling Evidence from Which the Jury May Reasonably Infer Causation and Injury.

In any event, contrary to FIGS' argument, SPI does not propose to "point to *a series of attenuated* inferences" or "the *bare fact* that SPI and FIGS are both companies in the healthcare apparel industry." (ECF 892 at 10 (emphasis added).) As it undoubtedly intends to do in closing, FIGS trots out a straw-man and takes it apart—and FIGS has every right to present that argument to the jury. But FIGS' position that no inference of causation is permissible *as a matter of law* defies legal precedent and common sense. The inferences the jury is entitled to make in this case and on this record are close, clear, and reasonable.

<u>First</u>, SPI is not arguing causation and injury on the basis of "the mere fact that the plaintiff and defendant competed in the same market." (ECF 892 at 11:7-12.) The record contains ample evidence that *actual customers* who purchased SPI's products (including Cherokee- and Dickies-brand scrubs) began purchasing FIGS' scrubs *specifically* because they were influenced to do so by FIGS' false statements.[3]  Scores of customers on FIGS' internally commissioned surveys indicated that they have worn SPI-brand scrubs but now purchase FIGS, extoling "the material (antimicrobial!)" (TRX-2281 at row 90; *see also, e.g.*, TRX-2282 at row 11); the fact that they are "infection resistant" (TRX-2187 at row 277); the fact that "each set buys a new one for healthcare workers" (TRX-2281 at row 652); and the fact that it "repels liquids." (TRX-2187 at row 179.) The upshot is that even in FIGS' own self-selected and unrepresentative surveys, SPI's *actual* consumers indicated that they have *actually* chosen FIGS *because* of FIGS' false claims. (*See, e.g.* Ex. L (additional examples of consumer responses that re-state FIGS' false statements.) That is sufficient evidence to infer causation. (*Cf. Grasshopper House*, 2019 WL 12074086, at *8 ("[T]estimony about potential clients responding favorably to Passages' advertising is

---

[3] Although FIGS refers to Exhibit 2233 in its briefing, *see* Dkt, 892 at 4 n.3, SPI (in an abundance of caution) refers to select excerpted entries from Exhibits 2187, 2281, and 2282, which represent redacted versions of the same compiled survey information, in deference to the individuals' privacy interests.

1   sufficient to support an inference by the jury that Passages' advertising caused injury to
2   Cliffside, a direct competitor.").) There is, moreover, sufficient evidence to infer that at
3   least one *retailer* on a list of Cherokee customers obtained by FIGS—Inka's Uniforms—
4   was deceived by the false health claims that relate to FIGS' scrubs being treated with
5   antimicrobial technology and the One-For-One Claim and began purchasing FIGS because
6   of them. (TRX-262-1.) Third-party analyses in the record further reflect that a sizeable
7   percentage of SPI's customers now wear FIGS scrubs. (*See, e.g.*, TRX-2825-94.) This
8   evidence is more than sufficient for a reasonable jury to link by simple and sensible
9   inference the *materiality* of FIGS' advertising claims (established by SPI's marketing and
10  consumer survey expert, Dr. Itamar Simonson) with the *magnitude of injury* (established
11  by SPI's lost profits and disgorgement expert, Dr. Gregory Bell). The jury is entitled to
12  draw that inference, and FIGS is entitled to urge them not to (or, as it has suggested, to
13  draw a different one). In either case, the ultimate question is necessarily left to the jury.

14       Second, the direct evidence of diverted sales is not only bolstered by, but provides
15  *validation* of, the evidence of materiality and injury presented in Dr. Simonson's and Dr.
16  Bell's respective expert analyses. Indeed, even without the "actual customer" testimonials,
17  Dr. Simonson's and Dr. Bell's testimony would alone provide sufficient evidence to infer
18  causation: Dr. Simonson establishes that *actual* consumers in the scrubs market were *more*
19  *likely* to purchase FIGS' scrubs after exposure to FIGS' false claims; Dr. Bell demonstrates
20  that the materially false claims translate to *additional sales* FIGS would not otherwise have
21  made. By itself, this could raise a reasonable inference of injury; in combination with SPI's
22  direct evidence of actual SPI-brand consumers who purchased FIGS' scrubs because of the
23  false claims, the inference is inescapable.

24       FIGS' misplaced critiques of Dr. Simonson's studies and Dr. Bell's analysis are
25  quintessential closing-argument material, even if they miss the mark. At most, they go to
26  the *weight* of the evidence—and weighing evidence and assessing credibility is precisely
27  what a Court *cannot* do on a JMOL. Ultimately, FIGS' complaints about Dr. Simonson's
28  study—that it purportedly did not use "real-world advertisements," did not analyze "how

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

many actual customers of scrubs actually saw the challenge[d] claims," and that it "refused to credit the tens of thousands of actual responses given by FIGS customers," (ECF 892 at 12:21-24)—are attacks on the *controlled, scientific nature* of the study, which isolated the variables at issue (the challenged claims) and assessed their materiality in a properly sampled population. Dr. Simonson vigorously defended the validity of his analysis, and a reasonable jury could readily credit it.

Dr. Bell's analysis, in turn, applied Dr. Simonson's results to the historical record of FIGS' sales. FIGS' attacks on Dr. Bell's "assumptions" once again go to the weight and persuasiveness of his testimony. What is more, these weight-of-evidence attacks attempt to import non-existent standards of commercial advertising "ubiquity" in the guise of an expert critique. FIGS attacks Dr. Bell's assumption of ubiquity for failing to demonstrate by evidence that "95 percent of FIGS purchasers saw the sparse social media posts or web pages," (ECF 892 at 13:5-7,) but that does not go to *causation*—it merely is an attempt to kneecap an expert analysis. The jury is entitled to credit Dr. Bell's analysis or reject it, but FIGS' critique has nothing to do with the *fact of injury*. Moreover, Dr. Bell's use of Dr. Simonson's choice allocation to establish the number of converted SPI customers is substantiated by the evidence: as noted, FIGS' own surveys demonstrate that SPI's consumers started buying FIGS based on one or more of the false claims. (*See* TRXs-2187, 2281, 2282.) Nor was Dr. Bell required to "rule out other potential causes" for injuries, as FIGS suggests. (ECF 892 at 13:14-19.) This is not a securities fraud case, where other causes for stock-price declines may serve as exculpatory evidence. Unlike Defendants' damages expert—who purports to opine on other speculative causes for losses FIGS simultaneously denies, despite having no expertise in any relevant fields—Dr. Bell performed an analysis based on the *claims at issue in this case*. In other words, Dr. Bell's damages model already isolates SPI's damages to the harm caused specifically by the false claims . That was proper, and the jury is entitled to credit it.

Third, SPI has adduced evidence that FIGS *directly targeted* consumers of SPI's brands to entice them to purchase FIGS' scrubs. Both Trina Spear and Devon Gago

admitted that FIGS specifically targeted Cherokee consumers with Google AdWord purchases. (Ex. B at 110:18-21; Ex. D at 425:2-10.) FIGS specifically bids on Google AdWords concerning terms that pertain to the false claims—*e.g.*, "microb" or "Thread." (TRX-2273-1.) Furthermore, Ms. Spear knew "Cherokee [wa]s going after the wholesale market with poly rayon fabric with anti-microbial treatment," and insisted "our research and marketing of these attributes must also compete with theirs." (TRX-136-1.) Retailer Inka's Uniforms, as discussed above, was not only *fooled*, but *targeted*; the evidence demonstrates that Defendants obtained a list of Cherokee retailer customers, including Inka's Uniforms (TRX-104 at row 1271), and, shortly before a retailer conference, Spear forwarded that list to fellow FIGS employees—followed a month later by Inka's Uniforms telling that employee and Spear that she was motivated to place a purchase order because of the antimicrobial properties and "Threads-for-Threads." (TRX-262-1.) This further supports an inference of causation—it is direct evidence that FIGS sought to pursue and convert SPI customers based on, among other things, FIGS' non-existent antimicrobial properties. In sum, the record contains sufficient evidence from which a jury may reasonably conclude that FIGS' false and misleading advertisements deprived SPI of sales it otherwise would have made. Causation and injury are for the jury to decide.

**B.** **SPI Has Sufficiently Established That FIGS' One-for-One, Immediate Kill, and Liquid-Repellent Claims Were False or Misleading.**

FIGS' argument that "SPI has failed to introduce *any* evidence" that the One-for-One, Immediate Kill, and Liquid-Repellent Claims are false or misleading is contrary to the evidence.

**1.** **The One-for-One Claim**

FIGS argues that the Threads-for-Threads program ended in 2017, and the number of donations exceeded the number of scrubs sold as of 2017, so SPI cannot show that FIGS' One-for-One Claim is literally false. (*See* ECF 892 at 15:1-26.) But FIGS *admits* it was advertising the One-for-One Claim after 2017, when it, in fact, was not donating a scrub for every scrub sold. The evidence shows that FIGS continued to make the One-for-One

Claim through at least 2020. (*See, e.g.*, TRX. 497-3 (2018 customer email); TRXs. 129-1, 593-2 (2020 customer invoices); TRX. 610-2 (2020 Facebook page).) FIGS concedes this point in its brief. (*See* ECF 892 at 15:13-22.) These advertisements are literally false.

To substantiate its One-For-One Claim, FIGS produced a single one-page document indicating that, in total, FIGS had donated 610,000 scrubs as of 2019. (TRX-158-1; Ex. D at 313:07-314:04; 314:11-315:18.) In contrast, the number of units FIGS sold by product type as of 2019 is well over 2,000,000. (TRX-587-1.) Even taking its own document at face value, FIGS sold more scrubs than it donated during the time it advertised it donated one set of scrubs for every set of scrubs sold. Further, SPI has challenged the credibility of the document by offering testimony that the document was compiled by Gago and FIGS' counsel in the course of this litigation. (Ex. D at 217:04-317:08.) During cross examination, Gago could not name one specific piece of source data underlying this document. (*Id.* at 313:07-314:04 & 409:17-410:17). Whether this document, in fact, represents the number of scrubs FIGS donated is a question for the jury.

FIGS further admits that it continues to use to this day the name "Threads for Threads"—the brand name coined for FIGS' charitable programming that included the One-For-One Claim—without telling customers that it no longer employs a one-for-one donation model. (Ex. B at 193:13-19 & 194:8-13). FIGS contends that SPI has not offered any evidence that customers associate Threads for Threads with the one-for-one giving model. (*See* ECF 892 at 16:3-23.) Not so. Based on customer responses to a survey FIGS administered with every purchase, FIGS' purchasers from the same timeframe mention the Threads for Threads initiative as hand-in-hand with a one-for-one donation model. In response to the question, "What do you like best about FIGS?," FIGS' customers respond with, "They give a set of scrubs to those in need," "Threads for Threads," "the giving of set of scrub to a least fortunate healthcare worker," "the main part is they give a set to a healthcare in need," "the threads for threads program," and 'good philanthropy with buy one set give one to someone in need"; one customer even noted "I also love to support the Threads for Threads campaign. I love to give to others." (TRX-2282 at rows 138, 201, 175,

1 │ 240, 335, 317, 1064.)

2 │      Given these consumer responses, Spear's acknowledgment that Threads for Threads

3 │ is a "brand," the pervasive advertisement of Threads for Threads as a "buy one give one"

4 │ model, and the continued advertisement of Threads for Threads until at least 2020, it is

5 │ reasonable—given all favorable inferences—to conclude that the individuals responding

6 │ during the same timeframe when FIGS advertised *both* Threads for Threads *and* the "buy

7 │ a set give a set" messaging would have understood those terms to be synonymous after

8 │ 2017. Again, FIGS engaged in no corrective advertising. No misimpressions were

9 │ dispelled. And that inference leads directly to injury: Based on FIGS' data, Dr. Bell

10 │ specifically isolates the effect of FIGS' repeat purchasers on SPI's lost profits, and posits

11 │ that the repeat purchasers expected in a 30-month period would still be expected to

12 │ purchase due to the false claims. (Ex. E at 21:9-22:16.) Therefore, a reasonable jury could

13 │ conclude that repeat purchasers for 30 months after 2017 would still associate FIGS' scrubs

14 │ with the one for one giving program—and FIGS has not shown that this conclusion would

15 │ be unreasonable as a matter of law.

16 │           **2.     The Immediate Kill Claim**

17 │      FIGS contends that SPI has no evidence that the Immediate Kill Claim was false or

18 │ misleading for a variety of reasons addressed below. Even if all of FIGS' arguments were

19 │ true and sufficient – and they are not – FIGS fails to address three critical points of

20 │ contention that are fatal to its argument that the falsity of the Immediate Kill Claim can be

21 │ resolved as a matter of law.

22 │           **a.     Even Taking FIGS' Arguments as True, the Immediate Kill**

23 │                **Claim is Literally False and Misleading.**

24 │      First, FIGS does not even address that its Immediate Kill Claim is based on the

25 │ representation that its products kill bacteria *and infection* immediately upon contact. While

26 │ FIGS focuses on whether its scrubs kill bacteria on contact, FIGS does not dispute that

27 │ testimony provided by SPI's experts on this point, which is the only evidence in the case

28 │ concerning whether FIGS scrubs kill *bacteria and infection* on contact. SPI's infectious

disease expert, Dr. Deverick Anderson, testified that he reviewed the testing performed by FIGS' experts and "did not see any kind of empirical evidence to support that it immediately killed bacteria and infection on contact." (Ex. F at 113:14-114:13.) Dr. Anderson further testified that representing the scrubs killed infection was incorrect – i.e., false – because infection refers to "patient related outcomes, not surface fabric types of outcomes." (*Id.* at 114:11-21.) Even claiming a scrub could kill infection on contact would be inappropriate and false. (*Id.* at 116:2-11.) FIGS does not offer any evidence or argument to counter the falsity of its claim that its scrubs kill bacteria *and infection* on contact.

Second, FIGS does not mention – or offer any evidence to dispute – that Dr. Simonson identified that 73% of consumers believe FIGS' Immediate Kill Claim to be based on tests or studies. (Ex. G at 286:5-287-4.) If FIGS' Claim was based on tests or studies that do not, in fact, state the proposition, they are literally false. (*See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).) If they were *not* based on tests but they clearly implied as much, they are at least misleading. There is no evidence in the record that FIGS or DuPont tested FIGS' fabric to determine whether it killed bacteria and infection immediately upon contact. Even if FIGS wanted to contend that the test records in evidence support its claim – which SPI disputes – FIGS cannot point to one test prior to 2016 in evidence. By FIGS' own admission, it made the Immediate Kill Claim from 2015-2019. (TRX-650.) Even assuming FIGS did apply Silvadur after 2016, SPI has put into dispute whether the Silvadur guidelines permit the Immediate Kill Claim and, therefore, whether Silvadur supports the Immediate Kill Claim. FIGS identifies Silvadur guidance as the sole support for its Immediate Kill Claim. (Ex. B at 73:15-19). It is undisputed, however, that FIGS was provided the Silvadur Branding Guidelines, which do not permit representations that Silvadur-treated garments kill bacteria and infection. (TRX-151-1-2.) In evidence, too, is a 2015 email to Hasson from Hyosung stating that Silvadur could not pass the antimicrobial efficacy testing. (TRX-137-4.) SPI has put into dispute whether the application of Silvadur substantiated FIGS' Immediate Kill Claim. The evidence supports SPI's contention that, at minimum, the Claim was false because

1    consumers thought it was based on testing that did not, in fact, exist.

2              **b.    FIGS' Remaining Arguments Emphasize the Reasons Why**

3                    **its Immediate Kill Claim Cannot be Resolved as a Matter of**

4                    **Law.**

5          First, FIGS' renewed motion to exclude Dr. Peter Hauser as an expert fares no better

6    than its first. Dr. Hauser is a distinguished expert in textile chemistry and AATCC testing

7    protocols. He holds a PhD in Chemistry and had extensive experience working in the textile

8    industry for more than two decades before joining the faculty of North Carolina State

9    University's Textile Engineering, Chemistry & Science Department in 2005. (TRX-707-1.)

10   Not only has Dr. Hauser been a long-time member of the American Association of Textile

11   Chemists and Colorists ("AATCC"), the organization that created the antimicrobial and liquid

12   repellency testing the experts in this case evaluated, he served as its President from 2013-2014

13   and currently sits on AATCC's Board of Directors. (Ex. H at 110:6-111:2.) Indeed, the

14   AATCC recognized his significant contributions to the field of textile chemistry by awarding

15   Dr. Hauser the much-coveted Olney Medal in 2017. (*Id.* at 111:12-19.) The Court—as with

16   courts in every other case in which he was tendered as an expert—properly qualified Dr.

17   Hauser as an expert in the areas of antimicrobial and liquid repellent textiles and the testing

18   and efficacy of the same. (*Id.* at 113:4-7 & 121:8-22.)

19         Now, FIGS again argues that Dr. Hauser is "not qualified to argue whether Silvadur

20   does or does not kill bacteria immediately on contact" because (1) he has never studied cell

21   death, (2) did not consult academic research on whether antimicrobial treatments like

22   Silvadur kill bacteria, and (3) has never worked with bacteria before. (ECF 892 at 17:4-

23   22.) As a preliminary matter, FIGS focuses on the wrong qualification; Dr. Hauser was not

24   offered as an expert on the efficacy of Silvadur; DuPont is not on trial – FIGS is. Dr. Hauser

25   was offered and accepted as an expert in antimicrobial and liquid repellent textiles and, as

26   such, opines on the antimicrobial efficacy of FIGS' fabric. As discussed below, SPI has

27   offered evidence to dispute that FIGS has even applied Silvadur to its fabrics but, even if

28   it has, Dr. Hauser studied whether FIGS scrubs that were allegedly treated with Silvadur,

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

in fact, demonstrated antimicrobial efficacy sufficient to support its Immediate Kill Claim. They did not.

Dr. Hauser has significant expertise with the TM 100 testing protocol—the test method used by both parties' experts to assess the antimicrobial efficacy of FIGS' products—having co-written "the" textbook on chemical finishing of textiles, which addresses antimicrobial finishes and testing.   Dr. Hauser also taught graduate and undergraduate courses on antimicrobial finishes and TM 100 testing protocols. (Ex. H at 111:20-112:15; 117:8-13.) Dr. Hauser testified the protocol specifically "pertains to cell death." (*Id.* at 117:8-13.) Suffice to say, Dr. Hauser is qualified to evaluate TM 100 results and opine whether the tests were reliably performed. Dr. Hauser is also familiar with various treatments used to convey antimicrobial efficacy and does not need to have studied the Silvadur website, specifically, to opine on whether FIGS' scrubs contained antimicrobial efficacy.   In sum, he knows "those mechanisms." (*Id.* at 135:24-136:3.) The fact that Dr. Hauser, at the time of his deposition, was only able to provide some vague testimony regarding a funghi that was included in his tests, hardly bears on whether Dr. Hauser works with bacteria. As this Court found, Dr. Hauser is a qualified expert.

Second, FIGS argues that the testing shows a reduction in bacteria, so the claim is literally true. This fact is in dispute.

As a threshold issue, FIGS' Immediate Kill Claim is false and misleading to the extent FIGS did not apply antimicrobial technology to its products. The evidence in the record places in dispute whether FIGS even treated its scrubs with an antimicrobial treatment. FIGS advertised that **all** of its scrubs were antimicrobial. (*See, e.g.*, TRX-200-2 (FIGS' 2015 Catalogue); TRX-211-4 (FIGS' Website in 2015); TRXs-236-1 & 309-1 (2015 and 2016 FIGS Instagram posts); TRX-538-1 (2018 FIGS Facebook page); TRX-561-1 (2019 Facebook Ad); Ex. D at 105:8-16; Ex. I at 101:25-102:6.) But FIGS' executives have equivocated on the record about whether its products are, in fact, antimicrobial.

- At first, Hasson contends that all of FIGS' scrubs are antimicrobial. (Ex. A at 59:15-14.) Later in her testimony, she said she hoped that the poly/rayon scrubs produced in 2015 and potentially later were not antimicrobial, but she is not sure. (*Id.* at 68:18-24.)

- Gago first testified that all of FIGS' scrubs were antimicrobial, but later conceded that scrubs sold in 2014, called the California collection, were not antimicrobial. (Ex. D at 105:08-13; 354:10-356:1.)

- Spear ordered her team to put on the hangtag of FIGS' poly/rayon fabric that it was "anti-microbial," and agreed that FIGS' website says, "All FIGS scrubs are antimicrobial," but later testified that the poly rayon fabric was sometimes not antimicrobial. (TRX-136-1; Ex. B at 49:11-50:4; 125:11-16; 21-23.)

- Chiang initially testified that all FIGS scrubs were antimicrobial in 2015. (Ex. J at 33:2-8). After further probing, Chiang stated that the technical collection was sometimes not antimicrobial. (*Id.* at 33:20-34:2.)

Despite representing the technology was "proprietary," FIGS' executives could not name the antimicrobial applied to FIGS' scrubs prior to 2016. (Ex. A at 60:7-62:24; Ex. D at 214:1-3; Ex. B at 246:8-13.) Prior to 2016, the evidence shows that Hasson and Spear were still trying to identify an appropriate antimicrobial to use. (*See*, *e.g.*, TRX-265-1 (Oct. 2015); TRX-290-1 (Dec. 2015).)

There is not one purchase order in evidence showing that FIGS ever directed that an antimicrobial finish added to its fabric prior to 2016. There is not one antimicrobial efficacy test in evidence from that time, either. The only evidence of antimicrobial testing from that time is a photo-shopped positive test result created by Hasson. (*Compare* TRXs-73-1, 74-5-6, 75-2, & 220-1 *with* TRX-1522-3-4.) Both Hasson and Spear admit they needed to show what a positive antimicrobial test looked like, the inference being they never had a positive antimicrobial test outcome before. (Ex. A at 35:10-36:1; *accord* Ex. B at 129:5-11.) Prior to 2016, the evidence does not support the conclusion that FIGS applied antimicrobial treatments to its products.

From 2016 onward, FIGS claims it applied Silvadur to its scrubs. (Ex. B at 219:19-220:1.) But the evidence is in dispute as to whether and when FIGS, in fact, applied

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

Silvadur. No purchase order in evidence specifically includes the word Silvadur. (*See*, *e.g.*, TRXs 3384A & 3404A). A corporate representative from FIGS' mill, Hyosung, testified that Hyosung has never received a purchase order indicating it should apply antimicrobial treatments to FIGS' scrubs and could not find any corresponding testing that would have accompanied such an order. (Ex. K at 104:14-105:19.) The Hyosung representative specifically indicated that the company never ordered or applied Silvadur to FIGS' scrubs. (*Id*.) As late as 2017, FIGS' Head of Product Development, Diana Shin, directed the manufacturer to not apply an antimicrobial finish to certain scrubs. (TRX-139-4.) The evidence supports SPI's contention that FIGS did not apply an antimicrobial agent to all its scrubs, as it advertised, and therefore its scrubs cannot kill bacteria and infection on contact.

Furthermore, testing performed in this case places into dispute whether FIGS' scrubs, even if treated, kill bacteria and infection immediately upon contact. Dr. Anderson stated that, after reviewing both SPI's and FIGS' testing, "there was no empirical data to show that the bacteria were killed immediately upon contact…" (Ex. F at 116:2-11.) SPI's textile testing expert, Dr. Hauser, also tested FIGS scrubs to determine whether FIGS could substantiate its Kill Claim. After testing 15 different types of bacteria at five seconds of contact time, none of FIGS' scrubs showed any significant reduction in bacteria on contact. (*See* TRXs-697-8; 698-8; 700-9; 713-8; 715-7; 717-7; 718-7; 719-7; 720-7.) Dr. Hauser testified that MRSA, in particular, actually grew on the fabric after the first five seconds. (Ex. H at 133:7-134:6.) Furthermore, Dr. Hauser interpreted Dr. El Shafei's results to conclude that, again, FIGS' fabric did not reduce bacteria enough to support its claim that it kills bacteria and infection on contact. (*Id.* at 136:6-137:20.) FIGS has not offered any testimony of its experts to establish that its testing amounts to "kill[ing]" bacteria.

Third, FIGS argues that the claim cannot be misleading because SPI did not present a survey showing that consumers read the claim to mean that FIGS' scrubs kill 100% of all types of bacteria. This ignores that SPI has shown literal falsity, especially as to the infection component of the statement and the consumer belief in underlying testing that did

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

not exist. This further ignores that SPI has alleged intentional acts by FIGS, Spear, and Hasson to perpetuate the false and misleading Immediate Kill Claim, which permits a presumption of deception. (*Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 (9th Cir. 1989).) That aside, FIGS has not made an initial showing that the claim must be considered misleading because it is ambiguous. (*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2019 WL 5320390, at *4 (S.D. Cal. Oct. 21, 2019) ("Defendants do not point to… any evidence of consumers finding the phrase to be confusing. This is especially true considering the consumers are likely educated entities considering the phrase in context. Therefore, the Court finds Defendants have not demonstrated that the phrase 'TSI only' is ambiguous.".) FIGS attempts to make a showing of ambiguity by paralleling this case to the *Vestagen* case, but the facts of that case underscore why FIGS' claim is not ambiguous.

Although the *Vestagen* Court agreed that touting the effect of an antimicrobial treatment as "inhibiting the growth of bacteria" should not reasonably be construed to apply to "all bacteria," it made that determination *in the context of the advertisement*. *Strategic Partners Inc. v. Vestagen Protective Techs. Inc.*, 2016 WL 10611186, at *3 (C.D. Cal. Nov. 23, 2016). As found by the *Vestagen* Court, SPI's statements addressed the antimicrobrial *protection of its fabric*, rather than health claims affecting the individual. *Id.* Unlike in *Vestagen*, here FIGS asserts that its *scrubs* (rather than its antimicrobial treatment) *kill* (rather than reduce) bacteria *and infection* (never stated by SPI, and pertaining to the wearer) immediately upon contact. This is precisely the type of extreme health claim that would unambiguously indicate broad protection of a person against bacteria, particularly in light of the fact that FIGS was simultaneously touting that its scrubs reduce hospital acquired infections, which implicate a broad range of bacteria, "by 66%". SPI has offered direct evidence of this in Dr. Simonson's messages survey and consumer responses to FIGS' own surveys, which mention, "The fabric is…antibacterial" and "infection resistant" (TRX-2187 at rows 368 & 277).

As SPI successfully argued in its opposition to FIGS' motion for summary judgment, it is well-established that a claim can be literally false "by necessary implication."

(*Southland Sod Farms*, 108 F.3d at 1139.) In so determining, the claim must be analyzed in full context. (*Id.*) Here, FIGS' Immediate Kill Claim expressly and by necessary implication conveys a health benefit that its products immediately protect consumers from "infection" based on its product's immediate "kill" effect. FIGS did not make the claim that its products could kill only "some" small percentage of bacteria that would have no impact on reducing the risk of infection, as FIGS now suggests. Rather, FIGS intended for its claim to convey a health benefit – for example, that its fabrics protected against MRSA. (TRX-202-2; Ex. J at 25:18-21; Ex. D at 370:03-09 & 370:18-25.) Spear further testified that FIGS told consumers its fabric was treated with Silvadur, and Silvadur could kill bacteria like MRSA. (Ex. B at 91:1-5.) Dr. Hauser testified that MRSA actually grew on the sample tested. Ex. H at 133:7-134:6. Importantly, FIGS' interpretation would rewrite the claim by adding the words "some" and "insignificant," and delete the word "infection." It is for the jury to determine whether FIGS' claim that its scrubs killed bacteria and infection immediately upon contact could reasonably be interpreted to mean that its scrubs kill only some insignificant number of select types of bacteria (*e.g.*, one bacterial cell) on contact.

Fourth, FIGS contends that SPI cannot argue against the truthfulness of FIGS' statement because it allegedly "made the same claim." (ECF 892 at 19:1-2 (emphasis removed).) SPI disputes that it made the same claim. SPI, unlike FIGS, received approval from the manufacturer of Silvadur to make its specific claims. SPI's statements that Silvadur-treated scrubs "reduce, inhibit, and minimize the growth of bacteria" and "growth is disrupted" on contact are very different than the claim here – that FIGS' scrubs "*kill* bacteria *and infection immediately* on contact." This Court has already determined the similarity of these statements – or dissimilarity – is in the reasonable province of the jury. (ECF 701 at 27:10-12 ("Here, whether the statements at issue are functionally the same is a matter of fact subject to genuine dispute. FIGS's affirmative defense of unclean hands therefore involves a factual dispute for the jury to decide.").)

///

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

### 3.   Liquid Repellent Claim

FIGS contends this Court can dispose of the liquid repellent claim because FIGS never advertised its non-liquid repellent scrubs as liquid repellent, the term is ambiguous, and FIGS passes the water repellency test, which is the only representation it made to consumers. Each point is in dispute and properly belongs with the jury.

<u>First</u>, the only testimony FIGS offers in its Motion to state that FIGS never advertised its non-liquid repellent scrubs as liquid repellent is the testimony of its own counsel. (ECF 892 at 23:13-16 (citing Ex. L at 45:16-18).) The weight of the evidence shows that FIGS advertised all its scrubs as liquid repellent since 2014. (*See*, *e.g.*, TRX-650-4 (FIGS admitted it made the representation from 2014 to present in its discovery responses); TRX-538-1 (2018 FIGS' Facebook page); TRX-561-1 (2019 FIGS' Facebook advertisement).) FIGS' advertisements of its products' liquid repellency did not differentiate among product lines. (*See*, *e.g.*, TRX-568 (2018 Facebook page); TRX-561 (2019 Facebook ad); TRX-558-3 (2018 Twitter post).)

The undisputed testimony of FIGS' executives confirms that FIGS' scrubs are not all liquid repellent, even by their own definition of the phrase. As with the antimicrobial technology, Spear and Gago referenced a "proprietary" fluid resistant technology applied to FIGS' scrubs. (TRX-152-13; Ex. B at 98:21-99:19). Yet, Gago could not recall the name of FIGS' allegedly proprietary fluid resistant technology or how long FIGS used it. (Ex. D at 280:2-18.) Spear, likewise, could not recall the name of the proprietary technology. (Ex. B at 84:25-86:7.)

Gago later represented that FIGS did not apply any liquid repellent treatments to its scrubs before 2015 and only applied treatments to the technical collection from 2015-2017. (Ex. D at 395:23-396:21.) Spear corroborated that timeline. (Ex. B at 84:25-86:7.) Yet, as late as 2017, Hasson, Duff Gago, and Spear were working on a bid for Cedars Sinai and asking internally what fluid resistant technology they could write about on the bid, the implication being that they did not already possess fluid resistant technology. *See* (TRXs-152-13; 153-1.) The record establishes that FIGS did not consistently apply a liquid

repellent technology to its products during the time it advertised its products were liquid repellent. That is literal falsity.

Second, FIGS contends that Dr. Hauser said the term liquid repellent was ambiguous. However, the same authority cited by FIGS states that an expert's conception of ambiguity is not dispositive because the expert is not a consumer. (*Quidel Corp.*, 2019 WL 5320390, at *4.) The *Quidel* further disregarded Defendants' assertion that the claim at issue there was ambiguous without offering any evidence that consumers found the claim confusing. (*Id.*) Here, too, FIGS has not demonstrated that a consumer would view liquid repellency as an ambiguous term, particularly in this context. Even if it had, FIGS' scrubs do not repel the liquids of concern to its customers. FIGS represented that its scrubs were liquid repellent, which it understood and represented to consumers to include protection against blood. (TRXs-166-1 (2014 Blog); 417-1 (2017 Email).) Hasson herself clearly drew this connection in a 2014 interview: "When we were starting our initial production, we realized that the fabrics and materials that we believed were ideal for the medical setting did not exist in the medical apparel industry… It was also really important to us to protect our medical professionals from blood, liquids and other contaminants." (TRX-166-7.) Spear testified that, while FIGS made the Liquid Repellent Claim, her understanding was their scrubs protected against blood. (Ex. B at 61:14-63:7.) Dr. Hauser also testified it was important to test a hospital scrub that is purportedly liquid repellent for its resistance to blood. (Ex. H at 63:5-14.) The weight of the evidence shows that, taking the representation that a scrub is liquid repellent in full context, (*Southland Sod*, 108 F.3d at 1139,) the jury can determine whether said scrubs' lack of resistance to blood would render FIGS' Liquid Repellent Claim false by necessary implication.

Dr. Hauser tested for water and synthetic blood, given their relevance.[4] These tests show that 19 of 19 FIGS' samples failed the blood resistance test, 14 of 15 FIGS' samples

---

[4] Dr. Hauser also tested for oil repellency. Although FIGS contends Dr. Hauser did not provide an explanation for his testing of oil, he in fact testified he tested oil to assess the

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

failed the oil repellency test, and 13 of 15 scored a 70 or less on the water resistance test. (TRXs-711; 721; 735.) Dr. Hauser concluded that FIGS' scrubs are not liquid repellent. (Ex. H at 157:8-14.)

Third, FIGS' contention that its scrubs pass the water repellency test is in dispute. Although there is no formal pass rate for the water repellency test, Dr. Hauser testified that he does not consider 70 a passing score for water repellency because, in his 40 years working with companies in the industry, "if a company wants to say their fabric is water repellent, it needs [at] least . . . 95 or a hundred to get it." (Ex. H at 61:11-62:2.) Consumer feedback submitted to FIGS substantiates Dr. Hauser's findings. (*See, e.g.*, TRX-2282, row 238 (listing an area for improvement as, "A little more Water resistance.").) The aforementioned evidence puts at issue whether FIGS' scrubs are, in fact, liquid repellent.

## C.  **The Jury Has Ample Evidence to Reasonably Find that FIGS Intentionally Interfered with its Customers.**

Finally, for many of the same reasons the jury has sufficient evidence to reasonably infer causation related to SPI's Lanham Act claim, FIGS' attempt to take the IIPER claim from the jury fails.

To begin with, insofar as FIGS argues JMOL is warranted because SPI has not identified specific customers, (*see* ECF 892 at 2-4,) the argument is moot. The parties agree that a closed set of third parties is required to take the claim to the jury, and SPI is not pointing to "the market" or "repeat buyers." Rather, it has identified a universe of customers contained in exhibits of record—Exhibits 104, 2187, 2281, and 2282—on which its IIPER claim is based. Indeed, FIGS has anticipated and identifies some of these exhibits—and it does not dispute that they suffice to provide the "specifically identified" third parties required to take the claim to the jury. Nor could it; rather, FIGS' argument is focused principally on causation: It contends that SPI cannot show any "interference" that caused losses. Those arguments are unavailing. SPI need only prove that, crediting its

---

ability of FIGS' scrubs to repel fluids with lower surface tensions than water. Oct 25 AM Transcript at 155:13-24.

evidence and drawing all inferences in its favor, its economic harm was proximately caused by FIGS.

The evidence suffices for a jury to readily infer that *specific customers* were *specifically and intentionally interfered with*, which resulted in *lost sales for SPI*—and that satisfies the elements of an IIPER claim. SPI has offered ample direct, circumstantial, and inferential evidence that its customers purchased products from FIGS, a direct competitor, after FIGS targeted those customers with false claims—and then those customers cited the substance of FIGS' false claims as reasons for their purchase. This satisfies the proximate causation standard under IIPER, which is *not* (as Defendants contend) a "high bar" to recovery. (ECF 892-1.) "Under California law, the test for causation is whether the alleged conduct played a 'substantial factor' in causing damages." (*See Roadrunner Intermodal Services, LLC v. T.G.S. Transportation, Inc.*, 2021 WL 2188138, at *4 (E.D. Cal. 2021).) "[A] minor force that nonetheless causes harm qualifies as a substantial factor in a causation analysis." (*Id.* at *9.) And a finding of causation may be predicated on reasonable inferences drawn from circumstantial evidence. (*See, e.g.*, *City of Modesto v. Dow Chemical Co.*, 19 Cal. App. 5th 130, 153 (2018).)

Here, then, a reasonable jury can infer that as a direct competitor, FIGS' false and misleading statements caused economic damage to the extent that customers' purchases of SPI scrubs declined after hearing FIGS' statements. (*Cf.*, *e.g.*, *Code Rebel, LLC v. Aqua Connect, Inc.*, 2013 WL 5405706 at *6 (C.D. Cal. Sept. 24, 2013).) Causation is ordinarily a question of fact for the jury. (*E.g.*, *Altman v. HO Sports Co.*, 821 F. Supp. 2d 1178, 1193 (E.D. Cal. 2011).) Hence, judgment as a matter of law is only appropriate if the defendant can show that *no triable issue of fact* remains with respect to the customers listed in Exhibits 104, 2187, 2281, and 2282—even though scores of those customers *specifically cited* FIGS' false claims as their most appealing attributes. Defendants, needless to say, can make no such showing. A jury could easily, reasonably conclude that FIGS' false claims were a "minor force that nonetheless causes harm," (*Roadrunner*, 2021 WL 2188138, at *9,) in influencing those customers to purchase FIGS' scrubs instead of SPI's.

The evidence here is clear and compelling, and the inference of injury by interference readily reached. The jury has seen that one of SPI's *own customer lists* was obtained by Defendants, and that scores of customers volunteered FIGS' falsehoods as their favorite feature in FIGS-commissioned surveys. Defendants, blinkered, try to reason their way out of the obvious: SPI customers who were targeted with false advertising by FIGS started buying FIGS, and it is a reasonable inference that those sales came at SPI's expense. A jury is entitled to infer that an ordinary scrubs consumer does not suddenly start buying more scrubs in total than their baseline because they found FIGS, or because FIGS found them. And the corollary of that reasonable inference is that the sales going to FIGS probably reduced or replaced some or all of the share of *SPI* purchases that customer otherwise would have made. Similarly, a reasonable jury could (and, given the applicable standard, must be allowed to) infer that a retailer will not deliberately overstock itself because it likes FIGS—rather, carrying FIGS necessarily comes at the expense of other brands, including SPI.

The direct and circumstantial evidence practically *compels* the conclusion these targeted consumers were intentionally interfered with by way of targeted advertising and exposure to false claims—and, in the light most favorable to SPI, the jury is entitled to draw that conclusion on the evidence. Again, SPI has presented evidence that FIGS employed a strategy *specifically targeting* SPI's customers. (*See* Ex. B at 113:2-8; Ex. D at 452:2-10, 16-20; Ex. C at 17:23-18:1.) FIGS' digital advertising campaign was shot through with false claims. (*See, e.g.*, TRXs 145-1; 152-10; 200-2; 211-4; 233-1; 610-2.) Thus, to the extent a customer (1) identified an SPI brand as one he or she wore, past or present, (2) was exposed to FIGS' false and misleading claims (in many cases, specifically targeted by FIGS); (3) purchased FIGS' scrubs; and (4) identified one of the false claims as a reason for buying FIGS, then that customer *necessarily* was exposed to one more false and misleading claims. Therefore, the jury may reasonably infer that that exposure was the result of FIGS' targeting efforts—and that it caused damage to SPI. And assuming (as the Court must on JMOL) that the jury credits Dr. Simonson's conclusions that FIGS' false

and misleading claims are material, it requires the minutest of inferences to conclude that the SPI customers identified in those surveys and customer lists *who identified the false FIGS claims as key features* (and who then purchased FIGS scrubs), did so *because of* the false claims. That is causation. It is not an attenuated chain; it is an inference that invites itself. And it is certainly not unreasonable *as a matter of law* to reach that conclusion.

FIGS rounds out its attack on SPI's IIPER claim with a series of subsidiary arguments, all meritless. It argues that a jury cannot reasonably infer IIPER liability with respect to Inka's Uniforms because "[n]either the 'threads for threads initiative' nor 'antimicrobial' are challenged claims in this case." (ECF 892 at 8.) In other words, FIGS posits that no reasonable juror could conclude that these terms refer to the *same* falsehoods FIGS was *also* promoting through its omnichannel marketing campaign. On its face, that argument fails; a jury could easily infer that Inka's Uniforms heard the false claims at issue. FIGS also argues that any claim based on Inka's Uniforms is precluded by the statute of limitations. (*See* ECF 892 at 8-9.) No: IIPER claims are governed by the discovery rule. (*See, e.g., Taie Weie Enter. Co, Ltd v. Tech. Aquatic Associated Mfg.*, 2021 WL 8572628, at *4 (C.D. Cal. Apr. 23, 2021).) That rule tolls the statute of limitations from the time "when the plaintiff has reason to suspect an injury and some wrongful cause." (*Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005).) Until discovery *in this litigation*, SPI could not possibly have known that FIGS obtained its customer list and used it to target retailers with its falsehoods at a convention. FIGS also posits that Exhibits 104 and 2233 identify customers as to which any claim is time-barred. (*See* ECF 892 at 9 n.5.) Again, though, as to these customers SPI had *no reason* to suspect a "wrongful cause." The argument fails.

At bottom, this is a case for the jury.

///

///

///

///

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

III.   <u>**CONCLUSION**</u>

For the foregoing reasons, SPI respectfully requests that the Court deny FIGS' Motion for Judgment as a Matter of Law.

Date: October 31, 2022                    **MICHELMAN & ROBINSON, LLP**

                                By:    */s/ Jennifer Goldstein*
                                       Sanford L. Michelman, Esq.
                                       Mona Z. Hanna, Esq.
                                       Jeff D. Farrow, Esq.
                                       Marc R. Jacobs, Esq.
                                       Jesse J. Contreras, Esq.
                                       Kevin Kim, Esq.
                                       Allison C. Aguirre, Esq.
                                       Jennifer S. Goldstein, Esq.
                                       Adam M. Korn, Esq.

                                       **KATTEN MUCHIN ROSENMAN LLP**

                                By:    */s/ Kristin J. Achterhof*
                                       Richard H. Zelichov, Esq.
                                       Kristin J. Achterhof, Esq.
                                       Timothy H. Gray, Esq.

                                       Attorneys for Plaintiff
                                       STRATEGIC PARTNERS, INC.

**STRATEGIC PARTNERS, INC.'S OPPOSITION TO FIGS' MOTION FOR JUDGMENT AS A MATTER OF LAW**