1   Jacob S. Kreilkamp (State Bar No. 248210)
       jacob.kreilkamp@mto.com
2   Adam B. Weiss (State Bar No. 296381)
       adam.weiss@mto.com
3   Sara A. McDermott (State Bar No. 307564)
       sara.mcdermott@mto.com
4   James R. Salzmann (State Bar No. 324527)
       james.salzmann@mto.com
5   William M. Orr (State Bar No. 331842)
       william.orr@mto.com
6   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, Fiftieth Floor
7   Los Angeles, California 90071-3426
    Telephone:  (213) 683-9100
8   Facsimile:  (213) 687-3702

9   Ekwan E. Rhow (State Bar No. 174604)
       erhow@birdmarella.com
10  Julia B. Cherlow (State Bar No. 290538)
       jcherlow@birdmarella.com
11  Fanxi Wang (State Bar No. 287584)
       fwang@birdmarella.com
12  Kate S. Shin (State Bar No. 279867)
       kshin@birdmarella.com
13  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
14  1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
15  Telephone:  (310) 201-2100
    Facsimile:  (310) 201-2110

16  *Additional Counsel on Next Page*

17

18              **UNITED STATES DISTRICT COURT**

19              **CENTRAL DISTRICT OF CALIFORNIA**

20

21  | STRATEGIC PARTNERS, INC., | Case No. 2:19-cv-02286-JWH-KS |
22  |                           |                               |
    |          Plaintiff,       | **DEFENDANTS' BRIEF RE LACK OF CAUSATION** |
23  |                           |                               |
    |              vs.          | Date:      February 3, 2023   |
24  |                           | Time:      9:00 a.m.          |
    | FIGS, INC., CATHERINE ("TRINA") | Crtrm.:    9D            |
25  | SPEAR, HEATHER HASSON,     |                               |
26  |         Defendants.        | Judge: Hon. John W. Holcomb   |

27

28

1 | *Additional Counsel*

2 | Xiaonan April Hu (State Bar No. 321354)
  |     april.hu@mto.com
3 | MUNGER, TOLLES & OLSON LLP
  | 601 Massachusetts Ave. NW, Suite 500E
4 | Washington, D.C. 20001-5369
  | Telephone:  (202) 220-1100
5 | Facsimile:  (202) 220-2300

6 | Sara H. Worth (State Bar No. 341088)
  |     sara.worth@mto.com
7 | MUNGER, TOLLES & OLSON LLP
  | 350 South Grand Avenue, Fiftieth Floor
8 | Los Angeles, California 90071-3426
  | Telephone:  (213) 683-9100
9 | Facsimile:  (213) 687-3702

10 | Miri E. Gold (State Bar No. 319060)
   |     mgold@birdmarella.com
11 | BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   | DROOKS, LINCENBERG & RHOW, P.C.
12 | 1875 Century Park East, 23rd Floor
   | Los Angeles, California 90067-2561
13 | Telephone:  (310) 201-2100
   | Facsimile:  (310) 201-2110

14 |

15 | Attorneys for Defendants

16 |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................. 1

II.   LEGAL STANDARDS ........................................................................ 3

III.  ARGUMENT ...................................................................................... 4

    A.    No "chain of inferences" can support UCL or FAL causation. .............. 4

    B.    The jury found *no unfair act* to cause SPI harm. .................................... 6

    C.    SPI has not proved (and cannot prove) that it suffered harm as the result of *any* action by FIGS. ............................................................. 7

        1.   Since FIGS' 2013 founding, SPI's finances have *improved*. ......................................................................................... 9

        2.   SPI cannot identify *any* actual lost customers. ........................... 10

        3.   Damages opinions are not evidence of causation or harm. ........ 12

        4.   SPI was its own worst enemy. ..................................................... 15

IV.   CONCLUSION ................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Allbirds, Inc. v. Giesswein Walkwaren AG,*
    2020 WL 6826487 (N.D. Cal. 2020)................................................................5

*Alonzo v. Maximus, Inc.,*
    832 F. Supp. 2d 1122 (C.D. Cal. 2011)........................................................4

*AlterG, Inc. v. Boost Treadmills LLC,*
    388 F. Supp. 3d 1133 (N.D. Cal. 2019).......................................................3

*Appliance Recycling Ctrs. of Am., Inc. v. JACO Env't, Inc.,*
    378 F. App'x 652 (9th Cir. 2010)................................................................4

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ...................................................................................7

*CKE Rest. v. Jack in the Box, Inc.,*
    494 F. Supp. 2d 1139 (C.D. Cal. 2007)......................................................14

*Clorox Co. v. Reckitt Benckiser Grp. PLC,*
    398 F. Supp. 3d 623 (N.D. Cal. 2019)........................................................8

*Copart, Inc. v. Sparta Consulting, Inc.,*
    339 F. Supp. 3d 959 (E.D. Cal. 2018) .......................................................1

*Grasshopper House, LLC v. Clean & Sober Media LLC,*
    2019 WL 12074086 (C.D. Cal. July 1, 2019) .........................................4, 5

*Hansen Beverage Co. v. Vital Pharm., Inc.,*
    2010 WL 3069690 (S.D. Cal. Aug. 3, 2010)..............................................8

*L.A. Taxi Coop. v. Uber Techs., Inc.,*
    114 F. Supp. 3d 852 (N.D. Cal. 2015)........................................................7

*LegalForce RAPC Worldwide, P.C. v. DeMassa,*
    532 F. Supp. 3d 856 (N.D. Cal. 2021)...........................................1, 3, 8, 9

*McCabe v. Guitars,*
    2013 WL 12064539 (S.D. Cal. Mar. 4, 2013)........................................5, 6

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) ................................................................ 14

*Nathan Kimmel, Inc. v. DowElanco*,
    275 F.3d 1199 (9th Cir. 2002) ............................................................... 7

*Ngethpharat v. State Farm Fire & Cas. Co.*,
    2021 WL 2823245 (W.D. Wash. July 7, 2021) ..................................... 11

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
    2020 WL 4747724 (S.D. Cal. Aug. 17, 2020) ...................................... 14

*Sperling v. Stein Mart, Inc.*,
    291 F. Supp. 3d 1076 (C.D. Cal. 2018) .............................................. 3, 4

*Strategic Partners, Inc. v. Vestagen Protective Techs., Inc.*,
    No. 16-5900, Dkt. 255 (C.D. Cal. Nov. 14, 2017) ................................. 7

*TrafficSchool.com, Inc. v. Edriver, Inc.*,
    633 F. Supp. 2d 1063 (C.D. Cal. 2008) ................................................. 5

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ............................................................. 4, 5

*In re Turner*,
    859 F.3d 1145 (9th Cir. 2017) ............................................................... 6

*Vampire Fam. Brands, LLC v. MPL Brands, Inc.*,
    2021 WL 4134841 (C.D. Cal. 2021) ...................................................... 5

*Van Patten v. Vertical Fitness Grp., LLC*,
    847 F.3d 1037 (9th Cir. 2017) ............................................................... 3

**STATE CASES**

*Daro v. Superior Court*,
    151 Cal. App. 4th 1079 (2007) .............................................................. 6

*Demeter v. Taxi Comput. Servs., Inc.*,
    21 Cal. App. 5th 903 (2018) .................................................................. 7

*Kwikset Corp. v. Superior Ct.*,
    51 Cal. 4th 310 (2011) ...................................................................... 3, 6

*Troyk v. Farmers Grp., Inc.*,
    171 Cal. App. 4th 1305 (2009) ................................................................................. 3

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17200 ............................................................................. *passim*

Cal. Bus. & Prof. Code § 17204 ..................................................................................... 1, 3

Cal. Bus. & Prof. Code § 17500 ............................................................................. *passim*

Cal. Bus. & Prof. Code § 17535 ..................................................................................... 1, 3

1    **I.     INTRODUCTION**

2        On November 3, 2022, after nearly four years of litigation, the jury returned a

3    complete defense verdict for Defendants FIGS, Inc., Catherine "Trina" Spear, and

4    Heather Hasson (collectively, FIGS). Dkt. 925. FIGS prevailed on every question

5    the jury was called upon to answer. The jury found that there was neither falsity nor

6    deception as to each of the four advertising claims challenged by Plaintiff Strategic

7    Partners, Inc. (SPI); that FIGS did not engage in false advertising; that no Defendant

8    intentionally interfered with SPI's economic relationships; and that SPI filed suit

9    with unclean hands, having itself made similar marketing claims. *Id.*

10       The jury's verdict likewise dooms SPI's equitable claims, which allege

11   violations of Cal. Bus. & Prof. Code § 17200 (the UCL) and § 17500 (the FAL). As

12   a practical matter, the jury's findings are dispositive: Each remaining equitable

13   claim is premised on the purported "falsity" of FIGS' advertisements, Dkt. 854 at 7–

14   8, which the jury fully rejected; and the parties agree that the Lanham Act is

15   substantially congruent to California's false advertising statutes. The Court need go

16   no further to dispose of SPI's equitable claims.

17       However, the Court has asked for briefing as to whether a failure of proof on

18   causation presents an additional avenue for bringing the equitable claims to

19   conclusion and reaching a final judgment in this matter. Dkt. 937 at 1–2. By statute,

20   a plaintiff lacks standing to pursue a claim under the UCL or FAL absent proof that

21   it has "lost money or property *as a result*" of unfair competition or false advertising.

22   Cal. Bus. & Prof. Code §§ 17204, 17535 (emphasis added). That is, without proof of

23   causation, SPI has *no* basis for a claim under either the UCL or FAL. The Court may

24   conduct that standing analysis, as here, after the jury decides predicate questions and

25   the full record of trial evidence is complete. *See, e.g., Copart, Inc. v. Sparta*

26   *Consulting, Inc.*, 339 F. Supp. 3d 959, 985 (E.D. Cal. 2018); *LegalForce RAPC*

27   *Worldwide, P.C. v. DeMassa*, 532 F. Supp. 3d 856, 859 (N.D. Cal. 2021)

28   (addressing the standing burden at the conclusion of trial). Now that the jury has

rendered its verdict, the facts are plain: SPI did not and cannot prove even the threshold statutory standing requirements for its UCL and FAL claims because it failed to prove that it lost *anything* as a result of *any* action (or inaction) by FIGS.

Across three weeks of trial, SPI not only failed to establish that a single one of FIGS' advertising claims was untrue or misleading, but it also failed to adduce any cognizable evidence whatsoever of causation. Instead, SPI relied exclusively— as it has for years—on its argument that the trier of fact should simply "infer" causation (as well as harm). It is far too late for that now: SPI's long-touted "chain of inferences" is irreparably broken. Even putting aside the jury's flat-out rejection of SPI's allegations as to any predicate wrongful conduct on the part of FIGS in the first place, the evidence adduced at trial overwhelmingly showed that SPI cannot to this day—after years of scorched-earth pretrial discovery and three weeks of trial— identify even a *single* sale that it lost to any alleged (and wholly unproven) unfair competition; that, to the contrary, FIGS actually *expanded* the market for medical apparel; and that SPI maintained market share and *grew* in value thanks to this expansion, offsetting its own self-inflicted wounds from its inability to adapt its business to meet the needs of modern customers of medical apparel. The only possible inference that remains is that, after nearly four years of protracted litigation, the only parties injured by this suit have been FIGS and its co-founders.

In accordance with the Court's Order of December 7, 2022, FIGS elaborates below on SPI's wholesale failure of proof of causation as to its two equitable claims and respectfully requests that the Court promptly enter judgment for FIGS and bring this meritless lawsuit to its end. Should the Court choose *not* to dismiss SPI's equitable claims on the basis of causation, however, FIGS requests the opportunity to be heard as to the numerous other grounds that require judgment in FIGS' favor on those same claims, including, *inter alia*, SPI's inability to establish any cognizable predicate wrongful conduct for either claim; SPI's lack of entitlement to

1    either of the UCL's and FAL's exclusive remedies; SPI's unclean hands;

2    preemption; judicial estoppel; laches; and the statute of limitations.

3           This litigation has been ongoing for almost four years, millions upon millions

4    of dollars have been spent, and a tremendous amount of judicial resources have been

5    expended. The jury verdict could not have represented a more wholesale rejection of

6    SPI's claims. There is no wax left in SPI's candle.

7    **II.     LEGAL STANDARDS**

8           "Before evaluating the substance" of a UCL or FAL claim, "the Court must

9    ensure that [the plaintiff] has standing." *AlterG, Inc. v. Boost Treadmills LLC*, 388

10   F. Supp. 3d 1133, 1156 (N.D. Cal. 2019). UCL and FAL standing is "substantially

11   narrower than federal standing under article III, section 2 of the United States

12   Constitution," and a private actor lacks such standing unless it can prove that its

13   own economic injury—i.e., lost money or property—*was caused by* the defendant's

14   unfair, unlawful, or fraudulent act. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310,

15   324, 326 (2011) (citing Cal. Bus. & Prof. Code §§ 17204, 17535). It is the plaintiff's

16   burden to "establish those facts 'by a preponderance of the evidence.'" *LegalForce*,

17   532 F. Supp. 3d at 859 (quoting *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th

18   1305, 1351 (2009)).

19          This standing requirement functionally "imports a *reliance or causation*

20   element" into the UCL and FAL. *Kwikset*, 51 Cal. 4th at 326. Absent proof of a

21   causal link to "an economic injury 'which is (a) concrete and particularized . . . and

22   (b) actual or imminent, not conjectural or hypothetical,'" the defendant is entitled to

23   judgment. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1049 (9th Cir.

24   2017) (quoting *Kwikset*, 51 Cal. 4th at 322).[1]

25   _____

26   [1] Even if SPI could establish standing under the UCL, "liability under the UCL requires a showing that an unfair, unlawful, or fraudulent practice harmed [the]

27   Plaintiff[]." *Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1087 (C.D. Cal.

28   2018) (to conclude otherwise "would place liability" on the defendants "even

## III.   ARGUMENT

SPI not only has failed to prove a causal relationship between its purported losses and FIGS' advertisements, but also has failed to establish any legally actionable loss whatsoever. Dkt. 937 at 3. SPI's failure of proof on causation is thus threefold: SPI has not adduced evidence of (i) an unfair business practice; (ii) an economic injury; *or* (iii) one having caused the other—all of which are necessary to prove up SPI's claims. This lack of evidence is triply fatal to standing, and triply fatal to SPI's remaining claims.

### A.   No "chain of inferences" can support UCL or FAL causation.

As the Court's December 7 Order notes, SPI "fended off [FIGS'] causation" arguments at summary judgment and on FIGS' motion for judgment as a matter of law only by "taking refuge under the cover of *Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *7 (C.D. Cal. July 1, 2019)." Dkt. 937 at 2. That refuge is no longer available.

The *Grasshopper House* court relied on the Ninth Circuit's discussion of "injury in the context of *Article III* standing under the Lanham Act" to conclude that a plaintiff may "establish an injury by creating a chain of inferences showing how defendant's false advertising *could* harm plaintiff's business." *Id.* (quoting *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011))

---

though the harm . . . did not actually occur"). Where a jury finds that there was no such practice, there can, of course, be no liability. *See id.*; *see also Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1137 (C.D. Cal. 2011) (citation omitted) (UCL claims "stand[] or fall[] depending on the fate of the antecedent substantive causes of action"). And it is undisputed that where the trier of fact has found there to be no false advertising, there plainly cannot be any violation of the FAL. *See Appliance Recycling Ctrs. of Am., Inc. v. JACO Env't, Inc.*, 378 F. App'x 652, 655–56 (9th Cir. 2010) (failure of a Lanham Act claim "on the merits" results in failure of the "'substantially congruent' state claim"). As a result of these and the numerous other substantive failures of SPI's claims not addressed here, FIGS is entitled to judgment on SPI's UCL and FAL claims.

(emphasis added). At the threshold, that context is now altogether inapt: Because the jury fully rejected SPI's false advertising claims, those claims no longer can supply the required predicate harmful act under the UCL or FAL. *See id.* at *8 (the same evidence of inferences that the *Grasshopper House* court considered sufficient at summary judgment became "irrelevant" after the jury rejected liability).

Moreover, "[s]tanding under the UCL and FAL is more exacting" than standing under Article III of the U.S. Constitution. *Allbirds, Inc. v. Giesswein Walkwaren AG*, 2020 WL 6826487, at *5 (N.D. Cal. 2020); *Vampire Fam. Brands, LLC v. MPL Brands, Inc.*, 2021 WL 4134841, at *8 (C.D. Cal. 2021). While the Lanham Act "permits 'any person' to sue if he 'believes that he . . . is *likely* to be damaged," *TrafficSchool.com*, 653 F.3d at 826, inferences are insufficient to establish standing for state-law equitable claims. Rather, "*actual* injury and *immediate* causation are required to establish standing under California's UCL and FAL." *McCabe v. Guitars*, 2013 WL 12064539, at *7 (S.D. Cal. Mar. 4, 2013) (emphasis added).

Indeed, the *TrafficSchool* decision upon which *Grasshopper House* relies *specifically applied and upheld* these very UCL standing requirements. Because at trial the plaintiffs in *TrafficSchool* "failed to prove by a preponderance of the evidence that they ha[d] suffered an injury in fact and lost money or property *as a result* of Defendants' actions," the lower court found that "Plaintiffs lack[ed] standing to pursue their claim under . . . Section 17200, *et seq.*" *TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063, 1074 (C.D. Cal. 2008) (emphasis added). The Ninth Circuit affirmed in relevant part, concluding that "[t]hese findings conclusively establish that plaintiffs didn't have standing to bring their state-law claim." *TrafficSchool.com*, 653 F.3d at 825; *cf. id.* at 826–27 (permitting presumptions and inferences for *Lanham Act* standing *only*).

*TrafficSchool*'s finding of *no causation and thus no standing* for state-law claims holds here. As discussed *infra*, SPI adduced neither evidence of an unfair

business act by FIGS nor evidence of any injury to SPI, much less evidence that the former *caused* the latter. SPI cannot rely upon hypotheticals, supposition, and inference; the UCL and FAL require proof of "actual injury and immediate causation." *McCabe*, 2013 WL 12064539, at *7. SPI cannot provide what the UCL and FAL require by any measure, and certainly not by a preponderance of the evidence.

### B.   The jury found *no unfair act* to cause SPI harm.

At the outset, both the UCL and FAL causation inquiries require the existence of an actuating event, i.e., that some "unfair business practice or false advertising that is the gravamen of the claim" set events in motion. *In re Turner*, 859 F.3d 1145, 1151 (9th Cir. 2017) (quoting *Kwikset*, 51 Cal. 4th at 322); *see also id.* (there can be no standing if the plaintiff would have suffered "the same harm whether or not a defendant complied with the law" (quoting *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007))). The jury's verdict, however, conclusively establishes that SPI does not have a predicate unfair business act to support its equitable claims, which alone entitles FIGS to judgment.

The gravamen of SPI's UCL and FAL claims—of *all* its claims—was "*FIGS' [Allegedly] False Claims*." Dkt. 854 at 12, 14. At trial, the jury rejected wholesale the purported "falsity of FIGS' advertisements" and "the absence of scientific testing to support the health and safety claims." *Id.* For every one of the allegedly false claims, including so-called "health and safety" claims, the jury's verdict was unequivocal: The claims were *not* false, misleading, or deceptive. Dkt. 925 at 2–8.

The jury's verdict alone thus answers the question of causation. Because the only "unfair business practice" identified by SPI in the Final Pretrial Conference Order[2] was FIGS' purportedly false advertising, Dkt. 854 at 7, the jury's finding that

---

[2] To the extent SPI would now recharacterize its suit to premise its equitable claims on *other* allegedly unfair actions, that would be improper. The FAL can, *ipso facto*,

1   FIGS did *not* "engage in false advertising"—and that, indeed, there was no falsity at

2   all under the "substantially congruent" federal false advertising statute—necessarily

3   means that SPI lacks any legally actionable grievance to sustain its equitable

4   claims.[3] *L.A. Taxi Coop. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 860 (N.D. Cal.

5   2015); *see also* Dkt. 925 at nos. 2–3, 9–10, 16–17, 23–24, 31, 38, 45. Needless to

6   say, in the absence of an actionable grievance, there can be no causation.

7       **C.      SPI has not proved (and cannot prove) that it suffered harm as the**

8       **result of *any* action by FIGS.**

9       Finally, SPI's equitable claims fail for a separate and independent reason:

10   SPI's evidence at trial does not show that SPI suffered any economic loss *at all*,

11   much less any loss tethered in any way to FIGS' advertisements. Customers come

12   and go for all sorts of reasons; that is why the UCL and FAL require plaintiffs to

13

14   concern only false advertisements, and SPI can prove its UCL claims solely on the

15   grounds alleged in the operative pleading. *Demeter v. Taxi Comput. Servs., Inc.*, 21

     Cal. App. 5th 903, 915–16 (2018). The operative pleading is, by its own terms, the

16   Final Pretrial Conference Order, which superseded all prior complaints and

17   governed the course of trial, and which expressly predicates SPI's UCL claim on

18   FIGS' purportedly false advertisements (which the jury later found to be true and/or

     not misleading). Dkt. 854 at 35.

19   [3] Even if SPI now attempts to premise its UCL claim on an alleged regulatory

20   violation—an argument it once made in support of its rejected Lanham Act claims—

     substantial caselaw on preemption, preclusion, and deference would preclude it. *See,*

21   *e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348–49 (2001) (state-

22   law claims based on violations of federal regulatory schemes are preempted so as to

     preserve federal agencies' ability to pursue "difficult (and often competing)

23   objectives"); *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1206 (9th Cir.

24   2002) ("FIFRA leaves states with no authority to police manufacturers' compliance

     with the federal procedures."). SPI is well aware of these limitations, having

25   previously lost its UCL claims against another competitor, Vestagen, on similar

26   grounds. *See Strategic Partners, Inc. v. Vestagen Protective Techs., Inc.*, No. 16-

     5900, Dkt. 255 at *4, *6 (C.D. Cal. Nov. 14, 2017) ("In deference to the FDA, other

27   courts have refused to consider claims that turn on the interpretation of FDA

28   regulations.").

establish that they lost customers *specifically* because of a defendant's unfair business practices and false advertising. The UCL and FAL standing requirement of "lost money or property as a result of the unfair competition" is typically satisfied by proof that a defendant's actions caused plaintiff to lose sales. *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644–45 (N.D. Cal. 2019). Evidence such as hampered growth rates or declining revenue during relevant claim periods may also suffice. *E.g., Hansen Beverage Co. v. Vital Pharm., Inc.*, 2010 WL 3069690, at *5 (S.D. Cal. Aug. 3, 2010).

At trial, SPI introduced nothing of the sort. Rather, the evidence shows that SPI's profits, revenues, and market share all *increased* from 2013, when FIGS entered the market, to the present. *See infra* at 9–10. Nor did SPI bring forward a single real-life customer—not one, from amongst the many millions of scrub-buying professionals in the market—to testify at trial that he or she stopped buying from SPI in favor of FIGS *for any reason whatsoever*.

The absence of such evidence is fatal to UCL and FAL standing. *LegalForce* is instructive. 532 F. Supp. 3d at 859. In *LegalForce*, an established trademark-registration service sued a new competitor, alleging unfair business practices. The court deferred the standing question until after trial, when it correctly applied the preponderance-of-the-evidence standard to determine whether the plaintiff had standing. *Id.* The court concluded that the plaintiff's suit was barred by the plaintiff's failure to adduce sufficient evidence of (i) some amount by which its revenues declined; (ii) the differentiated balance-sheet impact of the defendant in particular, as opposed to business conditions in general; or (iii) any specific customers lost to the defendant for any reason at all, much less "as a result" of allegedly unfair practices. *Id.*

Without this evidence, the court concluded that even if the plaintiff *had* lost any customers, "the more reasonable inference is that those customers left LegalForce as a result of their dissatisfaction with the service they received," not

because of the defendant's actions. *Id.* at 860. Particularly damning was the lack of "evidence to support a finding that any such former customer, in the absence of [the defendant], would have returned to LegalForce, *as opposed to seeking assistance from one of its competitors*." *Id.* (emphasis added).

SPI's evidence suffers from all the same defects identified in *LegalForce*. SPI presented no evidence of declining sales generally, no evidence of customers lost to FIGS specifically, and no evidence of any particularized harm. But despite its long-held hope that a jury would simply infer all of this, SPI now faces a rigorous and exacting state statutory standing inquiry that demands *actual proof of actual harm and causation*, for which an illusory chain of inferences will not suffice. Indeed, not only does the trial record fail to support a finding of harm or causation by a preponderance of the evidence, it in fact contains substantial evidence affirmatively *disproving* both harm and causation. In short, under the now-applicable state law standards, there is a total failure of proof as to causation.

### 1.   Since FIGS' 2013 founding, SPI's finances have *improved*.

First, since FIGS entered the marketplace, SPI's earnings have shown no injury whatsoever. Quite the opposite: SPI's former Chief Operating Officer, Bob Pierpoint, and former Chief Executive Officer, Michael Singer, each confirmed that SPI's revenues *increased* annually from 2012 to 2021. Oct. 27 Tr., Vol. 2, at 69:10–13; Designated Pierpoint Tr. at 165:17–166:3. In fact, between 2016 and 2021, SPI's value as a company *doubled*; so too did SPI's earnings from 2012 to 2021. Designated Pierpoint Tr. at, 162:2–13, 167:6–22 ("[O]ur EBITDA has doubled or so in those nine years roughly.]"). The result was a windfall for SPI's capital backers, who met their target of doubling their investment within the same "four-to-six-year period of time" during which FIGS was establishing its brand. Designated Johansson Tr. at 19:13–21, 61:7–17 ("Q. And that growth was through revenue and earnings for SPI, correct? A. Yeah. Revenue growth, earnings growth, and through cash generation over the period of time we owned the company, correct.").

1    Nor did SPI lose ground to its competitors: Mr. Pierpoint testified that SPI
2    *gained* market share from 2012 to 2021. Designated Pierpoint Tr. at 166:5–21. That
3    testimony was confirmed by the "Project Diamond" study, produced by Ernst &
4    Young at the direction of Mr. Singer. Ex. 2825 at 2. Ernst & Young found that as of
5    October 2020, SPI was "~4x as large as the second largest competitor and ha[d]
6    *consistently gained share*" in the overall market, increasing from 31% to 35%
7    between 2018 and 2020 alone. *Id.* at 14 (emphasis added). And even that estimate
8    may be conservative: SPI's own damages expert, Dr. Gregory Bell, testified that
9    SPI's market share grew by *nine* points between 2018 and 2020. Oct. 26 Tr., Vol. 2,
10   at 77:18–79:1.

11   SPI's unproven allegations that FIGS caused SPI to suffer an economic loss
12   are particularly ironic in light of the evidence at trial demonstrating that FIGS' entry
13   into the medical apparel market actually contributed to SPI's *growth*. Ernst &
14   Young's financial analysis of SPI found that FIGS (and other premium brands) *grew*
15   the overall market for scrubs and medical apparel. Ex. 2825 at 14. This phenomenon
16   undeniably benefitted SPI, which "has grown share while *other* scaled players have
17   lost share to new entrants." Ex. 2825 at 14. By Ernst & Young's measure, then,
18   FIGS' impact on SPI was *positive*—not negative.

19   In sum, there is no evidence of harm in traditional balance sheet metrics.
20   SPI's own executives and experts instead agreed that throughout the period at issue
21   SPI improved its market share, improved its sales, and improved its revenue,
22   providing investors with a tidy return. The preponderance of the evidence (indeed,
23   *all* the evidence) conclusively shows that SPI suffered no harm *at all*.

### 2.    SPI cannot identify *any* actual lost customers.

25   SPI has also failed to muster any evidence that it lost even *a single customer*
26   to FIGS on account of the unfair business practices it alleges. When this exact
27   question was put to SPI's Rule 30(b)(6) designee in a February 2022 deposition—a

28

deposition that was then designated and played into evidence at trial—SPI *admitted* this fundamental failing:

> Q. Do you have any documents—are you aware of any documents in SPI's possession that identify a specific customer that was lost due to what is being alleged in the complaints?
> A. That names a specific customer?
> Q. Correct.
> A. I do not.

Designated McAdam Tr. at 101:12–18.

Moreover, SPI's Rule 30(b)(6) testimony confirmed that the document SPI had attached to the Fifth Amended Complaint that SPI claimed to be a list of "Consumers who previously purchased medical apparel from Plaintiff but switched to FIGS due to Defendants' wrongful actions and misrepresentations" was in fact nothing of the sort. Dkt. 152 ¶ 148. Indeed, testimony at trial revealed that the source of that exhibit—Exhibit 2233, which represented SPI's sole and exclusive attempt to "list" any such lost customers—never measured lost customers at all. Instead, it was "a survey of [FIGS'] customers," *conducted at FIGS' direction and misleadingly edited by SPI*, "to understand what was important to them when it came to their scrubs and then also what they liked best about [FIGS'] scrubs." Oct. 25 Tr., Vol. 2, at 50:24–51:2 (testifying regarding Ex. 2233). The survey never asked any of the customers whether they *stopped* purchasing from any of FIGS' competitors, including SPI, in order to purchase from FIGS—much less why. When a survey "merely gauge[s] customer satisfaction generally" yet avoids "the pertinent issues" actually relevant to the claims, it is ultimately "irrelevant and unhelpful to the trier of fact." *Ngethpharat v. State Farm Fire & Cas. Co.*, 2021 WL 2823245, at *3 (W.D. Wash. July 7, 2021). The same goes for SPI's Exhibit 2233—that document is simply meaningless when it comes to assessing SPI's burden of proving that it lost any consumers *at all* to FIGS (much less why).

SPI introduced no better evidence at trial. SPI's damages expert Dr. Bell testified that he too did not "know the name of a single consumer who switched

from an SPI brand to a FIGS scrub." Oct. 26 Tr., at 50:12–15. The very next day, in the midst of trial, the Court asked (outside the presence of the jury) that SPI identify "the evidence of causation." Oct. 27 Tr., Vol. 2, at 128:5. After a telling pause during which the Court observed that "[n]obody [wa]s leaping to the floor," SPI's counsel eventually suggested that SPI "ha[s] individual instances that we could point to of potential lost sales and tie those to specific false advertisements." *Id.* at 128:6, 23–129:1. The sole example given by SPI's counsel, however, was (and remains) a single Baton Rouge, Louisiana-based retail shop called "Inka's Uniforms." *Id.* at 129:7–8 ("There is as least one example of a sale made on the basis of a false representation.").

But even if the jury had found that FIGS made any false representations—and it bears repeating that the jury found precisely the opposite—the "Inka's Uniforms" evidence shows no "lost sales" whatsoever. To the contrary, this "evidence" amounts to nothing more than a 2015 email from the proprietor of Inka's Uniforms ordering $1,761 of FIGS products while noting that Inka's *also*—i.e., *still*—carried Cherokee scrubs. Ex. 262 at 1, 5. To be clear: SPI's *best evidence* of *any lost sale* is a single purchase by a single, multi-brand, non-exclusive retailer who, more than seven years ago, informed FIGS that he was *continuing to purchase from SPI*. On this hook alone, SPI hung an eight-figure damages claim.

### 3.   Damages opinions are not evidence of causation or harm.

There is a third source SPI has long sought to characterize as "causation" evidence, but that is nothing of the sort: the testimony of its damages expert, Dr. Bell. Contrary to SPI's promises in the Final Pretrial Conference Order, Dr. Bell did not and could not demonstrate that "damages incurred by SPI" were "*a result of*" any so-called "False Claims." Dkt. 854 at 12 (emphasis added). To state the obvious, the elements of causation and harm are distinct from the mere quantification of damages; Dr. Bell testified only to the latter after *assuming* (per

counsel's instruction) the existence of falsity, causation, and harm. Those assumptions are not evidence and are not entitled to any weight whatsoever.

Neither side's damages expert offered *any* evidence of the elements of SPI's claims, including whether any statements by FIGS "were the cause of any harm to SPI." Nov. 1 Tr., Vol. 1, at 10:10–11:13 (emphasis added). As FIGS' rebuttal damages expert Dominic Persechini explained, the damages experts were not "opining on whether there was harm to SPI," much less as to what was the cause of it. Nov. 1 Tr., Vol. 1, at 11:14–19. Rather, their job was to "quantify potential damages if you, the jury, find that there is harm or liability. . . . It's not our role to tell you whether liability or harm actually exists." *Id.* at 11:20–25.

When pressed, Dr. Bell agreed: His opinion extended *only to damages*, not causation. *See* Oct. 26 Tr. Vol. 2, at 80:6–16. When asked to confirm that he was "not opining . . . that any claims made by FIGS actually caused damages," Dr. Bell responded "Well, yes . . . to be clear, what I am saying is *if the claims were false and misleading*, then I'm opining about *damages*." Oct. 26 Tr., Vol. 2, at 35:1–5. Dr. Bell's entire opinion was premised on having been "asked to assume that each of [FIGS' claims] was false and misleading," and on that basis calculating "how many additional sales FIGS made." Oct. 26 Tr., Vol. 1, at 143:23–24; Oct. 26 Tr., Vol. 2, at 17:11–12. His calculations *would not apply* if the claims were judged to be true. *See* Oct. 26 Tr., Vol. 2, at 60:1–61:8, 64:2–66:8. Of course, we now know that *all* the claims were so judged.

In fact, Dr. Bell's damages calculations were based on a long *string* of baseless—and facially inaccurate—assumptions, including "the fact of liability" (which the jury subsequently rejected), that the challenged advertisements were so ubiquitous that every potential customer of FIGS saw them from 2014 to 2021 (despite substantial evidence to the contrary), acceptance of the viability of a grossly

DEFENDANTS' BRIEF RE LACK OF CAUSATION

flawed materiality survey conducted by Dr. Itamar Simonson,[4] and, most pertinent here, the assumption that "causation as a legal element" had been (or could be) established. *Id.* at 38:12–13, 44:7-9, 80:6–23. Each of Dr. Bell's many assumptions was based on an instruction "by SPI's lawyers." *Id.* at 81:4–6. He did *no* work to determine whether the assumptions were true, and he even *ignored* "other market research" that would have unsettled his preordained opinion. *Id.* at 51:2–10.

Damages opinions based "on unsupported assumptions" are not given evidentiary weight, particularly if the expert also "ignores distinctions crucial to arriving at a valid conclusion." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988). Here, Dr. Bell compounded the errors of his assumptions when he set aside substantial *real-world* data disproving SPI's theory of causation. For example, Dr. Bell did not assess the impact on SPI of "its operation of AllHeart," an

---

[4] The flaws of Dr. Simonson's materiality surveys were thoroughly explored in cross-examination, including his misleading use of "information unavailable" as an attribute (even though, as the jury found, SPI itself made marketing claims similar to those of FIGS); they do not bearing repeating here. It is worth noting, however, that Dr. Simonson's surveys were *materiality* surveys, and not *causation* surveys. His artificial and binary choice forced respondents to pick between FIGS on the one hand and Cherokee—a single brand in the SPI portfolio—on the other. Oct. 24 Tr. at 286:19–22, 287:17–19. Such a survey is *not* "evidence that establishes actual injury and causation" in a multi-player market. *CKE Rest. v. Jack in the Box, Inc.*, 494 F. Supp. 2d 1139, 1146 (C.D. Cal. 2007); *see also Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2020 WL 4747724, at *11 (S.D. Cal. Aug. 17, 2020). Dr. Simonson's study says nothing whatsoever about real-world causation, in which consumers choose not between FIGS and Cherokee but between FIGS, Cherokee, Jaanuu, WonderWink, Barco, and numerous other scrub brands—many of which were more closely aligned with FIGS in terms of quality, price, and appearance. *See* Ex. 2825 at 16. The results of Dr. Simonson's survey therefore cannot inform the finder of fact about any real-life causation or harm suffered by SPI in particular. This failure was echoed by former SPI owner and board member Lars Johansson, who testified that he too "couldn't quantify the relative impact of FIGS versus *any other individual competitor*." Designated Johansson Tr. at 80:3–9.

SPI subsidiary that competed with other SPI retailers; (ii) "of Jaanuu," another direct-to-consumer company; (iii) of the antimicrobial advertisements of competitors other than FIGS; (iv) of SPI's failure to implement direct-to-consumer websites until 2018; or (v) of the performance of Mr. Singer. *Id.* at 67:15–77:8. This pervasive ostriching led Mr. Persechini to conclude, rightly, that Dr. Bell simply did not consider *any* real-world data of "what caused SPI to gain *or* lose sales." Nov. 1 Tr. Vol. 1 at 17:23–18:2 (emphasis added). Neither SPI nor Dr. Bell offered anything to the contrary.

None of the damages experts' opinions is a factual basis by which to determine that FIGS caused harm to SPI; nor is it evidence of injury resulting from FIGS' actions. Rather, Dr. Bell offered up a quantification of a set of hypotheticals, each now discredited and disproven. This is no basis for standing.

### 4. SPI was its own worst enemy.

In the absence of competent evidence of either harm or causation, SPI may belatedly attempt to argue that despite its demonstrated financial growth discussed *supra*, FIGS somehow caused it harm by way of undefined incurred costs or lost opportunities. This would be frivolous. A mountain of evidence (let alone a preponderance) shows that any purported underperformance on SPI's part was attributable not to FIGS, but to SPI's own flawed business model. Mr. Singer himself put it best at trial, when he conceded that "there are a lot of reasons why we lost sales that aren't related to the claims in this case." Oct. 27 Tr., Vol. 1, at 106:21–23.

As early as 2016, Bain & Company provided SPI with warnings about the true threats to its future performance, including that "[f]urther development of online channels should be a key focus for [SPI]." Ex. 2827 at 68. Bain also cautioned that most of SPI's "brands lag other competitors" in terms of brand awareness; that its products were "low quality"; and that SPI's brick-and-mortar

retailers threatened market share through their ability to "carry more manufacturers."[5] *Id.* at 27, 30, 40.

In the years that followed, SPI struggled to respond. In November 2017, Mr. Singer drafted an "Internet Strategy" as an "initial stab" for his investors; in it, he acknowledged that "there are many new consumers who shop on-line [sic], that may be much more loyal to a direct-to-consumer brand like Figs and Jaanuu," and that these customers were "turned off" by SPI's failure to offer a shopping website. Ex. 2004 at 2. In April 2018, Mr. Singer drafted a "Retail Partner" letter attempting to break the news to brick-and-mortar sellers that "DTC companies" had become a "real threat." Ex. 2003 at 1. And later that year, SPI executives met to compare their brands against upstarts like FIGS: SPI's brands were "Not DTC," had "No press coverage," and struggled with "Minimal outreach and engagement"—in contrast to FIGS' "great corporate image," "[s]trong digital presence," and marketing message that "aims to transform the healthcare experience by creating innovative and supremely functional medical apparel for modern medical professionals." Ex. 2005A at 2. The evidence is straightforward: If SPI was injured at all during the relevant time period, it had only itself to blame.

Additionally, FIGS' marketing expert Dr. Kusum Ailawadi testified compellingly at trial about SPI's protracted failure to see the world moving online or to heed Bain's 2016 advice. Faced with a revolution in shopping preferences, for years "SPI really struggled to transfer its indirect distribution model, which was in the brick-and-mortar world, over into the online space, and it was really, really late and struggled to have a really strong, clear distribution strategy for the online

---

[5] Retailer tension was a constant undercurrent in SPI's operations. As former SPI retailer Marni Penta testified, SPI undermined both its own performance and that of its retail partners in at least two respects: first, by failing to focus on consumer marketing; and second, by failing to support its own retailers "to the degree that it reduce[d] potential sales." Designated Penta Tr. at 56:8–11, 85:15–16.

DEFENDANTS' BRIEF RE LACK OF CAUSATION

space"; this "really affected its ability to compete effectively with FIGS." Oct. 27 Tr., Vol. 2, at 79:16–22. While FIGS and other direct-to-consumer brands addressed the growing desire of shoppers to buy from the comfort of home, SPI remained tied to its physical retailers—retailers that "did not have the skills, the competence, the resources to be able to comp[]ete effectively." *Id.* at 85:24–86:2.

Dr. Ailawadi attributed SPI's struggle to compete not to FIGS or other direct-to-consumer brands but to SPI's outdated business model, which made it "not in SPI's interest to do anything to accelerate" a transition to the modern marketplace—until it was too late. Oct. 27 Tr., Vol. 2 at 89:13–18. Even when SPI finally *did* try selling online, it half-heartedly underinvested with "a lack of digital advertising to actually make those sites visible and findable," resulting in an expensive corporate folly that was "just not a particularly good purchase experience" for the end user. *Id.* at 99:19–23. This testimony, as with *all* the testimony given by Dr. Ailawadi, was unrebutted by any of SPI's witnesses.

In short, there is a total failure of proof as to causation—and what evidence is in the record that might bear on the question affirmatively *undermines* any conceivable argument as to causation. Witness after witness and document after document highlighted SPI's failure to adapt to a changing world—a world in which scrub purchasers might not want to shop in medical-supply shops, but from the comfort of their homes. That FIGS saw this opportunity coming is not any evidence that FIGS harmed SPI. It *is* evidence that falls on the other side of the scale: To the extent that SPI—for a generation, the market leader—suffered any harm at all, it brought it upon itself through complacency and indecision.

## IV.   **CONCLUSION**

SPI took this case to trial on the premise that it would demonstrate injury it suffered as the result of FIGS' allegedly false advertising. Across years of scorched-earth discovery, motion practice, and what often amounted to little more than the transparent harassment of its competitor, SPI was unable to gather evidence to prove

that a single one of FIGS' advertisements was false. Even if it had, SPI altogether failed to come forward with even a scintilla of evidence of causation and harm—let alone evidence sufficient to carry its burden of proof. Under the UCL and FAL, a plaintiff who cannot do so has no case. Period. FIGS therefore respectfully requests that the Court bring this case to a swift conclusion by entering judgment in FIGS' favor on the only two claims still remaining.

DATED: January 6, 2023             MUNGER, TOLLES & OLSON LLP


                                   By:    /s/Jacob S. Kreilkamp
                                          JACOB S. KREILKAMP
                                          Attorneys for Defendants FIGS, Inc.,
                                          Catherine "Trina" Spear, and Heather
                                          Hasson


DATED: January 6, 2023             BIRD, MARELLA, BOXER, WOLPERT,
                                   NESSIM, DROOKS, LINCENBERG &
                                   RHOW. P.C.


                                   By:    /s/Ekwan E. Rhow
                                          EKWAN E. RHOW
                                          Attorneys for Defendants FIGS, Inc.,
                                          Catherine "Trina" Spear, and Heather
                                          Hasson

-18-