MONA Z. HANNA (SBN 131439)
 mhanna@mrllp.com
JEFFREY D. FARROW (SBN 180019)
 jfarrow@mrllp.com
KEVIN S. KIM (SBN 275200)
 kkim@mrllp.com
ALLISON C. AGUIRRE (SBN 312544)
 aaguirre@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:   (714) 557-7990
Facsimile:   (714) 557-7991

KRISTIN J. ACHTERHOF
(*Admitted Pro Hac Vice*)
 kristin.achterhof@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone:   (312) 902-5296
Facsimile:   (312) 902-1061

*Additional Counsel on Next Page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STRATEGIC PARTNERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FIGS, INC., CATHERINE ("TRINA") SPEAR, HEATHER HASSON, <br><br> Defendants. | Case No. 2:19-cv-02286-JWH-KS <br><br> **PLAINTIFF STRATEGIC PARTNERS INC.'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION** <br><br> Trial:   October 17, 2022 <br> Time:   8:00 a.m. <br> Crtrm.:   9D <br><br> Judge: Hon. John W. Holcomb |

*Additional Counsel:*

SANFORD L. MICHELMAN (SBN 179702)
 smichelman@mrllp.com
MARC R. JACOBS (SBN 185924)
 mjacobs@mrllp.com
JESSE J. CONTRERAS (SBN 190538)
 jcontreras@mrllp.com
JENNIFER S. GOLDSTEIN (SBN 10335)
 jgoldstein@mrllp.com
ADAM M. KORN (SBN 333270)
 akorn@mrllp.com
MICHELMAN & ROBINSON, LLP
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90024
Telephone: (310) 299-5500
Facsimile: (310) 201-2110

RICHARD H. ZELICHOV (SBN 193858)
 richard.zelichov@katten.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
T: (310) 788-4680
F: (310) 788-4471

TIMOTHY H. GRAY
(*Admitted Pro Hac Vice*)
 timothy.gray@katten.com
KATTEN MUCHIN ROSENMAN LLP
2900 K Street NW, North Tower, Suite 200
Washington, DC 20007-5118
T: (202) 625-3608
F: (202) 298-7570

*Attorneys for Plaintiff*

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ....................................................................................... 1

II.    ARGUMENT ............................................................................................. 4

A.    FIGS Caused SPI Harm By Its Unlawful Violation of FIFRA, FDCA, and Applicable Regulations, and Its Unfair Competition ......... 4

1.    Standard of Causation for UCL "Unlawful" and "Unfair" Claims ......................................................................................... 5

2.    FIGS' Violation of FIFRA and EPA Requirements Constituted Unlawful and Unfair Business Practices Under the UCL. ............................................................................... 7

3.    FIGS' Violation of FDCA Regulatory Requirements Constituted Unlawful and Unfair Business Practices Under the UCL. ............................................................................. 10

4.    FIGS' Violation of FIFRA, FDCA, and Implementing Regulations Caused Harm to SPI by Diverting Customers and Sales. ................................................................................ 12

B.    The Trial Evidence Established that FIGS' Four Challenged Claims Meet the UCL Fraud and FAL Causation Standard ............... 14

C.    The Court's Causation Inquiry Implicates Survey Evidence that FIGS was Required to Produce ............................................................ 17

III.    CONCLUSION ....................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Case**

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005) ...................................................................................................... 9

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ............................................................................................. 4, 5

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
   392 F. Supp. 3d 1074 (N.D. Cal. 2019).............................................................. 6, 12, 13

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ............................................................................................... 16

*Ivie v. Kraft Foods Glob., Inc.*,
   961 F. Supp. 2d 1033 (N.D. Cal. 2013)........................................................................ 9

*Kasky v. Nike, Inc.*,
   27 Cal. 4th 939 (2002) ................................................................................................. 4

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003).............................................................................................. 4

*Kwikset Corp. v. Superior Ct.*,
   51 Cal. 4th 310 (2011) ............................................................................................... 15

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003)..................................................................................... 15

*LegalForce RAPC Worldwide, P.C. v. DeMassa*,
   532 F. Supp. 3d 856 (N.D. Cal. 2021)......................................................................... 6

*LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*,
   2019 WL 160335 (N.D. Cal. Jan. 10, 2019) ......................................................... 5, 10

*Lona's Lil Eats, LLC v. DoorDash, Inc.*,
   2021 WL 151978 (N.D. Cal. Jan. 18, 2021)......................................................... 15, 16

*Millennium Dental Techs. Inc. v. Terry*,
   2018 WL 5094965 (C.D. Cal. July 16, 2018)............................................................ 16

*Nationwide Biweekly Admin, Inc. v. Sup. Ct. Alameda*,
 9 Cal. 5th 279, 309 (2020) ..................................................................... 15

*Pulaski & Middleman, LLC v. Google, Inc.*,
 802 F.3d 979 (9th Cir. 2015) .............................................................. 4, 15

*Roshkovan v. Bristol-Myers Squibb Co.*,
 2022 WL 3012519 (C.D. Cal. June 22, 2022) ......................................... 7

*Rutherford v. Owens-Illinois, Inc.*,
 16 Cal. 4th 953, 969 (1997) .................................................................... 6

*Sanchez v. Nurture, Inc.*,
 2022 WL 4097337 (N.D. Cal. Sept. 7, 2022) ........................................... 5

*Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
 552 F. Supp. 3d 901 (N.D. Cal. 2021) ................................................... 16

*Sierra Club v. U.S. E.P.A.*, 762 F.3d 971
 (9th Cir. 2014) ........................................................................................ 7

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
 2019 WL 6841992 (C.D. Cal. Oct. 30, 2019) ....................................... 16

*Tourgeman v. Collins Fin. Servs., Inc.*,
 2009 WL 6527758 (S.D. Cal. Nov. 23, 2009) ......................................... 6

*Troyk v. Farmers Grp., Inc.*,
 171 Cal. App. 4th 1305 (2009) ................................................................ 6

*VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*,
 2010 WL 1611398 (E.D. Cal. Apr. 20, 2010) ....................................... 16

*Warner Bros. Enters. Inc. v. Random Tuesday, Inc.*,
 2020 WL 12762735 (C.D. Cal. Nov. 9, 2020) ....................................... 16

*Weeks v. Home Depot U.S.A., Inc.*,
 2020 WL 5947811 (C.D. Cal. Sept. 18, 2020) ......................................... 9

**Statutes, Regulations, and Legal Authorities**

7 U.S.C. § 136a ................................................................................................ 8

7 U.S.C. §§ 136v(a)-(b) ................................................................................... 9

**PLAINTIFF SPI'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

21 U.S.C. § 360(k) ........................................................................... 10

21 U.S.C. § 321(h)(1)(B) ................................................................ 10

21 C.F.R. § 801.4 ............................................................................. 11

21 C.F.R. § 807.81(a) ..................................................................... 10

21 C.F.R. § 807.87(g) ..................................................................... 11

21 C.F.R. § 807.100(a) ................................................................... 10

40 C.F.R. § 152.15 ....................................................................... 7, 8

40 C.F.R. § 152.25(a) ...................................................................... 7

EPA, Pesticide Registration (PR) Notice 2000-1 (Mar. 6, 2000) ................... 7, 8, 9

EPA Registration Notice (Registration No. 464-785) (May 29, 2013) ................... 7

FDA, Enforcement Policy for Gowns, Other Apparel, and Gloves
    During the Coronavirus Disease (COVID-19) Public Health
    Emergency, Guidance for Industry and Food and Drug
    Administration Staff (March 2020) ..................................................... 10

FDA, Response to Citizen Petition Docket No. FDA-2020-P-2289
    (December 5, 2022) ....................................................................... 11

**PLAINTIFF SPI'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

1   **MEMORANDUM OF POINTS AND AUTHORITIES**

2       Pursuant to the Court's December 7, 2022 Order Regarding Equitable Claims

3   (Dkt. No. 931), Plaintiff Strategic Partners, Inc. ("SPI") submits this post-trial brief

4   regarding SPI's ability to establish the causation element of its equitable claims

5   brought under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code

6   § 17200, and California's False Advertising Law ("FAL"). *Id.* § 17500.

7   **I.   INTRODUCTION**

8       The Court has directed the parties to brief "whether SPI can establish, or has

9   established, by a preponderance of the evidence adduced at trial, the causation

10  element of its UCL and FAL claims." Dkt. No. 931 at 2. Causation under both statutes

11  is part and parcel of the statutory *standing* analysis, and requires that the alleged loss

12  of money or property be "a result of" the complained-of conduct. Cal. Bus. & Prof.

13  Code § 17204. Courts have consistently recognized that the proper test for causation

14  is whether the defendant's conduct was a "substantial factor" in creating that harm.

15  SPI's equitable claims are based on two theories of relief, and the evidence suffices

16  to prove causation by a preponderance of evidence under both.

17      <u>First</u>, SPI asserts a UCL claim for unlawful and unfair business practices arising

18  from FIGS, Inc.'s ("FIGS") violations of law, namely the Federal Insecticide,

19  Fungicide, and Rodenticide Act (FIFRA), the Federal Food, Drug, and Cosmetic Act

20  (FDCA), and their implementing regulations. *See* Fifth Amended Complaint ¶¶ 112-

21  115; *see also* Dkt. No. 703 (FIGS' acknowledgement of "regulatory UCL" claim);

22  Dkt. 848 at 10 (SPI Trial Brief confirming continued pursuit of regulatory UCL

23  claim).[1] FIGS has long insisted that its claims of "killing infection" and "reducing

24

---

25  [1] SPI further articulates this claim here, as expressly contemplated by the parties and
26  the Court during pre-trial proceedings. *See* Transcript of Hearing on Motions in
    Limine, Sept. 16, 2022, at 43:24-45:10 (contemplating hearing "additional
27  information" about the EPA/FDA aspect of SPI's UCL claim in post-trial briefing);
    *see also* Transcript of Hearing on Mot. to Bifurcate, Sept. 23, 2022, at 24:15-26:3
28

hospital-acquired infections" are true, and it will doubtless argue that the jury found them true as well.[2] For purposes of SPI's UCL claim, however, FIGS' position that its statements were true does not matter. Whether these statements are true or false is not dispositive as to SPI's UCL claim that FIGS engaged in unlawful and unfair business practices. The evidence adduced at trial, and legal documents of which the Court may take judicial notice, establish that FIGS violated FIFRA and FDCA by selling, distributing, and marketing its medical apparel with public health claims without registering its products with the U.S. Environmental Protection Agency (EPA) or obtaining clearance from the Food and Drug Administration (FDA). FIGS previously took the position that this "UCL claim can only be decided—on the law—by this Court." Dkt. No. 703 at 1. The claim is now ripe, requiring only the Court's application of law and equitable principles to the trial record—and that record holds ample evidence of causation.

Second, SPI asserts UCL and FAL claims predicated on the four advertising claims SPI also challenged under the Lanham Act. To prove causation, SPI is not required to demonstrate its *own* reliance on those claims—only *consumer* reliance, which the record amply shows—and the same trial evidence likewise establishes, by a preponderance of the evidence, a UCL and FAL causal link between consumers' purchases in reliance on FIGS' challenged advertising claims and the harm SPI suffered by losing sales.

---

(Defendants' acknowledgment that EPA/FDA aspect of SPI's UCL claim involved evidence that did not perfectly overlap with the evidence concerning SPI's Lanham Act claim, and that this evidence should be considered separately by the Court in making its decision on SPI's equitable claims).

[2] SPI submits that the jury's finding on the combined falsity/deception question on the verdict form, which incorporated a "substantial segment" Lanham Act requirement, does not establish the *truth* of the advertising claims. *See infra* n.8.

Taken as a whole, the trial record compels the inference that FIGS' unlawful, unfair, and deceptive business practices caused diversion of consumers and sales from SPI—even assuming its "health claims" were true. FIGS' internal surveys showed that customers of SPI who purchased FIGS scrubs identified FIGS' antimicrobial, infection-reduction claims (and its one-for-one donation claim) as either their favorite or an important selling point—a direct connection between FIGS' conduct and consumer purchasing decisions. Surveys conducted by the parties' expert witnesses confirm that connection, showing that consumers regarded these claims as material. Industry market research further confirms that FIGS' health claims appealed to a substantial percentage of consumers and were key considerations in purchasing medical apparel—and many of those same consumers had abandoned SPI-branded scrubs for FIGS'. Indeed, FIGS admitted that it intentionally and specifically targeted SPI consumers.

In sum, the trial record shows by a preponderance of the evidence that FIGS made impermissible health claims and thereby gained an advantage over competitors who did not break the law—and these claims were *at least* a substantial factor in diverting customers and sales from SPI to FIGS. As a result, SPI is entitled to injunctive relief (i) barring any future dissemination of such claims and (ii) rectifying or counteracting the continued circulation of such claims online or otherwise by requiring a corrective statement from FIGS, the scope of which may be addressed in supplemental briefing.[3]

---

[3] Injunctive relief remains necessary even if FIGS has voluntarily ceased propagating its health claims because those claims continue to circulate on the Internet, in news articles and on social media, and FIGS *never* obtained the necessary approvals to make such claims. Vendors, moreover, have continued to repeat FIGS' unapproved (and unproven) health claims that FIGS scrubs kill bacteria and infection immediately on contact. *See, e.g.*, https://poshmark.com/listing/Figs-Limited-Edition-Figs-Womens-Kade-Cargo-Heathered-Indigo-Scrub-Pants-SP-62a18699b6d825ab89313008. FIGS' stealth tweaks to previous statements—for

-3-

## II.   **ARGUMENT**

The UCL protects both consumers *and* competitors by promoting fair competition in commercial markets for goods and services. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949, (2002). It prohibits business acts or practices that are unlawful, unfair, or fraudulent—each a separate theory of violating the statute. Cal. Bus. & Prof. Code § 17200. The "unlawful" prong prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The "unfair" prong proscribes a business practice that is unfair, even if it does not violate some other law. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). In a suit by a competitor, "unfair" conduct is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or otherwise significantly threatens or harms competition*." *Cel-Tech,* 20 Cal. 4th 163, 187 (emphasis added). The FAL's consumer-and-competition-protection purpose is similar, although it more narrowly prohibits "untrue or misleading" statements made in the course of business. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) (quoting Cal Bus. & Prof. Code § 17500).

### A.   **FIGS Caused SPI Harm By Its Unlawful Violation of FIFRA, FDCA, and Applicable Regulations, and Its Unfair Competition.**

SPI's UCL claim is principally based on FIGS' violation of regulatory requirements and the unfair advantage it gained against its competitors by skating

---

instance, changing "kills bacteria and infection immediately on contact" to "odor protection" without acknowledging the change or why it was made—cannot suffice to curb the competitive harm from FIGS' unlawful and unfair practices. (These same concerns apply to FIGS' "one-for-one" claim; FIGS admitted that it ceased donating one set of scrubs for every set of scrubs sold at the end of 2017, but other vendors continue to make that claim.)

those regulations and advertising impermissible claims. *See* Dkt. No. 152 (FAC) ¶¶ 112-115 (Dkt. No. 152); *see* Dkt. 828 at 24:6-26:11; Dkt. 854 at 7:11-17, 13:8-12; Dkt. 931 at 1:17-2:6 (discussing preservation of theory). Specifically, FIGS advertised and sold its products with claims that its scrubs protected the consumer from infection, but failed to register its products with the EPA (in violation of FIFRA) and failed to obtain FDA clearance to market its products in this manner (in violation of Section 510(k) of the FDCA). *See, e.g.*, *Sanchez v. Nurture, Inc.*, 2022 WL 4097337, at *6 (N.D. Cal. Sept. 7, 2022) (UCL unlawfulness claim properly predicated on FDA regulation violation). As a result, FIGS was able to market and sell its products with prohibited health claims that its competitors did not and could not make without following the registration and clearance process under applicable regulations. *See Cel-Tech,* 20 Cal. 4th at 187 ("unfair" encompasses conduct that "significantly threatens or harms competition"); *LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*, 2019 WL 160335, at *18 (N.D. Cal. Jan. 10, 2019) ("unfair" UCL claim properly predicated on *inter alia*, noncompliance with ethics rules in fee-sharing arrangement). FIGS previously sought to defer SPI's "regulatory UCL" claim for the Court's consideration post-trial, *see* Dkt. 703 at 1. To do so, the Court need only apply federal regulations and principles of equity to the predicate acts that the documents showed—and FIGS' representatives admitted—at trial.

The evidence adduced at trial established by a preponderance of the evidence FIGS' violation of federal regulations; the advantage it thereby gained over its competitors; and the causal connection between that conduct and SPI's harm in the form of diverted consumers and lost sales.

### 1.   Standard of Causation for UCL "Unlawful" and "Unfair" Claims

Under the UCL, the element of "causation" is typically incorporated into the threshold analysis of whether a plaintiff has standing to bring a claim. *See* Cal. Bus. & Prof. Code § 17204 (a "person who has suffered injury in fact and has lost money or

-5-

property *as a result of* the unfair competition" has standing to bring suit (emphasis added)); *see also Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1349–50 (2009) (noting, at summary judgment stage, third element of UCL standing is causation). Courts have found that the "substantial factor" standard governs the UCL causation inquiry— the same standard applicable to negligence actions. *See, e.g.*, *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1093 (N.D. Cal. 2019) (applying "substantial factor" test to "unlawful" UCL claim); *Tourgeman v. Collins Fin. Servs., Inc.*, 2009 WL 6527758, at *8 (S.D. Cal. Nov. 23, 2009) ("The *Troyk* court further indicated where a defendant's conduct is 'a substantial factor' in the harm, the causation requirement would be satisfied"; in instant case, "the chain of causation … leads directly to" defendants).

The "substantial factor" standard is not an exacting one. A court must determine whether the business practice or conduct at issue "is a factor that a reasonable person would consider to have contributed to the harm[.]" *Diva*, 392 F. Supp. 3d at 1093 (quoting *Troyk*, 171 Cal. App. 4th at 1350). Importantly, the standard does *not* require a showing that the unlawful or unfair business practice be the sole or only cause of the harm. *See id.* ("It does not have to be the only cause of the harm."). Rather, it is sufficient to show that the substantial factor be "more than a remote or trivial factor." *Id.*; *see also Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997) (discussing "substantial factor" test). Causation must be proved by a preponderance of the evidence. *LegalForce RAPC Worldwide, P.C. v. DeMassa*, 532 F. Supp. 3d 856, 859 (N.D. Cal. 2021) ("To have standing to seek relief under § 17200, a plaintiff must have 'suffered injury in fact and...lost money or property as a result of the unfair competition,'…and must establish those facts 'by a preponderance of the evidence[.]'").

As discussed in Section II.A.4, the evidence adduced at trial proved that the health claims FIGS made (and its competitors could not) by virtue of its regulatory violations were not only key to scrubs consumers—they were key to consumers of *SPI's brands*. Had FIGS abided by law and *not* made those claims, at least those customers (and, by extrapolation, many others) would not have had that influence on their decision-

making—and likely would not have purchased FIGS scrubs instead of SPI's. Given the wealth of other evidence adduced at trial, SPI has shown it is more likely than not that the scrubs FIGS sold based on unlawful and unfair conduct came at the expense of a sale SPI would have made instead.

### 2. FIGS' Violation of FIFRA and EPA Requirements Constituted Unlawful and Unfair Business Practices Under the UCL.

Under FIFRA, articles treated with a pesticide (*e.g.*, an antimicrobial agent like Silvadur) *must* be registered with the EPA unless they fall under the so-called "treated articles" exemption. *See* 40 C.F.R. §§ 152.15, 152.25(a); Appx.[4] Exh. Q, EPA, Pesticide Registration (PR) Notice 2000-1 at 2 (Mar. 6, 2000), *available at* https://www.epa.gov/sites/default/files/2014-04/documents/pr2000-1.pdf.[5] "Treated articles"—*i.e.*, articles or substances treated with antimicrobials solely for the *product*'s protection (such as for odor prevention), not the consumer's—are exempt from registration under FIFRA if the *antimicrobial* used in the treatment is registered with the EPA for such use **and** the article does not bear any public health claims. *See* 40 C.F.R. § 152.25(a); PR Notice 2000-1 at 2 ("[P]roducts [that] ma[k]e public health claims that extend beyond the protection of the article itself . . . do not qualify for the treated articles exemption."). Silvadur is registered as a pesticide. *See* Appx. Exh. R, EPA Registration Notice (Registration No. 464-785) (May 29, 2013), *available at* https://www3.epa.gov/pesticides/chem_search/ppls/000464-00785-20130529.pdf.

---

[4] References to "Appx" refer to the concurrently filed Appendix of Evidence in support of SPI's Post-Trial Brief.

[5] The Court may take judicial notice of EPA and FDA documents, as well as the fact that Silvadur is an EPA-registered pesticide, pursuant to Federal Rule of Evidence 201(b). *See, e.g.*, *Sierra Club v. U.S. E.P.A.*, 762 F.3d 971, 975 n.1 (9th Cir. 2014); *Roshkovan v. Bristol-Myers Squibb Co.*, 2022 WL 3012519, at *5 (C.D. Cal. June 22, 2022).

A "health claim" includes "a claim for control of specific microorganisms or classes of microorganisms that are directly or indirectly infectious or pathogenic to man," an "unqualified claim of 'antimicrobial' activity," or a "claim of 'antibacterial,' 'bactericidal,' or 'germicidal' activity or references in any context to activity against germs or human pathogenic organisms *implying public health related protection is made*." PR Notice 2000-1, at 2-3 (Unit II.A) (emphasis added). EPA policy specifically identifies the following health claims as likely *unacceptable* under the treated articles exemptions when made in connection with antimicrobial-treated products: "Provides a germ-resistant surface"; "Provides a bacteria-resistant surface"; "Surface kills common gram positive and negative bacteria"; "Surface controls both gram positive and negative bacteria"; and "Surface minimizes the growth of both gram positive and negative bacteria." *Id.* at 5 (Unit IV.A). Treated articles *with* public health claims are subject to the requirements of FIFRA and may not be legally sold or distributed unless registered with the EPA. *See* 40 C.F.R. § 152.15; 7 U.S.C. § 136a.

The evidence SPI adduced at trial proves that FIGS violated FIFRA and its implementing regulations. Defendants testified that FIGS' scrubs have, since 2016, been treated with Silvadur—an EPA-registered antimicrobial agent. *E.g.*, Appx. Exh. K (Hasson Testimony, Oct. 19, 2022 Trial Transcript) at 59:25-60:7. The jury found that FIGS publicly disseminated its claim that its scrubs "kill bacteria and infection immediately upon contact"—an assertion distributed on hangtags with each scrub—and its claim that its scrubs "reduce hospital acquired infections by 66%." *See* Dkt. No. 925 at 2, 4 (Jury Verdict Questions 1 and 8). Both claims qualify on their face as "health claims" because they are assertions of bactericidal properties *expressly* conveying that FIGS' products "kill bacteria and *infection*" and confer health protection on the user by reducing hospital-acquired infections. Accordingly, FIGS' products were required to be registered with the EPA—and it is undisputed that FIGS

**PLAINTIFF SPI'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

*failed* to register its products with the EPA. Appx. Exh. G (Trial Exh. 650) at 4 (response to RFA 17).

Moreover, even absent explicit claims that its scrubs killed bacteria and infection on contact, FIGS' frequent, unqualified statements that its products were "antimicrobial"—without careful narrowing or clarifying that such properties protected the product, not the user—were "health claims." PR Notice 2000-1, at 7-8 (Unit IV.C). Accordingly, FIGS' assertion that its scrubs were antimicrobial, absent EPA registration, independently violated FIFRA, too. *E.g.*, Appx. Exh. A (Trial Exh. 198) at 3 ("antimicrobial enzyme wash"); Appx. Exh. B (Trial Exh. 211) at 4 ("All FIGS scrubs are antimicrobial, ridiculously soft and wrinkle resistant!"); Appx. Exh. C (Trial Exh. 248) at 4 (same); Appx. Exh. D (Trial Exh. 327) at 3 (same); Appx. Exh. E (Trial Exh. 409) at 2 ("Reduce the risk of hospital-acquired infection by 66% thanks to FIGS' antimicrobial washes."); Appx. Exh. F (Trial Exh. 538) at 1 ("ALWAYS liquid repellent, antimicrobial….").[6]

FIGS' sale and distribution of products with such health claims was not only "unlawful" under the UCL—it was *unfair*, harming competition by providing FIGS a lopsided advantage compared to its competitors, like SPI, who followed the rules. SPI's former CEO Mike Singer explained that SPI was only properly able to make claims about *product* protection, not *infection control*: "So there are EPA guidelines

---

[6] To the extent FIGS contends a FIFRA UCL claim is preempted, it is incorrect. FIFRA does not preempt state law claims unless the state law imposes labeling or packaging requirements that are in addition to or different from those required under the statute. 7 U.S.C. §§ 136v(a)-(b); *see Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 432 (2005). SPI's UCL claim based on FIGS' sales and distribution of products in violation of FIFRA registration requirements is wholly consistent with the statute. *See, e.g.*, *Weeks v. Home Depot U.S.A., Inc.*, 2020 WL 5947811, at *4 (C.D. Cal. Sept. 18, 2020) ("So long as the requirement plaintiff seeks to enforce under state law is consistent with FIFRA, plaintiff's [UCL] claim is not preempted."). The same is true with respect to the FDCA. *See, e.g.*, *Ivie v. Kraft Foods Glob., Inc.*, 961 F. Supp. 2d 1033, 1043 (N.D. Cal. 2013).

PLAINTIFF SPI'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION

around what you can and can't say….We are not talking about infection. We are not talking about disease. We are not talking about hospital-acquired infections. So those are the rules." Appx. Exh. M (Singer Testimony, Oct. 27, 2022 Trial Transcript (Morning), 74:8-75:19). FIGS did not follow the rules; SPI, its competitor, did. Such conduct distorted the market by artificially enabling FIGS to trumpet an important attribute its established, more scrupulous competitors could not claim. *Cf. UpCounsel, Inc.*, 2019 WL 160335, at \*18. FIGS' manifest disregard for the rules everyone else followed, made in pursuit of (and in achieving) market penetration, unfairly caused SPI to lose sales SPI would otherwise have made.

### 3. FIGS' Violation of FDCA Regulatory Requirements Constituted Unlawful and Unfair Business Practices Under the UCL.

FIGS also violated the UCL by selling and distributing medical "devices" without obtaining premarket approval or even following premarket notification and clearance procedures under Section 510(k) of the FDCA. *See* 21 U.S.C. § 360(k); 21 C.F.R. §§ 807.81(a), 807.100(a) ("Until the applicant receives an order declaring a device substantially equivalent [to an existing legally marketed, approved device], the applicant may not proceed to market the device"). Whether a device is regulated under FDCA and requires at least Section 510(k) clearance hinges on the "intended use" of the product. Covered "devices" are those "*intended for use in* the diagnosis of disease or other conditions, or in the cure, *mitigation*, treatment, *or prevention of disease*." 21 U.S.C. § 321(h)(1)(B) (emphasis added).

While basic scrubs are generally exempt from Section 510(k) requirements, this exemption does *not* extend to scrubs that are "intended for a medical purpose, such as prevention of infectious disease transmission[.]" Appx. Exh. S, FDA, Enforcement Policy for Gowns, Other Apparel, and Gloves During the Coronavirus Disease (COVID-19) Public Health Emergency, Guidance for Industry and Food and Drug Administration Staff , at 5 (March 2020), *available at*

-10-

https://www.fda.gov/media/136540/download (noting "gowns and other apparel are devices when they meet the definition of a device set forth in section 201(h)"). When evaluating whether products are intended for a medical purpose, FDA considers whether: (1) they are labeled or otherwise intended for use by a health care professional; (2) they are labeled or otherwise for use in a health care facility or environment; and (3) they include any drugs, biologics, or anti-microbial/anti-viral agents. *Id.*; *see* 21 C.F.R. § 801.4 (assessment of "intended use" may take into account "labeling claims, advertising matter, or oral or written statements").

FIGS' claims of protection from *infection* in its advertising, marketing, and emblazoned on each scrub's hangtag, demonstrates that its scrubs qualify as "medical devices" under the FDCA. Plainly, they are intended for use by healthcare professionals; as FIGS argued at trial, they contain antimicrobial agents; and FIGS' claimed in advertising and on its products that its scrubs prevent or mitigate infections immediately and reduce the spread of hospital-acquired infections. The FDA's intent to regulate scrubs is underscored by its recent *denial of* a petition from an unidentified manufacturer to exempt antimicrobial scrubs from the scope of covered "devices" under the FDCA. *See* Appx. Exh. T, FDA, Response to Citizen Petition Docket No. FDA-2020-P-2289 (December 5, 2022), *available at* https://downloads.regulations.gov/FDA-2020-P-2289-0005/attachment_1.pdf. FIGS was accordingly required to obtain 510(k) clearance from the FDA before marketing its antimicrobial-treated scrubs as capable of killing infection and reducing hospital-acquired infection.[7] It is undisputed that FIGS did not do so. Appx. Exh. G (Trial Exh. 650) at 4. FIGS was therefore prohibited from marketing its products with health

---

[7] The FDCA also requires an applicant to submit "appropriate supporting data" when seeking to market a device that has undergone a significant modification that could affect its effectiveness, such as the "addition of an antimicrobial agent." *See* 21 C.F.R. § 807.87(g). Having never sought any medical-device clearance, FIGS did not submit this data, either.

claims without obtaining clearance—yet, it nonetheless widely disseminated those claims, including on tags enclosed with each scrub it sold. FIGS' FDCA violation separately establishes its liability under the "unlawful" and "unfair" prongs of the UCL.

> **4.    FIGS' Violation of FIFRA, FDCA, and Implementing Regulations Caused Harm to SPI by Diverting Customers and Sales.**

Viewed as a whole, the evidence presented at trial—by *both* parties—establishes by a preponderance of the evidence that FIGS' health claims were, at a minimum, a "substantial factor" in diverting consumers and sales from SPI to FIGS. *See Diva*, 392 F. Supp. 3d at 1093. To start, FIGS' *own surveys* reflect that its health claims in violation of FIFRA and FDCA caused consumers—and, more to the point, *SPI's customers*—to purchase its products. *See, e.g.*, Appx. Exh. H (Trial Exh. 2187) at Q26, Q158, Q225, Q369, Q670, U701, Q801, Q810, Q895, Q943, Q949, Q1273, Q1331, Q1355, Q1387 (identifying "antimicrobial" or "antibacterial" quality as one of FIGS' best features); *id.* at P109, P335, P369, P654, P724, P810, P949, P968, P1249, P1272, P1331, P1363 (identifying "antimicrobial" or "antibacterial" as "factor[] that [is] important" to survey respondent).[8] FIGS conceded that it targeted SPI's customers (and specifically Cherokee buyers) for conversion. *See* Appx. Exh. L (Spear Testimony, Oct. 24, 2022 Trial Transcript) at 110:18-21 ("Q. […] Isn't it true that one of the competitors whose consumers were specially targeted by FIGS were consumers of Cherokee? A. Yes."). But FIGS' surveys showed that it was not just *SPI's* customers who deemed FIGS' health

---

[8] Because the relief SPI seeks here is solely injunctive, the "causation" requirement (a component of statutory standing) does not require quantification of injury or lost sales. Accordingly, SPI submits that even if the Court infers that *only* these customers and no others purchased a FIGS scrub instead of an SPI scrub as a result of a health claim FIGS was not permitted to make, it may conclude SPI has proven its standing to seek equitable redress under the UCL, and may enter appropriate relief.

claims key to their embrace of FIGS—many others did so, too. *See* Appx. Exh. H (Trial Exh. 2187) at Q12, Q113, P491, Q491, Q558, Q559, Q568, P777, Q777, P983, P1124, P1168, P1299, P1306, P1319, P1377, P1401, Q1407.

This is compelling evidence of consumer reliance and causation—and it is further bolstered by circumstantial evidence showing scrubs consumers generally deemed these health claims important to their buying decisions. For example, FIGS' survey expert, Dr. Nowlis, testified that the health claims were a reason the consumer purchased FIGS scrubs, even identifying portions of FIGS' sales that could be attributed, in whole or in part, to these claims. *Cf. Diva*, 392 F. Supp. 3d at 1093 ("substantial factor" test requires conduct be "more than a remote or trivial factor," and "[i]t does not have to be the only cause of the harm"). For example, Dr. Nowlis's survey showed that (i) 15.2% of FIGS' consumers purchased FIGS' scrubs based on the claim that its fabric was a hundred percent antimicrobial; (ii) 6.2% of FIGS' consumers purchased FIGS' scrubs based on the claim that its fabric "kills bacteria and infections immediately on contact"; and (iii) 2.8% of FIGS' consumers purchased FIGS' scrubs based on the claim that its products "[r]educe hospital-acquired infections by 66%." Appx. Exh. N (Nowlis Testimony, Oct. 31, 2022 Trial Transcript (Morning)) at 139:4-140:15.

SPI's survey expert, Dr. Itamar Simonson, confirmed that consumers were more likely to purchase FIGS' scrubs based on the health claims. The kills-bacteria-and-infection claim increased consumers' likelihood of purchase by 15% among all surveyed consumers (even higher among past FIGS purchasers) and the reduces-hospital-acquired-infections claim increased the likelihood by 12% among all surveyed consumers (even higher among past FIGS purchasers). Appx. Exh. L (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 294:6-17, 296:10-21. Moreover, in open-ended questions, nearly half (48%) of those surveyed identified the reduces-hospital-acquired-infections health claim as a reason for choosing FIGS; over half (54%) identified the kills-bacteria-and-infection health claim. *Id.* (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 296:2-7. Dr. Simonson specifically designed the survey to

isolate the effect of the specific claims—meaning the various other "causes" FIGS has suggested throughout this litigation, such as management or a DTC sales model, were already accounted for.[9] As FIGS' own damage expert, Dominic Persechini, affirmed at trial, these surveys bear on the causal connection of FIGS' challenged claims to sales: "You know, I had the *survey data from FIGS*, *the Delighted data*, *Dr. Nowlis's data*, the web traffic data, key word data, *all these data that would bear on this notion of, you know, how could these challenged claims be connected to sales*." Appx. Exh. P (Persechini Testimony, Nov. 1, 2022 Trial Transcript (Afternoon)) at 30:12-16 (emphasis added).

While the various consumer surveys by FIGS, Dr. Nowlis, and Dr. Simonson by themselves suffice to establish causation, they are reinforced by other market research adduced at trial, including "Project Diamond"—itself based on a survey of over 1,000 scrubs consumers. Appx. Exh. J (Trial Exh. 2825) at 4. Nearly a quarter of respondents identified "health and safety" and infection control as a "key consideration" in their scrubs-purchasing decision, *id.* at 21, 88, and up to 59% expressed interest in antimicrobial claims like those FIGS was making about their medical apparel. *Id.* at 101. Tellingly, the Project Diamond report noted "CBI [was] currently in the process of seeking EPA approval for [such] claims," *id.*—a step FIGS never bothered to take. Many of those same respondents were "lapsed" or former consumers of SPI brands like Cherokee, Cherokee Workwear, and Infinity, and many of the "lapsed" SPI consumers (up to 16%, in this survey) had been converted to FIGS products. *Id.* at 94.

Taken together, this evidence makes it more likely than not that a number of consumers purchased FIGS' scrubs instead of SPI's in whole or in part because FIGS unlawfully and unfairly marketed and sold them with health claims it was not authorized

---

[9] These other purported "causes" were also already reflected in SPI's costs and its market share. Thus, for example, if SPI had a more effective DTC strategy, its market share during the relevant period would have been higher.

to make absent EPA registration and FDA clearance. SPI has therefore established causation.

**B.      The Trial Evidence Established that FIGS' Four Challenged Claims Meet the UCL Fraud and FAL Causation Standard.[10]**

As with UCL claims under the "unlawful" and "unfair" prongs, "causation" is typically assessed in false-advertising UCL and FAL cases in connection with a plaintiff's standing to bring a claim. *See* Cal. Bus. & Prof. Code § 17204; *Lona's Lil Eats, LLC v. DoorDash, Inc.*, 2021 WL 151978, at *12 (N.D. Cal. Jan. 18, 2021). Here, however, the standards for *consumer* and *competitor* claims differ. *Consumers* must allege (and prove) their *own* reliance on allegedly false or misleading statements, although the statement need not be the sole or decisive cause of the alleged harm. *See, e.g.*, *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 326 (2011). As long as the challenged claims were a "substantial factor" in the consumer's decision, the element of reliance is

---

[10] SPI's false-advertising theory under the FAL and UCL "fraudulent" prong mirrors that under its Lanham Act claims. SPI acknowledges that the jury found for FIGS on Jury Verdict Questions 2, 3, 9, 10, 16, 17, 23, and 24, pertaining to the "falsity" and "deception" elements of the Lanham Act. *See* Dkt. No. 925. However—and particularly with respect to the 66% and "kills infection" claims, given the evidence that the claims were untrue (and absence of evidence they were true)—it is reasonable to assume the jury's finding was predicated on the Lanham Act's requirement that a "substantial segment" of the audience *actually* be deceived by a statement. *See id.*

By contrast, UCL or FAL claims "based on false advertising or promotional practices" require only a showing "that members of the public are likely to be deceived." *Pulaski & Middleman*, 802 F.3d at 985. This asks a slightly different question—whether "it is *probable* that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, *could* be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003) (emphasis added). This is an inquiry that "does not typically involve the type of ordinary factfinding assigned to a jury, but rather calls for an equitable judgment to determine whether an often undisputed advertising or promotional practice presents a sufficient tendency to deceive or confuse the public so as to support invocation of the [UCL or] FAL's remedies." *Nationwide Biweekly Admin, Inc. v. Sup. Ct. Alameda*, 9 Cal. 5th 279, 309 (2020).

---

**PLAINTIFF SPI'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

satisfied; moreover, a showing of materiality entitles the plaintiff to a presumption of reliance. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009).

Numerous courts have held, however, that it is senseless (and indeed contrary to legislative aims) to require the same personal reliance of a *competitor* seeking relief under the UCL and FAL. *See, e.g.*, *Lona's Lil Eats*, 2021 WL 151978, at *12 (N.D. Cal. Jan. 18, 2021). Rather, all that is required is proof of a "sufficient causal connection." *Id.*; *see Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 552 F. Supp. 3d 901, 904 (N.D. Cal. 2021); *Warner Bros. Enters. Inc. v. Random Tuesday, Inc.*, 2020 WL 12762735, at *10 (C.D. Cal. Nov. 9, 2020); *Millennium Dental Techs. Inc. v. Terry*, 2018 WL 5094965, at *16 (C.D. Cal. July 16, 2018); *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2019 WL 6841992, at *6 (C.D. Cal. Oct. 30, 2019); *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 2010 WL 1611398, at *2 (E.D. Cal. Apr. 20, 2010). Accordingly (and intuitively), the standard of causation governing here requires proof by a preponderance that FIGS' challenged claims were a substantial factor in consumers' decision to purchase FIGS' scrubs, instead of SPI's scrubs.

The evidence discussed above in connection with SPI's unlawful/unfair UCL claim equally demonstrates that scrubs consumers relied, in whole or in part, on the four challenged claims in deciding to purchase FIGS' scrubs instead of SPI's.

First, the same internal FIGS survey evidence showing that SPI's customers (and customers of other brands) deemed FIGS' health claims key or important to their decision shows many consumers cited the so-called "one-for-one" or "Threads-for-Threads" claim as either the "best" or an "important" feature. *See* Appx. Exh. H (Trial Exh. 2187) at Q233 ("Q: What do you like best about FIGS? A: Comfort and the threads for threads program"); *id.* at Q169 ("Q: What do you like best about FIGS? A: Buy one, give one :)"); *id.* at Q390 ("Q: What do you like best about FIGS? A: They give a set of scrubs for every set purchased to clinics in need. Also, they are incredibly soft."); *id.* at Q683 ("Q: What do you like best about FIGS? A: Comfort, style and the Threads for threads program"). So too FIGS' liquid repellent claims. *See id.* at P180 ("Q: Any other

factors that are important to you? A: Repels liquid"); *id.* at P598 ("Q: Any other factors that are important to you? A: fluid resistant, no iron needed, soft hand feel, the gift to another of scrubs is important"); *id.* at P757 ("Q: Any other factors that are important to you? A: Water resistant"); *id.* at P819 ("Q: Any other factors that are important to you? A: Water resistance and flexibility."); *id.* at P968 ("Q: Any other factors that are important to you? A: splash resistant"). As with FIGS' health claims, the customers identifying these claims as important were not limited to consumers of SPI's brands. (*See, e.g.*, *id.* at line Q397 ("Q: What do you like best about FIGS? A: Style and tailored fit, but most importantly the threads for threads program! :)"); *see also id.* at Q414 ("Q: What do you like best about FIGS? A: Moisture repellent").)

Dr. Nowlis's and Dr. Simonson's surveys likewise demonstrate the importance of FIGS' "Threads-for-Threads" and "liquid repellent" claims to consumer purchasing decisions, further bolstering the simple inference that these were substantial factors in causing SPI harm. Dr. Nowlis testified that 5.2% of FIGS consumers he surveyed purchased its scrubs based in whole or in part on FIGS' claim of "charitable scrub donations," Appx. Exh. N (Nowlis Testimony, Oct. 31, 2022 Trial Transcript (morning)) at 140:1-7, and Dr. Simonson similarly found that the Threads-for-Threads claim increased consumers' likelihood of purchasing FIGS scrubs by 13% among all survey respondents (higher among past FIGS purchasers). Appx. Exh. L (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 294:6-22, 296:10-21. As to FIGS' liquid repellency claim, Dr. Simonson explained that this, too, substantially increased consumers' likelihood of purchasing FIGS' scrubs—by 20% among all surveyed consumers (higher among past FIGS purchasers). *Id.* at 294:6-22, 296:10-21. This evidence as a whole suffices to prove that the challenged claims were at least a substantial factor in consumers' decisions to purchase FIGS—and that many of those sales would have otherwise gone to SPI.

    **C.**    **The Court's Causation Inquiry Implicates Survey Evidence that FIGS was Required to Produce.**

Finally, as noted in SPI's Supplemental Status Report (Dkt. No. 935), SPI remains concerned that FIGS has not produced survey data that it should have—and such data would go directly to establishing, among other things, the causation element of SPI's equitable claims. In the waning days of trial, FIGS' "Data Science Director" Brian Kim testified to the existence of post-purchase consumer surveys (*i.e.*, surveys sent to consumer after every purchase) conducted by FIGS from at least 2017. Appx. Exh. O (Kim Testimony, Nov. 1, 2022 Trial Transcript (morning)) at 65:17-66:3. His trial deposition testimony, conducted the night before, established that Yotpo data was collected from 2017 through at least 2021. One of the surveys Mr. Kim identified as containing such "Yotpo" data, Exhibit 2282 (Appx. Exh. I), contained a substantial number of the entries in Exhibit 2187 (Appx. Exh. H), which (as discussed *supra*) linked the claims at issue with sales SPI lost to FIGS. Mr. Kim explained that Yotpo data was continuously collected—yet FIGS did not produce any such data for most of the time span Mr. Kim testified it was gathered. SPI is concerned that FIGS' incomplete production has prejudiced SPI's ability to prove the elements of its claims, including (but not limited to) causation. As shown in the surveys that FIGS *has* produced, such data yields crucial evidence of deception, materiality, *and* causation because FIGS solicited information about the reasons consumers purchased FIGS products and the other brands consumers have previously purchased. To the extent such survey data remains unproduced—and FIGS has thus far refused to provide direct answers on what it has and has not turned over—SPI remains at a significant, unjustified disadvantage.

## III.  CONCLUSION

For the reasons set forth herein, SPI respectfully submits that the evidence adduced at trial proves by a preponderance of the evidence that SPI lost customers and sales as a result of FIGS' UCL and FAL violations, and SPI has therefore established the element of causation.

1

Dated: January 6, 2023          MICHELMAN & ROBINSON, LLP

2

                                By:    */s/ Mona Z. Hanna*
3                                      Mona Z. Hanna, Esq.

4

Dated: January 6, 2023          KATTEN MUCHIN ROSENMAN LLP

5

6

                                By:    */s/ Kristin J. Achterhof*
7                                      Kristin J. Achterhof, Esq.

8
                                       *Attorneys for Plaintiff*
9                                      STRATEGIC PARTNERS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF SPI'S POST-TRIAL BRIEF ON EQUITABLE CLAIMS AND CAUSATION**