1   Jacob S. Kreilkamp (State Bar No. 248210)
       jacob.kreilkamp@mto.com
2   Adam B. Weiss (State Bar No. 296381)
       adam.weiss@mto.com
3   Sara A. McDermott (State Bar No. 307564)
       sara.mcdermott@mto.com
4   James R. Salzmann (State Bar No. 324527)
       james.salzmann@mto.com
5   William M. Orr (State Bar No. 331842)
       william.orr@mto.com
6   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, Fiftieth Floor
7   Los Angeles, California 90071-3426
    Telephone:  (213) 683-9100
8   Facsimile:  (213) 687-3702

9   Ekwan E. Rhow (State Bar No. 174604)
       erhow@birdmarella.com
10  Julia B. Cherlow (State Bar No. 290538)
       jcherlow@birdmarella.com
11  Fanxi Wang (State Bar No. 287584)
       fwang@birdmarella.com
12  Kate S. Shin (State Bar No. 279867)
       kshin@birdmarella.com
13  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
14  1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
15  Telephone:  (310) 201-2100
    Facsimile:  (310) 201-2110
16
    *Additional Counsel on Next Page*

17

18                    **UNITED STATES DISTRICT COURT**

19                   **CENTRAL DISTRICT OF CALIFORNIA**

20

21  STRATEGIC PARTNERS, INC.,          | Case No. 2:19-cv-02286-JWH-KS

22            Plaintiff,               | **DEFENDANT FIGS, INC.'S
                                       | APPENDIX OF EVIDENCE IN
23        vs.                          | SUPPORT OF ITS REPLY BRIEF
                                       | REGARDING CAUSATION**
24  FIGS, INC., CATHERINE ("TRINA")    |
25  SPEAR, HEATHER HASSON,             | Judge:  Hon. John W. Holcomb
                                       | Date:    February 3, 2023
26            Defendants.              | Time:    1:00 p.m.
                                       | Crtrm.:  9D
27

28

---

1  *Additional Counsel*

2  Xiaonan April Hu (State Bar No. 321354)
       april.hu@mto.com
3  MUNGER, TOLLES & OLSON LLP
   601 Massachusetts Ave. NW, Suite 500E
4  Washington, D.C. 20001-5369
   Telephone:  (202) 220-1100
5  Facsimile:  (202) 220-2300

6  Sara H. Worth (State Bar No. 341088)
       sara.worth@mto.com
7  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, Fiftieth Floor
8  Los Angeles, California 90071-3426
   Telephone:  (213) 683-9100
9  Facsimile:  (213) 687-3702

10 Miri E. Gold (State Bar No. 319060)
       mgold@birdmarella.com
11 BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
12 1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
13 Telephone:  (310) 201-2100
   Facsimile:  (310) 201-2110

14

15 Attorneys for Defendants

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Defendant FIGS, Inc. (FIGS) hereby submits the following Appendix of Evidence in support of its Reply Brief to Plaintiff's Post-Trial Brief on Equitable Claims and Causation.

| EXHIBIT | DOCUMENT |
|---|---|
| A | Trial Exhibit 3112 (Certainty Technologies Antimicrobial Fabric Technology YouTube Video) <br> *Native file previously lodged with the Court* |
| B | Excerpts from Trial Testimony of Dr. Stephen Nowlis on October 31, 2022 |
| C | Excerpts from Trial Testimony of Dr. Itamar Simonson on October 24, 2022 |
| D | Excerpts from Trial Testimony of Brian Kim on November 1, 2022 |
| E | Trial Exhibit 3129 (Certainty Plus™ YouTube Video) <br> *Native file previously lodged with the Court* |
| F | Trial Exhibit 2016 (Wayback Machine Webpage for http://www.certaintytechnologies.com, Frequently Asked Questions) |
| G | Trial Exhibit 2017 (Wayback Machine Webpage for http://www.certaintytechnologies.com, Fabric Technology for the Life You Live) |
| H | Trial Exhibit 2018 (RIS News, Strategic Partners Launches New Antimicrobial Tech for Medical Scrubs) |
| I | Trial Exhibit 2652 (PR Newswire, Strategic Partners, Inc. Launches New Medical Apparel Line with CERTAINTY™ Antimicrobial Technology) |

1

2   DATED:  January 20, 2023          MUNGER, TOLLES & OLSON LLP

3

4
                                     By:  ___/s/ Jacob S. Kreilkamp___
5                                        JACOB S. KREILKAMP
6                                    Attorneys for Defendants

7   DATED:  January 20, 2023          BIRD, MARELLA, BOXER, WOLPERT,
                                     NESSIM, DROOKS, LINCENBERG &
8                                    RHOW, P.C.

9

10

11                                   By:  ___/s/ Ekwan E. Rhow___
                                         EKWAN E. RHOW
12                                   Attorneys for Defendants

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT FIGS, INC.'S APPENDIX OF EVIDENCE IN SUPPORTS OF ITS REPLY BRIEF REGARDING CAUSATION

# EXHIBIT A

# Exhibit in Native Format

**EX-3112-1**

DEFX-3112

# EXHIBIT B

```
 1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION
 3
                              - - -
 4                 HONORABLE JOHN W. HOLCOMB,
              UNITED STATES DISTRICT JUDGE PRESIDING
 5                            - - -

 6
     STRATEGIC PARTNERS, INC.,        )
 7                                    )   CERTIFIED COPY
                                      )
 8              PLAINTIFF,            )
                                      )   CV 19-02286 JWH-KSx
 9   VS.                              )
                                      )
10                                    )
     FIGS, INC., CATHERINE           )
11   ("TRINA") SPEAR, HEATHER         )
     HASSON,                          )
12                                    )
                                      )
13              DEFENDANTS.           )
                                      )
14                                    )
     _____)
15

16

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                  MONDAY, OCTOBER 31, 2022
18                      A.M. SESSION
                   SANTA ANA, CALIFORNIA
19

20

21
             SHERI S. KLEEGER, CSR 10340
22         FEDERAL OFFICIAL COURT REPORTER
           312 NORTH SPRING STREET, ROOM 402
23           LOS ANGELES, CALIFORNIA 90012
                  PH:  (213)894-6604
24

25
```

```
 1

 2

 3   APPEARANCES OF COUNSEL:

 4   ON BEHALF OF PLAINTIFF:
               MICHELMAN & ROBINSON, LLP
 5             BY:  MONA Z. HANNA, ATTORNEY AT LAW
                    SANFORD L. MICHELMAN, ESQUIRE
 6                  JEFFREY FARROW, ESQUIRE
               17901 VON KARMAN AVENUE
 7             SUITE 1000
               IRVINE, CA 92614
 8
               KATTEN MUCHIN ROSENMAN LLP
 9             BY:  KRISTIN J. ACHTERHOF, ATTORNEY AT LAW
               525 WEST MONROE STREET
10             CHICAGO, IL 60661-3693

11   ALSO PRESENT:  MICHAEL SINGER

12

13   ON BEHALF OF DEFENDANT:
               BIRD, MARELLA, BOXER, WOLPERT,
14             NESSIM, DROOKS LINCENBERG & RHOW
               BY:  EKWAN E. RHOW, ESQUIRE
15                  JULIA CHERLOW, ATTORNEY AT LAW
                    FANXI WANG, ATTORNEY AT LAW
16             1875 CENTURY PARK EAST
               23RD FLOOR
17             LOS ANGELES, CA 90067-2561

18
               MUNGER, TOLLES & OLSON LLP
19             BY:  ADAM BENJAMIN WEISS, ESQUIRE
                    JACOB S. KREILKAMP, ESQUIRE
20                  SARA WORTH, ATTORNEY AT LAW
                    SARA McDERMOTT, ATTORNEY AT LAW
21                  XIAONAN APRIL WU, ATTORNEY AT LAW
               350 South Grand Avenue
22             50th Floor
               Los Angeles, CA 90071
23
     ALSO PRESENT:  HEATHER HASSON, TRINA SPEAR
24

25
```

```
 1     Q.  -- on the left?

 2             So does that refresh your recollection,

 3   Dr. Hardwick, as to whether the liquid-repellency tests

 4   that Ms. Achterhof asked you about were in fact of

 5   historical pre2016 threads?

 6     A.  I understood that they were the rough time

 7   period, yes.  I didn't know the exact date.

 8             MR. WEISS:  Nothing further.

 9             THE COURT:  Any recross?

10             MS. ACHTERHOF:  No.

11             THE COURT:  May Dr. Hardwick be excused?

12             Plaintiff?

13             MS. ACHTERHOF:  Yes, Your Honor.

14             THE COURT:  Defendant?

15             MR. WEISS:  Yes, Your Honor.

16             THE COURT:  Thank you very much,

17   Dr. Hardwick for coming in.

18             THE WITNESS:  Thank you.

19             THE COURT:  Defendants please call your next

20   witness.

21             MR. KREILKAMP:  Defendants call Stephen

22   Nowlis to the stand.

23             THE COURT:  Dr. Nowlis.  He's nodding his

24   head.  So Dr. Nowlis it is.

25             Please swear in the witness.
```

 1              THE CLERK:  If you could please raise your

 2    right hand.

 3              Do you solemnly swear that the testimony you

 4    shall give in the cause now before this Court shall be

 5    the truth, the whole truth and nothing but the truth, so

 6    help you God?

 7              THE WITNESS:  I do.

 8              THE CLERK:  Please state your name, spelling

 9    your first and last name for the record.

10              THE WITNESS:  My name is Stephen Nowlis.

11    The spelling is S-t-e-p-h-e-n.  Last name N-o-w-l-i-s.

12              THE COURT:  All right.  Welcome.  And good

13    morning, Dr. Nowlis.

14              THE WITNESS:  Good morning.

15              THE COURT:  I think you may have seen other

16    witnesses testifying.  I think we are going to give

17    you -- or someone will give you -- there it is -- a

18    binder with exhibits that the lawyers may ask you to

19    look at.

20              You have water?

21              THE WITNESS:  I do.  Thank you.

22              THE COURT:  All right.  Mr. Kreilkamp,

23    please begin when you're ready.

24              MR. KREILKAMP:  Thank you.

25              **DIRECT EXAMINATION**

1  BY MR. KREILKAMP:

2     Q.  Good morning, Dr. Nowlis.  Could you tell us your

3  occupation.

4              THE COURT:  You have a -- hold on one

5  second, Dr. Nowlis.  Sorry.  Do you have a copy of the

6  demonstratives for me?

7              MR. KREILKAMP:  Yes, Your Honor.

8              THE COURT:  I assume this was unobjected to?

9              MR. KREILKAMP:  That's correct.

10             THE COURT:  Sorry to interrupt.

11             Go ahead.

12  BY MR. KREILKAMP:

13    Q.  I will ask the question again.  Could you tell us

14  your occupation, Dr. Nowlis.

15    A.  Yes.  I am the August Busch distinguished

16  professor of marketing at Washington University in

17  St. Louis.

18    Q.  And can you describe for me your educational

19  background.

20    A.  Yes.  I grew up in California.  And I got my

21  undergraduate degree in economics from Stanford

22  University.  And I have my MBA and my PhD from UC

23  Berkeley, focusing on marketing.

24    Q.  How long you have been a professor?

25    A.  I have been a full-time professor since 1994.  So

```
 1   witness on consumer surveys' evidence.

 2              THE COURT:  All right.  Plaintiffs, any

 3   objection?

 4              MR. HANNA:  No, Your Honor.

 5              THE COURT:  All right.  Under Rule 702,

 6   Dr. Nowlis will be so designated.

 7   BY MR. KREILKAMP:

 8      Q.  Okay.  Now, Dr. Nowlis, were you retained by FIGS

 9   to provide an expert opinion in this case?

10      A.  Yes, I was.

11      Q.  And what was your assignment?

12      A.  My assignment was to test whether the challenged

13   claims that were allegedly deceptive were material to

14   consumers' purchase of FIGS products.

15      Q.  And can you explain what you mean by material?

16      A.  Yes.  Material means, were they likely to

17   increase someone's likelihood of buying FIGS products

18   depending on those -- consumers seeing those claims.

19      Q.  And as an expert in consumer surveys, is this a

20   question that you were able to address applying your

21   expertise?

22      A.  Yes.

23      Q.  And so could you tell us what expert methods you

24   used to form your opinion in this case for that

25   assignment?
```

1     A.   Well, I wanted to be very thorough about this.

2   It's my job to be thorough.  So I examined this issue

3   with three different methodologies.

4     Q.   Well, maybe let's go through them just at a high

5   level, one by one.

6              What was that first methodology that you

7   used?

8     A.   The first methodology that I used, I did a number

9   of surveys using the first methodology.  And that

10   methodology is called a test control methodology.

11     Q.   Okay.  And we'll talk a little bit more about

12   that in a minute.

13              What was the second methodology.

14     A.   The second methodology was I asked people who had

15   bought FIGS why they did that.  I called that a purchase

16   factor survey.

17     Q.   All right.  And what was the third methodology?

18     A.   The third methodology was I was able to look at

19   data that FIGS had collected itself, looking at customer

20   feedback, and I was able to analyze that data to again

21   look at the issue of materiality.

22     Q.   And did you have any kind of significant variance

23   in the results of those three methodologies?

24     A.   No.  They all lead to the same conclusion.

25     Q.   What was that conclusion?

1      A.   The conclusion were that the challenged claims

2   likely had no effect on consumers' purchase decision for

3   buying FIGS products.

4              In other words, the allegedly deceptive

5   claims were likely not material; in other words, they

6   were immaterial.

7      Q.   Now, are you aware that SPI engaged Dr. Itamar

8   Simonson to conduct surveys for this lawsuit as well?

9      A.   Yes, I am.

10      Q.   Have you reviewed his testimony that he gave last

11   week?

12      A.   Yes, I have.

13      Q.   Are you also aware that SPI engaged another

14   expert, Professor Blanchard, to critique your work in

15   this matter?

16      A.   Yes.

17      Q.   Did you review his testimony and familiarize

18   yourself with his criticisms?

19      A.   Yes, I have.

20      Q.   All right.  And we'll talk as we go through the

21   details of your work, we'll talk about some of those

22   criticisms.  Do you have any general response to

23   Professor Blanchard's criticism before we get into the

24   details?

25      A.   Yes.  I carefully reviewed his criticisms and I,

1    group -- what I did is I took the language in red, it's

2    called neutralizing it, making it something that

3    wouldn't be an issue.  So what they can then do is say,

4    Well, how likely would somebody be to buy this one where

5    there is no issue, and I can compare it against the test

6    group where there is an issue, and see if there is a

7    difference or not between them.  If there is a

8    difference, then maybe people were more likely to buy

9    something based on the test group.  If there is no

10   difference, then I can conclude scientifically that this

11   particular claim in the test group had no affect on

12   people's likelihood of buying because it didn't change

13   average responses.

14              And again, just to be perfectly clear about

15   this, separate groups of people saw one versus the

16   other.  About 150 people were in the test group.  They

17   gave a rating.  A separate group of 150 people were in

18   the control group.  They gave their own rating, whatever

19   they thought.  And I could compare the two

20   scientifically to see if there is a difference between

21   the two or not.

22   Q.   Okay.  So what we're looking at here is the test

23   group that contains one of the challenged claims.

24              So tell us what you replaced the challenged

25   claim with and what the control group saw.

1      A.  So the control group saw something that's a

2  neutral statement.  So instead of the earlier statement

3  about the 66 percent hospital-acquired infection rate,

4  it's a very specific claim, this one was a general

5  neutral claim inhibits the growth of bacteria, which

6  would not be at issue in the matter, so I can compare

7  what's not at issue versus what is at issue and see if

8  there's a difference.

9      Q.  Now, could you pick any neutral claim at all?  Or

10  is there anything about that neutral claim, how it

11  relates to the claim you're testing?

12      A.  So the control claim should be similar in spirit.

13  So the earlier -- the test claim was about bacteria.

14  The control claim is also about bacteria, but it

15  neutralizes, it removes any contention over whether it

16  was allegedly deceptive or not.

17      Q.  And is the difference that you have shown us

18  between the challenged claim here in the test group and

19  this neutral statement on the control group, is that the

20  only difference between the two stimuli?

21      A.  Yeah.  What's in the red box is the only

22  difference.  Everything else is the same on purpose

23  because that's the way that these tests are done is

24  isolating only the things that are at issue.  Leave

25  everything else the same and only change the one thing

1   that you care about.  That's the procedure for this type

2   of test.

3       Q.  Now, if you had changed other things between the

4   test group and the control group, would that raise any

5   issues in answering the question you're trying to

6   answer?

7       A.  It would have, because then I could isolate only

8   this one challenged claim.  If I changed a bunch of

9   other things, then what's causing people to answer this

10  way or that way, I couldn't really tell.

11          So, again, if I want to isolate the one

12  challenged claim, that's what I did.

13      Q.  Now, tell us how you determine that "the inhibits

14  the growth of bacteria" language was neutral?

15      A.  Right.  So one way I did it was I said we'll let,

16  you know, SPI itself, how did they advertise or how did

17  they describe some of their products?  And they use this

18  language, "inhibits the growth of bacteria."

19          So that must be neutral statement that's not

20  contentious if SPI itself is using it.  So that's why

21  I -- in part why I used that as my control to compare

22  against my test.

23      Q.  Now, instead of using this neutral statement that

24  SPI itself uses, could you have just put "information

25  unavailable" in the control statement?

1      A.   No.   If can scroll back for just a minute just to

2   remind ourselves of what I showed people.

3             So if I had put in the box, "not available,"

4   I couldn't have done that because that is not real

5   world.   That doesn't mimic something that somebody would

6   actually see in the real world.

7             And mimicking real world, what are called

8   marketplace conditions, is an extremely important

9   principal in litigation surveys, because I need to find

10  out how someone would react in the real world, so I need

11  to show them things that they could have seen in the

12  real world.

13     Q.   Now, is that principle of mimicking the real

14  world something that applies across the board to any

15  academic consumer survey or is it something that can be

16  more specifically in need in litigation surveys?

17     A.   So like I said, I'm a full-time marketing

18  professor.   I do a lot of peer-reviewed academic

19  research.   I also do litigation research.

20            One of the big differences between the two

21  is for litigation research, this idea of marketplace

22  conditions is much more important.   Sometimes in

23  academic research, we'll test our theories or other

24  things, and, you know, we're learning about concern

25  behavior in marketing and using surveys to do that, we

1

2

3                  COUNTY OF LOS ANGELES)

4                                      )  SS.

5                  STATE OF CALIFORNIA  )

6

7          I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN

8   AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

9   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

10  TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

11  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

12  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

13  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT page

14  FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

15  JUDICIAL CONFERENCE OF THE UNITED STATES

16  OCTOBER 31, 2022

17

18  /S/_____

19  SHERI S. KLEEGER, CSR

20  FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

# EXHIBIT C

1                     UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
2                 CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
3
                            - - -
4                 HONORABLE JOHN W. HOLCOMB,
           UNITED STATES DISTRICT JUDGE PRESIDING
5                           - - -

6
STRATEGIC PARTNERS, INC.,          )
7                                  )   CERTIFIED COPY
                                   )
8              PLAINTIFF,           )
                                   )   CV 19-02286 JWH-KSx
9  VS.                             )
                                   )
10                                 )
FIGS, INC., CATHERINE              )
11 ("TRINA") SPEAR, HEATHER        )
HASSON,                            )
12                                 )
                                   )
13             DEFENDANTS.          )
                                   )
14                                 )
_____)
15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                  MONDAY, OCTOBER 24, 2022
18                  A.M./P.M SESSION
                  SANTA ANA, CALIFORNIA
19

20

21
               SHERI S. KLEEGER, CSR 10340
22          FEDERAL OFFICIAL COURT REPORTER
            312 NORTH SPRING STREET, ROOM 402
23           LOS ANGELES, CALIFORNIA 90012
                  PH:  (213)894-6604
24

25

```
 1

 2

 3   APPEARANCES OF COUNSEL:

 4   ON BEHALF OF PLAINTIFF:
                 MICHELMAN & ROBINSON, LLP
 5               BY:  MONA Z. HANNA, ATTORNEY AT LAW
                     SANFORD L. MICHELMAN, ESQUIRE
 6               17901 VON KARMAN AVENUE
                 SUITE 1000
 7               IRVINE, CA 92614

 8               KATTEN MUCHIN ROSENMAN LLP
                 BY:  KRISTIN J. ACHTERHOF, ATTORNEY AT LAW
 9               525 WEST MONROE STREET
                 CHICAGO, IL 60661-3693
10
     ALSO PRESENT:  MICHAEL SINGER
11

12
     ON BEHALF OF DEFENDANT:
13               BIRD, MARELLA, BOXER, WOLPERT,
                 NESSIM, DROOKS LINCENBERG & RHOW
14               BY:  EKWAN E. RHOW, ESQUIRE
                     JULIA CHERLOW, ATTORNEY AT LAW
15               1875 CENTURY PARK EAST
                 23RD FLOOR
16               LOS ANGELES, CA 90067-2561

17
                 MUNGER, TOLLES & OLSON LLP
18               BY:  ADAM BENJAMIN WEISS, ESQUIRE
                     JACOB S. KREILKAMP, ESQUIRE
19                   SARA WORTH, ATTORNEY AT LAW
                     SARA McDERMOTT, ATTORNEY AT LAW
20               350 South Grand Avenue
                 50th Floor
21               Los Angeles, CA 90071

22   ALSO PRESENT:  HEATHER HASSON, TRINA SPEAR

23

24

25
```

1    counsel for defendants.

2              THE COURT:  And your clients are present as

3    well?

4              MR. SALZMANN:  Yes, indeed, they are, Your

5    Honor.

6              THE COURT:  Mr. Kreilkamp, are you ready to

7    begin your cross-examination of Dr. Simonson?

8              MR. KREILKAMP:  I am.

9              THE COURT:  Dr. Simonson, are you ready.

10             THE WITNESS:  I'm ready.

11             THE COURT:  This is just a quick reminder,

12   you are still under oath.

13             THE WITNESS:  Of course.

14             THE COURT:  Go ahead.

15                    CROSS-EXAMINATION

16   BY MR. KREILKAMP:

17   Q.  Good afternoon, professor Simonson.

18        So you have been a paid litigation expert, I

19   think I heard you testify, in over 200 cases; correct?

20   A.  Yes.

21   Q.  So I would like to talk, first, about your third

22   survey, what you call the Choice Impact survey.

23        And this is the one where SPI asked you to assess

24   the impact of FIGS' allegedly deceptive statements on

25   consumers' purchasing choices; correct?

1    A.  Yes.

2    Q.  To put it another way, in this third survey, you

3    were trying to test the materiality of the various

4    challenged statements; correct?

5    A.  It's related to materiality as I understand the

6    legal term of materiality.

7    Q.  All right.  And it is your testimony today, that

8    for each of surveys that you conducted, including this

9    one, the Choice Impact Survey, you followed

10   well-established survey standards; right?

11   A.  Yes.

12   Q.  And, in fact, you identified six of those

13   standards or principles in your testimony earlier;

14   right?

15   A.  I did.

16   Q.  I have got them called up here, and one of them

17   at the very bottom there, is "Properly controlled to

18   test only the variables at issue"; right?

19   A.  Right.

20   Q.  It is your testimony it's very important to

21   follow those principles; correct?

22   A.  Correct.

23   Q.  Otherwise, you might reach the wrong conclusions;

24   right?

25   A.  That's right.

1    Q.  Okay.  So in this Choice Impact Survey, you used

2    what you were calling a test control format, right?

3    A.  Yes.

4    Q.  And the way you did that is you divided your

5    survey population into different groups, one was the

6    control group, and then you had different test groups;

7    correct?

8    A.  Yes.

9    Q.  And each of these groups were shown information

10   about a FIGS scrub and then about a Cherokee scrub and

11   then asked to decide which one they would choose to buy

12   based on the information that they saw, correct?

13   A.  Yes.

14   Q.  And the control group was shown a stimulus that

15   did not include any of claims being challenged in this

16   lawsuit; right?

17   A.  Correct.

18   Q.  And then your test groups were shown a stimulus

19   that was almost identical to what the control group saw,

20   with the key difference being that you added one or more

21   of challenged claims to what the test group saw; right?

22   A.  That's correct.

23   Q.  And then you just compared the number of

24   respondents who chose FIGS in the control group where

25   they didn't see the challenged claims, with a number of

1    respondents who chose FIGS in the test group where they

2    did see one or more challenged claims; correct?

3        A.   Yes.

4        Q.   And it is your testimony that so long as you had,

5    which you said that you had a statistically significant

6    number of participants that allowed you to see how much

7    of a difference that adding the challenged claim made to

8    the survey participants; right?

9        A.   Yes.

10        Q.   So let's go back to the six principle here,

11   "properly controlled to test only the variables at

12   issue."

13           Now, I'm going to read you a statement from Dr.

14   Dimonds Tretis on how to properly design a test and

15   control survey.

16               "In designing a survey experiment, the

17   expert should select a stimulus for the control group

18   that's shares as many characteristics with the

19   experimental stimulus as possible, with the key

20   exception of the characteristic whose influence is being

21   assessed.

22               As a general matter, you agree with that;

23   right?

24        A.   Yes.

25        Q.   As much as possible, you want the only difference

1   between your test and your control to be the

2   characteristic that you're testing, right?

3       A.   If you're testing something, you want only what

4   you tested to be the differentiator.

5       Q.   That way you should know that any difference

6   between what the test group favored and what the control

7   group favored, has to be the challenged claim that

8   you've added, because that is the only thing that you

9   different between them, right?

10      A.   Yes.

11      Q.   And if there are other differences between the

12  control group and the test group, then you wouldn't be

13  able to know if the difference between the two groups

14  was due to the challenged claim you added or for some

15  other difference; right?

16      A.   It depends; you have to look at each case.  But

17  as a general matter, I with agree with that.

18      Q.   It's so important because it allows you to be

19  sure that there is no alternative hypothesis that could

20  explain the difference between the results from the

21  tests in the control groups; right?

22      A.   Yes.

23      Q.   It allows you to isolate the impact of an item

24  that you're trying to test; right?

25      A.   Right.

1            So in this test stimulus, you added a new

2    scrub feature row in which you call, "Ability of

3    antimicrobial fabric to reduce the growth of bacteria

4    yeast and algae"; right.

5        A.   Yes.

6        Q.   And then in the FIGS column, you've added, "Kills

7    bacteria and infection immediately on contact"; right?

8    That's one of the challenged claims here?

9        A.   Right.

10       Q.   And as we just discussed, you were trying to test

11   to see how many more people in the test group picked

12   FIGS once you added that challenge claim; correct?

13       A.   Right.

14       Q.   But then there is something else that you've

15   added to the control group -- sorry, to this test group,

16   you added "information unavailable," next to the

17   challenge claim in the Cherokee column; right?

18       A.   Right.

19       Q.   You added both the challenge claim in the FIGS

20   column, and then in the Cherokee column, "information

21   unavailable"; right?

22       A.   Right.

23       Q.   Now, you weren't trying to assess the influence

24   on your respondents of the statement for Cherokee

25   scrubs, that information on their ability to reduce the

1   growth of bacteria was unavailable; right?  You weren't

2   trying to test that?

3       A.  No.  As I explained, that was the best solution

4   based on a great deal of research I had conducted.

5       Q.  The only feature that you wanted to use to

6   distinguish the test from the control was the allegedly

7   deceptive claim; right?

8       A.  Yes.  Along with a neutral statement saying

9   Cherokee doesn't say anything about it.

10      Q.  You remember when I deposed you a few months ago,

11  sir?

12      A.  I do.

13              MR. KREILKAMP:  I would like to play for

14  impeachment from the transcript.  I can give you the

15  site when you're ready, Your Honor.

16              THE COURT:  Yes, page and line, please?

17              MR. KREILKAMP:  195, 12 to 196, 20.

18              THE COURT:  There is an objection in there.

19              MR. KREILKAMP:  We have removed those from

20  the video.

21              THE COURT:  Plaintiff is not standing on the

22  objection?

23              MS. HANNA:  No, Your Honor.

24              THE COURT:  Does plaintiff have an objection

25  otherwise?

```
 1                    MS. HANNA:  No.

 2                    THE COURT:  Go ahead, Mr. Kreilkamp.

 3                    Mr. Mendoza.

 4                    (Video played.)

 5    BY MR. KREILKAMP:

 6       Q.  Sir, so when you put "information unavailable" on

 7    your test, you didn't intend to distinguish it from the

 8    control, then.  You just told us in that video; right?

 9       A.  That is completely incorrect.  In fact, you just

10    took a couple of sentences from the deposition, and, in

11    fact, I think we went for a long time and I explained to

12    you exactly why I chose "information unavailable" for

13    Cherokee and not for FIGS, and we had a discussion about

14    my prior research.

15            So I think it was probably explained in the

16    deposition, and I'm sure you can find many examples

17    where I explain exactly that.

18       Q.  So my time is short, so I'm going to do this

19    quickly, but I want to quickly go through your other

20    test groups.  So I just put up the 66 percent claim.

21            Can you tell me if you recognize it, do I have

22    that right here?

23       A.  Yes.

24       Q.  And you have "information unavailable" in the

25    Cherokee column there, as well; right?
```

1      A.   Right.

2      Q.   Here's your test group for liquid repellent,

3  you've put "information unavailable" in the Cherokee

4  column there; right?

5      A.   Right.

6      Q.   And here's the one-for-one claim that you're

7  testing, and you put "information unavailable" in the

8  Cherokee column; right?

9      A.   Right.

10     Q.   And here's your test group where you showed them

11 all four and you've got four information unavailables;

12 right?

13     A.   That's correct.

14     Q.   So in every one of these, your participant saw

15 information unavailable in the Cherokee column only, at

16 least one instance for separate times; right?

17     A.   That's correct.

18     Q.   Now, we spoke just a moment ago about how it is a

19 fundamental principle of survey design, that you want to

20 make the control stimulus as similar as possible to the

21 test stimulus, with the only difference being the

22 characteristic whose influence you're trying to assess;

23 right?

24     A.   That's right.

25     Q.   And it's your testimony today, that you're

1    certain that the difference between the number of people

2    who picked FIGS in any of these test groups and the

3    number who picked FIGS in the control group is

4    necessarily, only because those participants preferred

5    the FIGS scrub because of the addition of the challenge

6    claim in the FIGS column; right?

7        A.   That's correct.  Of course, if the information is

8    unavailable in reality, one company makes the claim, the

9    other one does not, you would expect some consumers to

10   mention that.  Just as, in this case, I think less than

11   1 percent, did mention the information unavailable.

12   They just mirrors reality, and that is why I chose

13   "information unavailable," which was the most neutral

14   way to capture it.

15       Q.   You're not concerned that any respondents may

16   have picked FIGS in the test group because they did not

17   like seeing "information unavailable" in the SPI column?

18       A.   As I said, I believe, in this case, less than 1

19   percent mentioned information unavailable, I'm not at

20   all concerned about it.  That is the same in reality.

21   If one company makes a claim about 66 percent and so on,

22   the other one does not.  Some consumers would say, I

23   wonder why the other company doesn't say anything about

24   it.  So I was surprised to see that it was less than 1

25   percent who mentioned it.

```
1        Q.  Okay.  So you're talking now about, and I'm going

2   to put some of these up.  These are some of the comments

3   that your survey participants gave.

4            This one said, "I already like FIGS and the lack

5   of information on Option 1 is offputting"; right?  That

6   was one of your participants?

7        A.  Yes.

8        Q.  Here's another one:  "Option 2 listed there

9   features, such as antimicrobial, repellent, et cetera,

10  while Option 1 did not"; correct?

11       A.  Right.

12       Q.  That is another one of your participants, that is

13  what they said?

14       A.  Right.

15       Q.  Okay.  Another one said, "I had more information

16  on Option 1.  I didn't have as much info on Option 2";

17  right?

18       A.  Right.

19       Q.  And another said, "More info regarding specifics

20  available," describing their choice; right.

21       A.  Right.

22       Q.  But you still reject the alternative hypothesis

23  that some of your test group participants chose FIGS,

24  not because of the presence of the challenged claim but

25  because of the presence of information unavailable in
```

1   the Cherokee side; right?

2      A.   I absolutely rejected.  As I said, less than 1

3   percent, and you showed, I think, the majority of them

4   now refer to that.

5           And besides, as I said, that's life.  In reality,

6   one company says, our product reduces infection by

7   66 percent, the other one says nothing, that would cause

8   consumers to say, I wonder why they don't say anything.

9   Probably they cannot say it.

10     Q.   You showed us earlier this Cross/Bic survey you

11  did; right?

12     A.   Yes.

13     Q.   Didn't you tell us that nobody said "Bic," but

14  you know that that's why they picked the Cross even

15  though they didn't tell you?

16     A.   I did say that.

17     Q.   You didn't do any other materiality survey which

18  didn't include "information unavailable" as an SPI

19  attribute for the jury to consider; correct?

20     A.   I just chose the best methodology based on my

21  research expertise.

22     Q.   All right.  Let's discuss another one of your

23  principles of survey design.  I want to draw your

24  attention to the third one:  "Test the relevant

25  products/context."

1    That is exactly why I used the results from the

2  Attractiveness Survey to represent the attractiveness of

3  the scrubs.

4    Q.  Now, sir, you're aware that SPI has, in the past,

5  advertised that certain of its scrubs antimicrobial

6  fabric has the ability to reduce the growth of bacteria;

7  aren't you?

8    A.  I believe that does not apply to the popular mid-

9  tier scrubs that I tested.

10   Q.  Sorry.  You're aware, though, that SPI has

11  advertised in the past, that certain of its scrubs'

12  antimicrobial fabric has the ability to reduce the

13  growth of bacteria?

14   A.  I believe I did for relatively small brands that

15  cost much more than the popular ones.

16   Q.  And did you know, actually, that another company

17  sued SPI for false advertising for making that

18  statement.  And that SPI took the position when it was

19  sued, that that statement was absolutely okay and was

20  not false advertising, and then prevailed in that

21  lawsuit.

22       Were you aware of that?

23   A.  I don't recall hearing about that.  But again, I

24  understand it.  This statement was used with respect to

25  upscale, like the more expensive low seller scrubs of

1    Cherokee, or SPI, they do not apply -- those statements

2    were not used with the popular best sellers of Cherokee

3    that I tested.

4        Q.   Okay.  So what I have done here, and I just want

5    to be clear, the red is not part of your actual survey.

6    What I have done is I've taken your test stimulus, but I

7    have replaced "information unavailable" with the

8    statement that SPI made to consumers in the real world:

9    "Starts to work up on contact with unwanted bacteria on

10   the fabric."

11            Do you see that?

12       A.   I do.

13       Q.   So you could have included this statement instead

14   of "information unavailable"; right?

15       A.   Absolutely not.  That would have been a big

16   mistake.  Because this statement was never used with the

17   best selling popular Cherokee product.  It would be a

18   misrepresentation of reality if I were to include this

19   as a control.

20       Q.   Misrepresentation of reality or of the reality

21   you were constructing in your survey for these

22   participants?

23       A.   I'm not sure, is that a question?  What is your

24   question?

25       Q.   Well, I'm asking if you really think it would be

```
 1
 2
 3              COUNTY OF LOS ANGELES)
 4                               )  SS.
 5              STATE OF CALIFORNIA  )
 6
 7         I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN
 8  AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL
 9  DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT
10  TO SECTION 753, TITLE 28, UNITED STATES CODE, THE
11  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE
12  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE
13  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT page
14  FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE
15  JUDICIAL CONFERENCE OF THE UNITED STATES
16  OCTOBER 25, 2022
17
18  /S/_____
19  SHERI S. KLEEGER, CSR
20  FEDERAL OFFICIAL COURT REPORTER
21
22
23
24
25
```

# EXHIBIT D

```
 1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION
 3
                            - - -
 4                HONORABLE JOHN W. HOLCOMB,
              UNITED STATES DISTRICT JUDGE PRESIDING
 5                          - - -

 6
    STRATEGIC PARTNERS, INC.,      )
 7                                 )   CERTIFIED COPY
                                   )
 8            PLAINTIFF,            )
                                   )   CV 19-02286 JWH-KSx
 9   VS.                           )
                                   )
10                                 )
    FIGS, INC., CATHERINE          )
11  ("TRINA") SPEAR, HEATHER       )
    HASSON,                        )
12                                 )
                                   )
13            DEFENDANTS.          )
                                   )
14                                 )
    _____)
15

16

17             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                   TUESDAY, NOVEMBER 1, 2022
18                        A.M. SESSION
                     SANTA ANA, CALIFORNIA
19

20

21
                   SHERI S. KLEEGER, CSR 10340
22             FEDERAL OFFICIAL COURT REPORTER
               312 NORTH SPRING STREET, ROOM 402
23               LOS ANGELES, CALIFORNIA 90012
                     PH:  (213)894-6604
24

25
```

```
 1

 2

 3   APPEARANCES OF COUNSEL:

 4   ON BEHALF OF PLAINTIFF:
                 MICHELMAN & ROBINSON, LLP
 5               BY:  MONA Z. HANNA, ATTORNEY AT LAW
                      SANFORD L. MICHELMAN, ESQUIRE
 6                    JEFFREY D. FARROW, ESQUIRE
                 17901 VON KARMAN AVENUE
 7               SUITE 1000
                 IRVINE, CA 92614
 8
                 KATTEN MUCHIN ROSENMAN LLP
 9               BY:  KRISTIN J. ACHTERHOF, ATTORNEY AT LAW
                 525 WEST MONROE STREET
10               CHICAGO, IL 60661-3693

11   ALSO PRESENT:  MICHAEL SINGER

12

13   ON BEHALF OF DEFENDANT:
                 BIRD, MARELLA, BOXER, WOLPERT,
14               NESSIM, DROOKS LINCENBERG & RHOW
                 BY:  EKWAN E. RHOW, ESQUIRE
15                    JULIA CHERLOW, ATTORNEY AT LAW
                      FANXI WANG, ATTORNEY AT LAW
16               1875 CENTURY PARK EAST
                 23RD FLOOR
17               LOS ANGELES, CA 90067-2561

18
                 MUNGER, TOLLES & OLSON LLP
19               BY:  ADAM BENJAMIN WEISS, ESQUIRE
                      JACOB S. KREILKAMP, ESQUIRE
20                    SARA WORTH, ATTORNEY AT LAW
                      SARA McDERMOTT, ATTORNEY AT LAW
21                    XIAONAN APRIL WU, ATTORNEY AT LAW
                 350 South Grand Avenue
22               50th Floor
                 Los Angeles, CA 90071
23
     ALSO PRESENT:  HEATHER HASSON, TRINA SPEAR
24

25
```

```
 1                    THE COURT:  Is that the end?

 2                    MR. WEISS:  Yes.

 3                    THE COURT:  Mr. Weiss, please call

 4    defendants' next witness.

 5                    MR. WEISS:  Thank you, Your Honor.

 6    Defendants call Lars Johansson, by video designation.

 7                    THE COURT:  Go ahead when you are ready,

 8    Mr. Mendoza.  Thank you.

 9                    (Video played.)

10                    THE COURT:  All right.  Mr. Weiss, please

11    call defendants' next witness.

12                    MR. WEISS:  One exhibit to introduce with

13    that deposition, Your Honor.

14                    THE COURT:  Okay.

15                    MR. WEISS:  We move to admit Exhibit 2560.

16                    THE COURT:  2560.  Any objection?

17                    MS. HANNA:  No, Your Honor.

18                    THE COURT:  2560 is received into evidence.

19                    (Exhibit 2560 is received.)

20                    MR. WEISS:  At this time, defendants will

21    call Brian Kim.

22                    THE COURT:  All right.

23                    THE CLERK:  Step up, Mr. Kim.  If you could

24    please raise your right hand.

25                    Do you solemnly swear that the testimony you
```

```
 1   shall give in the cause now before this Court shall be
 2   the truth, the whole truth and nothing but the truth, so
 3   help you God?
 4              THE WITNESS:  Yes.
 5              THE CLERK:  Please state and spell your
 6   first and last name for the record.
 7              THE WITNESS:  Brian Kim.  B-r-i-a-n K-i-m.
 8              THE COURT:  Good morning, Mr. Kim.
 9              THE WITNESS:  Good morning.
10              THE COURT:  There -- I see you brought your
11   water.  You are good to go there.
12              And are the binders on the witness stand,
13   are they for Mr. Kim?
14              MS. McDERMOTT:  I apologize, Your Honor.  I
15   believe they are.
16              Mr. Kim, can you look in front of you and
17   let me know if you see your name?
18              THE WITNESS:  "Kim Webb exhibits."
19              THE COURT:  Close.
20              MS. McDERMOTT:  Very close.
21              THE COURT:  It was a trick.
22              THE WITNESS:  I see Kim so...
23              THE COURT:  You may put those aside.  Some
24   convenient place to put them.  There's a book shelf.
25              MS. McDERMOTT:  While we are getting those
```

1    binders, may I ask some background questions, make sure

2    we're using our time wisely?

3              THE COURT:  Sure.  Go ahead.

4              **DIRECT EXAMINATION**

5    BY MS. McDERMOTT:

6        Q.   Good morning, Mr. Kim.

7        A.   Good morning.

8        Q.   Who is your current employer?

9        A.   FIGS.

10       Q.   What is your title at FIGS?

11       A.   VP of data.

12       Q.   VP is vice president, right?

13       A.   That's correct.

14       Q.   What are your responsibilities as vice president

15   of data?

16       A.   My responsibilities are to collect the data, to

17   process that data, and the analytics components of that

18   data.

19       Q.   What kind of data are you generally collecting at

20   FIGS?

21       A.   Consumer data or customer data.

22       Q.   And the customer data that you collect, where is

23   that generally stored?

24       A.   In our data warehouse.

25       Q.   You have your binder in front of you now, I

```
 1                  THE COURT:  Ms. McDermott, don't mean to
 2   rush you, but would you like to lay more foundation?
 3                  MS. McDERMOTT:  Yes, Your Honor.  I
 4   apologize, I wasn't sure if Ms. Hanna had further
 5   questions.
 6                  THE COURT:  Ms. Hanna, do you have any other
 7   questions?
 8                  MS. HANNA:  Not at this time.
 9                  THE COURT:  With respect to voir dire of
10   course.
11                  MS. HANNA:  Exactly.
12                  THE COURT:  Ms. McDermott, do you want a
13   moment to confer or are you good?
14                  MS. McDERMOTT:  I'm all set.
15                  THE COURT:  Go ahead.
16   BY MS. McDERMOTT:
17      Q.  Mr. Kim, was there an inadvertent error in your
18   declaration?
19      A.  Yes.
20      Q.  What was that error?
21      A.  I wrote Delighted instead of yotpo.
22      Q.  What happened?  Why did you do that?
23      A.  I was originally supposed to testify on behalf of
24   the Delighted data.  I had multiple documents open in
25   front me.  And I had mistaken the exhibit numbers.  And
```

1    the two sources, yotpo and Delighted, are very similar.

2       Q.   What sense are the two sources similar?

3       A.   They're both customer post-purchase surveys done

4    in a similar time frame.

5       Q.   So you had two exhibits in front of you:  One, a

6    post-purchase customer survey from Delighted; and one a

7    customer post-purchase survey from yotpo; is that right?

8       A.   That is correct.

9       Q.   And if I'm understanding correctly, you are

10   saying you accidentally confused them?

11      A.   Exactly.

12      Q.   Did you correct that error in your deposition?

13      A.   Yes.  It is one of the first things I did in my

14   deposition.

15      Q.   Now, you joined FIGS in 2018; is that right?

16      A.   That's correct.

17      Q.   The data in that exhibit, the yotpo data, when

18   does that date to?

19      A.   It starts in 2017.

20      Q.   When FIGS collects post-purchase consumer data

21   via yotpo, does the data at some point disappear?

22      A.   It does not.

23      Q.   Does it ever change?

24      A.   No.

25      Q.   So at the time you downloaded the yotpo data into

1   an Excel spreadsheet, you can download for the present,

2   right?

3       A.   That's correct.

4       Q.   And you can also download from years past, right?

5       A.   That's right.

6       Q.   Is it your understanding that this data was

7   downloaded -- the data in this exhibit was downloaded in

8   2018?

9       A.   That's my understanding.

10              MS. HANNA:   Objection; lacks foundation.

11      Q.   MS. McDERMOTT:   Do you have any reason --

12              THE COURT:   Hold on.

13              MS. McDERMOTT:   I apologize.

14              THE COURT:   Overruled.

15  BY MS. McDERMOTT:

16      Q.   Do you have any reason to believe that the data

17  in Exhibit 2156 was substantively altered in any

18  respect?

19      A.   No.

20      Q.   Do you trust the accuracy of this data?

21      A.   Yes.   I pulled the data.   I repulled the data and

22  checked it against the data that was pulled here.   And

23  it looks the same.

24      Q.   Can you tell us a little bit more about that.

25  What did you do in terms of repulling the data?

```
 1

 2

 3

 4                    COUNTY OF LOS ANGELES)

 5                                        )  SS.

 6                    STATE OF CALIFORNIA  )

 7

 8          I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN

 9   AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

10   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

11   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

12   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

13   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

14   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT page

15   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

16   JUDICIAL CONFERENCE OF THE UNITED STATES

17   NOVEMBER 1, 2022

18

19   /S/_____

20   SHERI S. KLEEGER, CSR

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```

# EXHIBIT E

# Exhibit in Native Format

**EX-3129-1**

DEFX-3129

# EXHIBIT F

The Wayback Machine - https://web.archive.org/web/20150713002551/http://www.certaintytechnologies.com:80/faq.html

 Certainty Logo

## Know Our Technologies

FIND A

## Frequently Asked Questions

**Benefits**

What are the benefits of medical apparel treated with antimicrobial and fluid barrier technologies?

**Overview**

What are CERTAINTY™ and CERTAINTY PLUS™?

How does the antimicrobial technology in CERTAINTY™ and CERTAINTY PLUS™ work?

How does CERTAINTY PLUS™ work?

What makes CERTAINTY PLUS™ products different from other fabric enhancements?

How is the fluid barrier technology of CERTAINTY PLUS™ applied?

**Effectiveness**

Will the antimicrobial protection last for the life of the garment?

What is the efficacy of properly treated products?

Will the fluid resistant technology last for the life of the garment?

Does CERTAINTY™ or CERTAINTY PLUS™ change the feel of the fabric?

Is CERTAINTY PLUS™ effective against fluids?

> **Exhibit 1016**

**EX-2016-1**

DEFX-2016

Can you print on fabrics treated with CERTAINTY™ and CERTAINTY PLUS™?

## Fabric Care

What are the recommended cleaning instructions for garments made with CERTAINTY™ and CERTAINTY PLUS™?

## Safety

Is the antimicrobial safe for me and my family?

Will the antimicrobial technology in CERTAINTY™ and CERTAINTY PLUS™ irritate my skin?

Do the technologies in CERTAINTY™ and CERTAINTY PLUS have an impact on the environment?

Are CERTAINTY PLUS™ products PFOA (Perfluorooctanoic acid) free?

---

## Benefits

**What are the benefits of medical apparel treated with antimicrobial and fluid barrier technologies?**

On a daily basis, many healthcare professionals are exposed to unwanted bacteria on their clothing. The technologies behind CERTAINTY™ and CERTAINTY PLUS™ can provide more protection than traditional scrubs, giving healthcare professionals the freedom to perform their duties in safer, comfortable, fashion-inspired clothing.

CERTAINTY™ antimicrobial provides:

- Garment (fabric) protection: offers long-lasting protection against unwanted bacteria from a day's work shift.
- Fit protection: excessive bacteria loads in scrubs can lead to premature loss of scrub quality. Antimicrobial treated scrubs are built to last and withstand the rigors of healthcare professionals.
- Protection against unpleasant odors and/or musky odor buildup.
- A better clean: keeps odor-causing bacterial loads at minimal levels, reducing the amount of bacteria on scrubs during and after launderings.

back to top

**EX-2016-2**

DEFX-2016

## Overview Answers

### What are CERTAINTY™ and CERTAINTY PLUS™?

CERTAINTY™ and CERTAINTY PLUS™ are fabric technologies added to our market-leading brands to create the next generation of healthcare apparel. CERTAINTY™ incorporates antimicrobial technology, while CERTAINTY PLUS™ includes the antimicrobial plus a fluid barrier by NANOTEX® that repels liquids.

back to top

### How does the antimicrobial technology in CERTAINTY® and CERTAINTY PLUS® work?

CERTAINTY® and CERTAINTY PLUS™ medical apparel uses a technology developed by DOW Chemical Company called SILVADUR™ that reduces, inhibits and minimizes the growth of bacteria on the fabric. As opposed to scrubs without antimicrobial protection, the technology of CERTAINTY™ and CERTAINTY PLUS™ delivers silver ions to fabric surfaces, where they are activated in the presence of undesirable bacteria. When the undesirable bacteria come into contact with treated fabrics, the growth of the bacteria is disrupted and the bacteria are continually reduced. SILVADUR™ technology ensures that unpleasant odors, decay and discoloration don't occur in fabrics by preventing bacteria from forming or growing.

back to top

### How does CERTAINTY PLUS™ work?

CERTAINTY PLUS™, which uses the technology Resists Spills by NANOTEX®, enhances products through the use of nanotechnology – tiny molecules permanently attach to fibers without clogging the fabric weave or compromising the look, feel or comfort of the fabric. CERTAINTY PLUS™ builds revolutionary spill resistance into the fibers of the fabric, fundamentally transforming each fiber so that liquids bead up and roll off. CERTAINTY PLUS™ features include:

- Repels liquids
- Outperforms conventional fabric treatments
- Provides long-lasting protection
- Extends the life of the fabric

**EX-2016-3**

DEFX-2016

- Retains the fabric's natural softness
- Allows fabric to breathe naturally

back to top

## What makes CERTAINTY PLUS™ products different from other fabric enhancements?

Traditional coatings make garments feel stiff and clog the weave of the fabric preventing breathability. Our treatment uses nanotechnology to attach to individual fibers, delivering superior performance characteristics without compromising the look, feel or comfort of the fabric.

back to top

## How is the fluid barrier technology of CERTAINTY PLUS™ applied?

CERTAINTY PLUS™ fluid barrier fabric technology is applied prior to the manufacturing of the garment. It can be pad applied in fabric form or can be dipped or spray applied in garment form.

back to top

### Effectiveness Answers

## Will the antimicrobial protection last for the life of the garment?

Yes. The polymer technology binds to the matrix of the fabric. It's been tested extensively and will last for more than 50 washings or for the expected life of the fabric or product, when used appropriately.

back to top

## What is the efficacy of properly treated products?

Independent, third party microbiological laboratories have confirmed that samples properly treated with the CERTAINTY™ antimicrobial technology demonstrate greater than 99% bacterial reduction even after 50 home launderings.

back to top

**EX-2016-4**

DEFX-2016

**Will the fluid resistant technology last for the life of the garment?**

CERTAINTY PLUS™ products are engineered to provide exceptional durability and will perform for the expected life of the fabric or garment.

back to top

**Does CERTAINTY™ or CERTAINTY PLUS™ change the feel of the fabric?**

No. There is no change in hand or drape of CERTAINTY™ and CERTAINTY PLUS™ treated garments compared to untreated garments.

back to top

**Is CERTAINTY PLUS™ effective against fluids?**

Yes. Fabrics with CERTAINTY PLUS™ technology are tested against a variety of liquids and stain agents to ensure they meet or exceed industry standards for repelling liquids.

back to top

**Can you print on fabrics treated with CERTAINTY™ and CERTAINTY PLUS™?**

Yes. CERTAINTY™ and CERTAINTY PLUS™ fabric treatments are compatible with heat transfer and screen-printing. Other types of fabric printing would need to be evaluated to determine success.

back to top

**Fabric Care Answers**

**What are the recommended cleaning instructions for garments made with CERTAINTY™ and CERTAINTY PLUS™?**

CERTAINTY™ and CERTAINTY PLUS™ are designed to stand up to real life; simply wash the garment as you would any other, following the care instructions provided on the care label. For CERTAINTY PLUS, tumble-drying with heat is required, and steam ironing will enhance performance. Liquid softeners and dryer sheets are not

**EX-2016-5**

DEFX-2016

recommended for CERTAINTY PLUS™ fabrics. Dry cleaning is allowed, however, the technology will perform better on garments that are machine washed.

back to top

### Safety Answers

### Is the antimicrobial safe for me and my family?

Yes. SILVADUR™, the antimicrobial developed by DOW and used in CERTAINTY™ and CERTAINTY PLUS™, has been tested extensively both by DOW scientists and independent third-party experts. The polymer technology is fixed to the textile surface, where it activates only in the presence of unwanted bacteria on the garment. CERTAINTY™ and CERTAINTY PLUS™ won't irritate your skin and won't wash out or rub off, when used appropriately.

back to top

### Will the antimicrobial technology in CERTAINTY™ and CERTAINTY PLUS™ irritate my skin?

The issue of skin sensitivity is paramount with any change that we make to our textiles, especially antimicrobial agents. We are very aware of this issue, and DOW has performed extensive testing, not only on the raw ingredient (which is all that is required by EPA), but also on the treated garments. An extensive study on sensitivity and the effects of repeated contact with fabrics treated at almost 7x the recommended level of CERTAINTY™ showed there were no "untoward effects."

back to top

### Do the technologies in CERTAINTY™ and CERTAINTY PLUS™ have an impact on the environment?

The antimicrobial technology behind CERTAINTY™ and CERTAINTY PLUS™ has silver atoms held within its molecules, so that only silver ions are released at the fabric's surface to fight odor-causing bacteria. Silver particles are not released into the environment. Plus, the silver used in CERTAINTY® comes from recycled sources and is not mined.

back to top

**EX-2016-6**

DEFX-2016

### Are CERTAINTY PLUS™ products PFOA (Perfluorooctanoic acid) free?

Yes. NANOTEX®, the technology behind CERTAINTY PLUS® took a leadership position in 2006 by being one of the first companies to introduce a C6-based "PFOA free" repellency solution, Resists Spills, to the market. PFOA-free denotes that there is no detection of PFOA using the most sensitive testing equipment available.

back to top

## RETAILER

 **STRATEGIC PARTNERS**   ©2015 All Rights Reserved. 9800 De Soto Avenue Chatsworth, CA 91311 | Phone: (818) 671-2100 | Email: customercare@strategicpartners.net | Terms of Use | Privacy

**EX-2016-7**

DEFX-2016

# EXHIBIT G

9/21/21, 12:47 PM                                                Discover CERTAINTY

The Wayback Machine - https://web.archive.org/web/20150410045857/http://certaintytechnologies.com:80/why.html


Certainty
Logo



CERTAINTY® and CERTAINTY PLUS® are revolutionary fabric technologies that turn ordinary scrubs into protective, highly durable uniforms. Found in market-leading brands Cherokee, Dickies and Code Happy, these advanced technologies add freshness and peace of mind to the next generation of healthcare apparel.

CERTAINTY®

Reduces the growth of unwanted bacteria on the fabric

**Exhibit 1017**

**EX-2017-1**

DEFX-2017

Discover CERTAINTY

Long-lasting protection won't wash off or wear off for the life of the garment

Keeps you fresh and odor free all day, every day

Delivers a better cleaned scrub, reducing bacterial loads prior to and during laundering

Superior performance without sacrificing the look, feel or comfort of the fabric

EPA-registered antimicrobial agent

Independent, third party microbiological laboratories have shown that samples properly treated with CERTAINTY and CERTAINTY PLUS antimicrobial technology demonstrate a 99.9% or greater bacterial reduction after 50 home launderings.

CERTAINTY PLUS®

Provides protection from a wide range of liquid spills and stains, including blood and Betadine®

Protects the wearer with superior performance even after 50 home launderings

Breathable and durable

Retains the fabric's natural softness for all-day comfort

PFOA (Perfluorooctanoic acid) free

Available Fall 2015

FIND A RETAILER

 ©2015 All Rights Reserved. 9800 De Soto Avenue Chatsworth, CA 91311 | Phone: (818) 671-2100 | Email: info@certaintytechnologies.com | Terms of Use | Privacy

**EX-2017-2**

DEFX-2017

# EXHIBIT H

Strategic Partners Launches New Antimicrobial Tech for Medical Scrubs | News | Apparel Magazine(AM)



**SUBSCRIBE**

LATEST NEWS

RESEARCH & REPORTS

STORE SYSTEMS

ANALYTICS

DIGITAL COMMERCE

SUPPLY CHAIN

CUSTOMER ENGAGEMENT

MORE

ADVERTISEMENT

05/11/2015

# Strategic Partners Launches New Antimicrobial Tech for Medical Scrubs

Strategic Partners, Inc., a provider of manufacturing and marketing of medical apparel, lab wear, footwear and accessories, announced the launch of its next generation of medical apparel: scrubs, lab wear and accessories protected with CERTAINTY antimicrobial technology.

On a daily basis, many healthcare professionals are exposed to unwanted bacteria on their clothing. CERTAINTY antimicrobial technology can provide more fabric protection than traditional scrubs, giving healthcare professionals the freedom to perform their duties in comfortable, fashion-inspired clothing.

**Exhibit 1018**

Strategic Partners Launches New Antimicrobial Tech for Medical Scrubs | News | Apparel Magazine(AM)

"We are delighted to have created the next generation of medical apparel using leading antimicrobial ingredient technologies," said Michael Singer, CEO of Strategic Partners, Inc. "The technologies in CERTAINTY will help reduce, inhibit and minimize the growth of bacteria on garments, contributing to peace of mind for healthcare workers."

According to a recent study conducted by Strategic Partners, 70 percent of healthcare workers are concerned or extremely concerned about bacteria on their clothing.

An antimicrobial technology in CERTAINTY is activated in the presence of undesirable bacteria. When the undesirable bacteria come into contact with CERTAINTY-treated fabrics, the growth of the bacteria is disrupted and the bacteria are continually reduced. Additionally, the treated fabrics help ensure that the garment will remain free of unpleasant odors, decay and discoloration resulting from bacteria exposure.

Strategic Partners is well-positioned to bring the effective antimicrobial technology of CERTAINTY to medical professionals in a number of options, including a wide range of fabrications, styles and colors. For the first time, healthcare workers can find this protection in several brands of medical apparel - Cherokee®, Dickies® and the new Code Happy™ uniforms.

In fall 2015, Strategic Partners will introduce CERTAINTY PLUS™, apparel which will include both antimicrobial and fluid barrier technologies.

Among several key ingredient providers, Strategic Partners has worked with Dow Chemical Company to successfully incorporate its SILVADUR™ technology into the CERTAINTY-treated fabrics.

share_facebook

ADVERTISEMENT

**EX-2018-2**

DEFX-2018

Strategic Partners Launches New Antimicrobial Tech for Medical Scrubs | News | Apparel Magazine(AM)

# Related Topics

Apparel

# You May Also Like

ADVERTISEMENT

facebook

**EX-2018-3**

DEFX-2018

Strategic Partners Launches New Antimicrobial Tech for Medical Scrubs | News | Apparel Magazine(AM)

twitter

linkedin

youtube

CONTACT US

EDITORIAL CALENDAR

EXECUTIVE COUNCIL

LEAGUE OF LEADERS

MEDIA KIT

PRIVACY STATEMENT

TERMS & CONDITIONS

© 2021 EnsembleIQ, All Rights Reserved

**EX-2018-4**

DEFX-2018

# EXHIBIT I

Strategic Partners, Inc. Launches New Medical Apparel Line with CERTAINTY™ Antimicrobial Technology



## STRATEGIC PARTNERS

Learn More About CERTAINTY™

## Strategic Partners, Inc. Launches New Medical Apparel Line with CERTAINTY™ Antimicrobial Technology

**Company to provide healthcare professionals medical apparel that helps reduce, inhibit and minimize the growth of bacteria on garments**

**LOS ANGELES – (April 30, 2015) – / PR Newswire / —** Strategic Partners, Inc., the leader in the manufacturing and marketing of medical apparel, lab wear, footwear and accessories, today announced the launch of its next generation of medical apparel: scrubs, lab wear and accessories protected with CERTAINTY™ antimicrobial technology.

On a daily basis, many healthcare professionals are exposed to unwanted bacteria on their clothing. CERTAINTY antimicrobial technology can provide more fabric protection than traditional scrubs, giving healthcare professionals the freedom to perform their duties in comfortable, fashion-inspired clothing.

"We are delighted to have created the next generation of medical apparel using leading antimicrobial ingredient technologies," said Michael Singer, CEO of Strategic Partners, Inc. "The technologies in CERTAINTY will help reduce, inhibit and minimize the growth of bacteria on garments, contributing to peace of mind for healthcare workers."

According to a recent study conducted by

**Video**

Could not load plug[...]
File not found

Strategic Partners, Inc. has created of medical apparel using the leading technology of CERTAINTY™.

**Photos**

**Exhibit 652**
M. Alexander

**Facebook**
**Twitter**
**Pinterest**
**LinkedIn**

DEFX-2652

Strategic Partners, Inc. Launches New Medical Apparel Line with CERTAINTY™ Antimicrobial Technology



CERTAINTY™ antimicrobial technol...
healthcare workers to perform their ...
that helps reduce the buildup of bact...
also being comfortable and fashion-...

Strategic Partners, 70 percent of healthcare workers are concerned or extremely concerned about bacteria on their clothing.

An antimicrobial technology in CERTAINTY is activated in the presence of undesirable bacteria. When the undesirable bacteria come into contact with CERTAINTY-treated fabrics, the growth of the bacteria is disrupted and the bacteria are continually reduced. Additionally, the treated fabrics help ensure that the garment will remain free of unpleasant odors, decay and discoloration resulting from bacteria exposure.

Strategic Partners is well-positioned to bring the effective antimicrobial technology of CERTAINTY to medical professionals in a number of options, including a wide range of fabrications, styles and colors. For the first time, healthcare workers can find this protection in the leading brands of medical apparel - Cherokee®, Dickies® and the new Code Happy™ uniforms.

In fall 2015, Strategic Partners will introduce CERTAINTY PLUS™, apparel which will include both antimicrobial and fluid barrier technologies.

Among several key ingredient providers, Strategic Partners has worked with Dow Chemical Company to successfully incorporate its SILVADUR™ technology into the CERTAINTY-treated fabrics.

To learn more about how Strategic Partners is leading the next generation of medical apparel, visit www.certaintytechnologies.com/.

**Multimedia**

Download CERTAINTY™ Video

Download Antimicrobial Technology Video

**Documents**

CERTAINTY Antimicrobial Technology Fact Sheet

Q&A with Critical Care Nurse Kati Kleber

**Links**

Strategic Partners, Inc. Launches New Medical Apparel Line with CERTAINTY™ Antimicrobial Technology

**About Strategic Partners, Inc.**

Established in 1995, Strategic Partners, Inc. designs, manufactures and distributes high-quality, fashion-inspired medical uniforms under the Cherokee, Dickies, HeartSoul, Code Happy, Infinity and Disney brands; manufactures and/or distributes footwear under the Cherokee, Dickies, Asics and K-Swiss brands, among many others; and manufactures and distributes medical accessories and Classroom brand school uniforms. The company supports nurses and other healthcare professionals through *Scrubs Magazine*, a leading lifestyle media brand for nurses, and its website, scrubsmag.com, the nation's number-one online destination for nurses; and numerous outreach and philanthropic activities. The corporation's home office is in Chatsworth, California. Visit www.strategicpartners.net.

Contact:
Wendell Mobley
Strategic Partners, Inc.
Email: wmobley@strategicpartners.net
Phone: 818-671-2116

Brenda De Alba
Edelman
Email: brenda.dealba@edelman.com
Phone: 323-761-6603

### #



Strategic Partners, Inc.

CERTAINTY Technology

SILVADUR™ by Dow Chemical

Infinity™ by Cherokee® Uniforms

Code Happy™ Uniforms

**Connect with CERTAINTY™**

**EX-2652-3**

DEFX-2652