MONA Z. HANNA (SBN 131439)
 mhanna@mrllp.com
JEFFREY D. FARROW (SBN 180019)
 jfarrow@mrllp.com
KEVIN S. KIM (SBN 275200)
 kkim@mrllp.com
ALLISON C. AGUIRRE (SBN 312544)
 aaguirre@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:    (714) 557-7990
Facsimile:    (714) 557-7991

KRISTIN J. ACHTERHOF
(*Admitted Pro Hac Vice*)
 kristin.achterhof@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone:    (312) 902-5296
Facsimile:    (312) 902-1061

*Additional Counsel on Next Page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STRATEGIC PARTNERS, INC.,<br><br>                Plaintiff,<br><br>        vs.<br><br>FIGS, INC., CATHERINE ("TRINA") SPEAR, HEATHER HASSON,<br><br>                Defendants. | Case No. 2:19-cv-02286-JWH-KS<br><br>**PLAINTIFF STRATEGIC PARTNERS INC.'S POST-TRIAL REPLY BRIEF ON EQUITABLE CLAIMS AND CAUSATION**<br><br>Trial:    October 17, 2022<br>Time:    8:00 a.m.<br>Crtrm.:  9D<br><br>Judge: Hon. John W. Holcomb |

1   *Additional Counsel:*

2   SANFORD L. MICHELMAN (SBN 179702)
3    smichelman@mrllp.com
    MARC R. JACOBS (SBN 185924)
4    mjacobs@mrllp.com
    JESSE J. CONTRERAS (SBN 190538)
5    jcontreras@mrllp.com
    JENNIFER S. GOLDSTEIN (SBN 10335)
6    jgoldstein@mrllp.com
    ADAM M. KORN (SBN 333270)
7    akorn@mrllp.com
    MICHELMAN & ROBINSON, LLP
8   10880 Wilshire Boulevard, 19th Floor
    Los Angeles, CA 90024
9   Telephone: (310) 299-5500
    Facsimile: (310) 201-2110
10
    RICHARD H. ZELICHOV (SBN 193858)
11   richard.zelichov@katten.com
    KATTEN MUCHIN ROSENMAN LLP
12  2029 Century Park East, Suite 2600
    Los Angeles, CA 90067-3012
13  T: (310) 788-4680
    F: (310) 788-4471
14
    TIMOTHY H. GRAY
15  (*Admitted Pro Hac Vice*)
     timothy.gray@katten.com
16  KATTEN MUCHIN ROSENMAN LLP
    2900 K Street NW, North Tower, Suite 200
17  Washington, DC 20007-5118
    T: (202) 625-3608
18  F: (202) 298-7570

19  *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   ARGUMENT ....................................................................................... 2

A.    SPI Preserved Its Regulatory UCL Claim, Which Is Not
      Preempted.................................................................................. 2

      1.    SPI Did Not Waive or Abandon Its Regulatory UCL Claim. ........ 3

      2.    SPI's Regulatory UCL Claim Is Not Preempted, and
            *Vestagen* Compels a Conclusion of Unlawful Conduct Here. ....... 5

B.    The Statutory Standing Inquiry Is Not an Impossible Hurdle. .............. 7

C.    It Was More Likely Than Not That SPI Lost Customers and
      Sales to FIGS as a Result of FIGS' Unlawful and Unfair
      Conduct. ................................................................................. 10

D.    FIGS's Cited Evidence Is Irrelevant to the Narrow Causation
      Inquiry. .................................................................................. 13

E.    SPI More Likely Than Not Lost Customers and Sales to FIGS as
      a Result of All Four Claims Alleged to Be False or Misleading. ........ 14

III.  CONCLUSION ................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Case**

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
 2017 WL 10526121 (C.D. Cal. Nov. 14, 2017) ................................................... 8

*Bates v. Dow Agrosciences LLC*,
 544 U.S. 431 (2005) ................................................................................................ 5

*Bettencourt v. Hennessy Indus., Inc.*,
 205 Cal. App. 4th 1103 (2012) ............................................................................... 8

*Buckman Co. v. Plaintiffs' Legal Comm.*,
 531 U.S. 341 (2001) ................................................................................................ 5

*Cortez v. Purolator Air Filtration Prod. Co.*,
 23 Cal. 4th 163 (2000) .......................................................................................... 14

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
 392 F. Supp. 3d 1074 (N.D. Cal. 2019) ................................................................. 7

*Huynh v. Quora, Inc.*,
 508 F. Supp. 3d 633 (N.D. Cal. 2020) ................................................................... 8

*In re Tobacco II Cases*,
 46 Cal. 4th 298 (2009) ............................................................................................ 8

*Ivie v. Kraft Foods Glob., Inc.*,
 961 F. Supp. 2d 1033 (N.D. Cal. 2013) .................................................................. 7

*Kwikset Corp. v. Superior Ct.*,
 51 Cal. 4th 310 (2011) ............................................................................................ 8

*LegalForce RAPC Worldwide, P.C. v. DeMassa*,
 532 F. Supp. 3d 856 (N.D. Cal. 2021) .................................................. 8, 9, 10, 11

*Lona's Lil Eats, LLC v. DoorDash, Inc.*,
 2021 WL 151978 (N.D. Cal. Jan. 18, 2021) .......................................................... 7

*Nathan Kimmel, Inc. v. DowElanco*,
 275 F.3d 1199 (9th Cir. 2002) ............................................................................... 5

PLAINTIFF SPI'S POST-TRIAL REPLY BRIEF ON EQUITABLE CLAIMS AND CAUSATION

*Nationwide Biweekly Admin, Inc. v. Sup. Ct. Alameda*,
   9 Cal. 5th 279 (2020) ............................................................................... 15

*Ngethpharat v. State Farm Fire & Cas. Co.*,
   2021 WL 2823245 (W.D. Wash. July 7, 2021) ........................................ 11

*McCabe v. Guitars*,
   2013 WL 12064539 (S.D. Cal. Mar. 4, 2013) ...................................... 7, 9

*Medrazo v. Honda of N. Hollywood*,
   205 Cal. App. 4th 1 (2012) ........................................................................ 8

*Miller v. Safeco Title Ins. Co.*,
   758 F.3d 364 (9th Cir. 1985) ..................................................................... 4

*TDN Money Sys., Inc. v. Everi Payments, Inc.*,
   796 F. App'x 329 (9th Cir. 2019) .............................................................. 4

*Patsystems (NA) LLC v. Trend Exch., Inc.*,
   695 F. App'x 206 (9th Cir. 2017) .............................................................. 4

*Roadrunner Intermodal Servs., LLC v. T.G.S. Transporation, Inc.*,
   2021 WL 2188138 (E.D. Cal. May 28, 2021) ........................................... 8

*Strategic Partners, Inc. v. Vestagen Protective Techs., Inc.*,
   No. 16-5900, Dkt. 255 (C.D. Cal. Nov. 14, 2017) ........................... 3, 5, 6

*Telebrands Corp. v. VindEx Sols. LLC*,
   2022 WL 1062051 (N.D. Cal. Apr. 8, 2022) ............................................ 7

*Teutscher v. Woodson*,
   835 F.3d 936 (9th Cir. 2016) ................................................................... 15

*TrafficSchool.com, Inc. v. Edriver, Inc.*,
   633 F. Supp. 2d 1063 (C.D. Cal. 2008) .................................................... 8

*Weeks v. Home Depot U.S.A., Inc.*,
   2020 WL 5947811 (C.D. Cal. Sept. 18, 2020) ......................................... 5

**Statutes**

21 U.S.C. § 321(h)(1)(B) .............................................................................. 7

**Regulations**

21 C.F.R. § 801.4 ................................................................................................................... 7

**PLAINTIFF SPI'S POST-TRIAL REPLY BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

## I.  <u>INTRODUCTION</u>

FIGS' Post-Trial Brief did not meaningfully engage with SPI's regulatory UCL claim or the standard of causation articulated by state and federal courts in California. SPI lost sales and customers as a result of FIGS' violations of federal statutes and unfair disregard for the regulations thereunder, which SPI and other competitors in the industry followed. FIGS, however, buried its few references to this claim in footnotes, suggesting baseless reasons not to decide it.

Causation is a threshold *standing* question, not an onerous burden. SPI is not required to prove a specific quantum of damages; its claim entails solely injunctive relief. FIGS suggests that the causation requirement poses an insurmountable barrier unless a competitor elicits unequivocal testimony from every customer who switched brands. Not so. The UCL and FAL are equitable, consumer-and-competitor-protection statutes designed to redress commercial misconduct. They require proof by a preponderance of the evidence that SPI lost money or property—just enough for Article III standing—and that FIGS' unfair competition was a substantial factor (*not* a but-for cause) in creating that loss. SPI meets that burden with FIGS' own evidence.

SPI's case for causation is simple, straightforward, and supported by the record. Throughout its crucial market-entry, market-penetration period, FIGS made health claims ("***kills infection***") about its scrubs without obtaining necessary approval to make them, thereby violating federal statutes and regulations. It simply ignored the rules constraining its competitors. FIGS does not and cannot deny that its health claims were forbidden under federal law; rather, it only denies that its health claims had any effect on sales to customers who bought SPI scrubs (or, apparently, any customers at all). But contemporaneous statements from FIGS' customers—bolstered by other surveys and trial evidence—clearly establish that SPI lost at least some sales to FIGS as a result of FIGS' conduct. New FIGS customers who had previously or concurrently bought SPI scrubs identified FIGS' health claims as *one* of the most, or *the* most, important feature about FIGS' scrubs. To find causation, the Court need

only infer that (1) FIGS' health claims were a substantial factor in some or all of these decisions, and (2) in some or all such cases, the decision to buy FIGS meant SPI lost a sale because those customers either *stopped* buying SPI scrubs, or bought *fewer* SPI scrubs than they otherwise would have. It is more likely than not that these are true.

Before trial, FIGS argued (and the Court agreed) that SPI's regulatory UCL claim should not be presented to the jury, but rather bifurcated and decided at this post-verdict stage. FIGS now attempts to avoid the claim completely, focusing on technical issue-preservation or preemption arguments to head off a decision on the merits. But the Final Pretrial Order—which must be construed liberally and considered in context—describes SPI's UCL claim broadly: "FIGS engaged in *unfair*, *unlawful*, and fraudulent business acts and practices in violation of California Business and Professions Code Section 17200." Dkt. 854 at 5 (emphasis added). Everyone understood that the regulatory UCL claim would be decided by the Court by applying law to fact following the jury trial. That claim is fairly embraced by the language of the Final Pretrial Order. FIGS' preemption arguments are equally meritless, because the UCL claim is consistent with (and indeed seeks to vindicate) the relevant federal law; no "deference" to federal agencies is required because the application of the law to these facts is clear, and courts routinely recognize that such regulations may supply predicate UCL violations.

For these reasons, SPI urges the Court to adopt its proposed Findings of Fact and Conclusions of Law, and to hold that (1) FIGS engaged in unlawful and unfair conduct when it touted its scrubs' "antimicrobial" properties—including their ability to kill and reduce infection—without obtaining necessary regulatory approvals; (2) those health claims were a substantial factor in causing at least one SPI customer to purchase FIGS scrubs instead of SPI scrubs; and (3) SPI is entitled to injunctive relief, the scope of which may be addressed in supplemental briefing.

## II.   ARGUMENT

### A.   SPI Preserved Its Regulatory UCL Claim, Which Is Not Preempted.

1.     **SPI Did Not Waive or Abandon Its Regulatory UCL Claim.**

FIGS declined the opportunity in its opening post-trial brief to substantively address SPI's regulatory UCL claim. Rather, FIGS suggests in footnotes and asides that SPI failed to preserve the claim by not asserting it explicitly enough in the Final Pretrial Order and, for the first time, argues that it is preempted. FIGS' position conveniently ignores its own extensive pre-trial motion practice and argument that only the Court could decide the UCL claim after the jury trial, and the Court's reliance on these arguments in deferring this claim as an issue of law suitable only for the Court. That time has come.

Recognizing that it has no viable defense to the regulatory UCL claim, FIGS attempts to deter the Court from reaching the merits by arguing it is waived. While clearly inconsistent with their prior positions, exploiting a technicality is FIGS' only option, because—as SPI's Brief made clear—the law plainly forbade FIGS from making its claims of, *inter alia*, killing infection on contact in advertising and marketing (including hangtags attached to every pair of scrubs) without following standard registration and approval processes. Dkt. 939 at 7-12. Unlike its competitors, FIGS asserted health claims without first seeking and obtaining approval from the relevant authorities (or limiting such claims to the scrub fabric). It admitted as much. Appx. Exh. G at 4. That is textbook unlawful, unfair competition under the UCL.

FIGS' argument for why this Court should summarily disregard SPI's regulatory UCL claim is, at best, unpersuasive. In particular, FIGS contends SPI abandoned its claim in the Final Pretrial Order by making reference to false advertising in the subsections describing the "elements" and "evidence" of its UCL claim. Dkt. 938 at 6 & n.2. FIGS is wrong: those cherry-picked references to the Lanham Act and false advertising invoke specific evidence and legal authorities pertaining to *one* theory—they do not limit the *scope* of the claim, which was clear from the record. SPI never limited its UCL claim to one based on false advertising. To the contrary: The "elements" section of the UCL claim provides "FIGS' act or

business practice was unlawful, or unfair, or fraudulent, **_or_** constituted unfair, deceptive, untrue, or misleading advertising," Dkt. 854 at 7 (emphasis added), clearly distinguishing between the two different theories of liability. (If SPI intended the UCL and FAL claims to be coextensive, as FIGS now argues them to be, it would not have asserted each, separately.) The regulatory UCL claim is plainly encompassed by SPI's broad articulation of the claim: "FIGS engaged in unfair, unlawful, and fraudulent business acts and practices in violation of…Section 17200." *Id.* at 5.

Pretrial orders "should be liberally construed to permit any issues at trial that are embraced within its language." *Miller v. Safeco Title Ins. Co.*, 758 F.3d 364, 368 (9th Cir. 1985) (quotation marks omitted); *accord TDN Money Sys., Inc. v. Everi Payments, Inc.*, 796 F. App'x 329, 331 (9th Cir. 2019) (no abandonment where, *inter alia*, "issue was reflected throughout the parties' pretrial motions, pleadings, trial briefs, and the joint pretrial order"). "[A] pretrial order is a procedural tool that is meant to facilitate trial on the merits, not to defeat a party on a technicality." *Patsystems (NA) LLC v. Trend Exch., Inc.*, 695 F. App'x 206, 208 (9th Cir. 2017). FIGS' position finds no support in the law, and it is fatally undermined by the facts.

There was no waiver or abandonment. FIGS had "fair notice" of and a "fair opportunity to present evidence refuting" the regulatory UCL claim. *TDN*, 796 F. App'x at 331. Indeed, FIGS dedicated one of its motions *in limine* to arguing that no evidence of federal regulations (or violations) was admissible before the jury precisely because the *Court* needed to decide those issues after a jury trial, *see generally* Dkt. 703, and SPI confirmed in opposition that its UCL claim encompassed that theory, *see* Dkt. 772 at 3:28-4:3, 4:11-13. At the motion *in limine* hearing, FIGS' counsel explained that the Court "will ultimately decide if the UCL claim flies," adding that post-trial briefs would present "a pure issue of law, Your Honor, for you to decide based on the facts." Transcript of Hearing on Motions in Limine (Sept. 16, 2022), at 43:3-7, 45:3-18. Similarly, on September 23, 2022—several days *after* the parties submitted the proposed Final Pretrial Conference Order on September 20—FIGS'

-4-

counsel acknowledged that SPI's UCL claim was still based in part on violations of FIFRA and the FDCA. Transcript of Hearing on Motion to Bifurcate (Sept. 23, 2022), at 24:6-26:3. The parties agreed not to submit jury instructions on equitable claims because they were for the Court to decide. Dkt. 833 at 1 n.1. FIGS cannot credibly argue that SPI has waived or abandoned this theory when the parties expressly contemplated it would be adjudicated at the equitable phase of the bifurcated action.

FIGS' evasive maneuvers are understandable. It has no good arguments against regulatory UCL liability—just an attempted "gotcha" seeking to defeat a claim on a technicality. As conclusively determined in the Final Pretrial Conference Order, FIGS *admits* that it did not seek or obtain any regulatory approval. Dkt. 854 at 3. While FIGS argues that the jury found its health claims not to be false, for purposes of this regulatory UCL claim, FIGS is liable irrespective of falsity. FIGS was required to obtain EPA and FDA approval to make health claims; it simply chose not to do so.

## 2. SPI's Regulatory UCL Claim Is Not Preempted, and *Vestegen* Compels a Conclusion of Unlawful Conduct Here.

In another attempt to roadblock a decision on the merits, FIGS relies on *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), and *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199 (9th Cir. 2002), to argue that a regulatory UCL claim is preempted. *See* Dkt. 938 at 7 n.3. FIGS is mistaken: *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)—decided *after* both *Buckman* and *Kimmel*—controls this inquiry. *Buckman* concerned a state cause of action—"fraud on the FDA"—that went *beyond* regulatory requirements, not a borrowing statute like the UCL. 531 U.S. at 347. In *Bates*, the Supreme Court confirmed that state-law claims *consistent* with and *parallel* to regulatory regimes (including FIFRA, which was specifically at issue in *Bates*) are not preempted. *Id.* at 432. *Bates* (from 2005) therefore supersedes *Kimmel* (from 2002). Courts have recognized this, holding that *Bates* controls the preemption analysis. *See, e.g.*, *Weeks v. Home Depot U.S.A., Inc.*, 2020 WL 5947811, at *4 (C.D. Cal. Sept. 18, 2020). SPI's UCL claim based on FIGS'

failure to follow EPA registration requirements and FDA notification and clearance processes before making health claims is consistent with, and parallels, those regimes.

FIGS wrongly argues that the Court's dismissal of regulatory UCL claim in *Vestagen* supports a finding of preemption here. *See Strategic Partners, Inc. v. Vestagen Protective Techs., Inc.*, No. 16-5900, Dkt. 255 (C.D. Cal. Nov. 14, 2017). Actually, the facts of *Vestagen confirm* that FIGS' conduct was unlawful. First, the *Vestagen* court recognized that, under EPA regulations and PR Notice 2001-1, "it is unlawful to sell a treated article with public health claims unless it is registered with the EPA." *Id.* at 5. It did not refuse to consider the claim or "defer" to EPA; it addressed the claim on the merits.

Second, unlike FIGS—which explicitly touted infection-killing and infection-reduction properties, and ubiquitously advertised "antimicrobial" properties without qualification—Vestagen's assertions in that case were qualified and confined to statements about the *fabric* and *product*. *See id.* at 5-6. FIGS, by contrast, claimed in commercial advertising (including hangtags distributed with its scrubs), that its products "killed bacteria and infection immediately on contact" and reduced HAIs by 66%. Scrubs cannot become "infected"; only people wearing them can—as Dr. Anderson explained, the term "infection" necessarily concerns "patient related outcomes, not surface fabric types of outcomes." S.Appx. Exh XX (Anderson, Oct. 27, 2022 AM Tr.) 113:14-114:13. The logic of *Vestagen*, which did not involve explicit and unqualified public health claims, dictates that FIGS' conduct here *was* unlawful. Moreover, in *Vestagen*, the Court could not find a violation because there was no record evidence that the products in question were unregistered. *Vestagen*, Dkt. 255, at 6. Here, FIGS admitted that fact. Appx. Exh. G (Tr. Exh. 650) at 4.

*Vestagen* also does not require deference to the FDA with regard to FIGS' failure to obtain approval for its products marketed and tagged with claims of reducing or killing infection. Dkt. 938 at 7 n.3. The FDA regulations at issue require no "interpretation"; FDA recently *re-confirmed*, in authoritative guidance (and by

-6-

rejecting an anonymous manufacturer's exemption request), that scrubs are exempt from clearance requirements *unless* their "intended use" is for the mitigation or prevention of disease. *See* Dkt. 939 at 10-12; 21 U.S.C. § 321(h)(1)(B); 21 C.F.R. § 801.4. "[T]he [C]ourt need only determine whether" FIGS' conduct "actually compl[ied] with existing and well-understood FDA regulations, a determination that would not risk undercutting the FDA's expert judgments and authority." *Ivie v. Kraft Foods Glob., Inc.*, 961 F. Supp. 2d 1033, 1044 (N.D. Cal. 2013) (quotation marks omitted); *see Telebrands Corp. v. VindEx Sols. LLC*, 2022 WL 1062051, at *6 (N.D. Cal. Apr. 8, 2022). The plain language of FIGS' public health claims, as well as Defendants' statements before and while FIGS was making them, supply dispositive evidence of "intended use," and thus of FIGS' violation of FDA regulations.

## B.    The Statutory Standing Inquiry Is Not an Impossible Hurdle.

Ignoring the regulatory UCL claim, FIGS focuses on the causation standard for UCL *false advertising* and *FAL* claims, asserting that it requires a difficult showing of "actual injury" and "immediate causation" and that *no inferences* of causation are permissible at all. Dkt. 938 at 5 (citing, *inter alia*, *McCabe v. Guitars*, 2013 WL 12064539, at *7 (S.D. Cal. Mar. 4, 2013)). FIGS misconstrues the law, attempting to transform a threshold statutory-standing inquiry into an impregnable force field.

To start, Section 17204 does *not*, as FIGS suggests, foreclose a fact-finder's ability to infer causation of past harm. It is axiomatic that the Court as finder of fact on these equitable claims is permitted to infer causation based on circumstantial evidence. Indeed, whether the evidence *allows* such an inference is what forecloses dismissal and summary judgment, necessarily putting to the fact-finder the issue of whether to *draw* that inference.[1] *See, e.g.*, *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074,

---

[1] The same holds true of SPI's UCL-fraud and FAL claim based on the misleadingness of all four challenged claims. Causation of injury to a competitor may be inferred so long as *consumer reliance* on a *misrepresentation* is proven. *See, e.g.*, *Lona's Lil Eats, LLC v. DoorDash, Inc.*, 2021 WL 151978, at *12 (N.D. Cal. Jan. 18, 2021).

1093 (N.D. Cal. 2019); *see also Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 652 (N.D.
Cal. 2020). Even *LegalForce RAPC Worldwide, P.C. v. DeMassa*, 532 F. Supp. 3d 856
(N.D. Cal. 2021), cited by FIGS and inapposite on the facts, acknowledges the fact-
finder's task is to determine the "reasonable inference" from the evidence. *Id.* at 860.
Allowing such inferences makes sense given the nature of the "substantial factor"
standard, where "a minor force that nonetheless causes harm qualifies" as a cause.
*Roadrunner Intermodal Servs., LLC v. T.G.S. Transporation, Inc.*, 2021 WL 2188138,
at *9 (E.D. Cal. May 28, 2021); *see, e.g.*, *Bettencourt v. Hennessy Indus., Inc.*, 205
Cal. App. 4th 1103, 1123 (2012) ("[A] force which plays only an 'infinitesimal' or
'theoretical' part in bringing about injury, damage, or loss is not a substantial factor,
but a very minor force that does cause harm is a substantial factor." (quotation marks
omitted)). If a company engages in unlawful or unfair practices by violating
regulations its competitors must and do follow by law, it suffices to show that the
unlawful conduct was a substantial factor in causing some past economic injury to a
competitor. As discussed below, SPI has done so here.

While standing under the UCL (and FAL) requires "actual injury" of *money or
property*—a category of injury narrower than that of Article III—"the quantum of lost
money or property necessary to show standing" is not a "substantial or insurmountable
hurdle," requiring a showing of a "personal, individualized loss of money or property in
any nontrivial amount." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 324-25 (2011).
"Immediate" causation, in turn, only refers to the *consumer* (not competitor) reliance
requirement for UCL-*fraud* and *FAL* claims. *See* Dkt. 939 at 16; *Medrazo v. Honda of
N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012) ("[A]ctual reliance requirement does not
apply to UCL actions that are not based upon a fraud theory."); *Allergan USA Inc. v.
Imprimis Pharms., Inc.*, 2017 WL 10526121, at *12 (C.D. Cal. Nov. 14, 2017) (same).
Moreover, even "immediate" causation is governed by the substantial-factor test. *See In
re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009). That is all FIGS' cases stand for. *See,
e.g.*, *TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063, 1073 (C.D. Cal.

2008) ("Plaintiffs provided no admissible evidence of actual injury or to lost money caused by Defendants"); *McCabe*, 2013 WL 12064539, at *7 (bare allegation that "common sense" showed "competitors would suffer" insufficient for statutory standing).

FIGS cites *DeMassa* to suggest that causation is lacking. Dkt. 938 at 8-9. *DeMassa* is clearly distinguishable, and FIGS' description of it is incomplete. The alleged "unlawful" practice in *DeMassa* was the "unauthorized practice of law." DeMassa, a non-lawyer, was supplying trademark registration services; LegalForce sued under the UCL. To establish that it lost customers to DeMassa, LegalForce pointed *solely* to testimony by DeMassa that DeMassa had heard (from unspecified persons) LegalForce provided "horrible," "botched" services, and that those persons had reached out to DeMassa to "fix their trademarks that were botched by" LegalForce and "would have to refile" the trademark. *See DeMassa*, 532 F. Supp. 3d at 859. LegalForce claimed that these unspecified persons making paraphrased complaints at unspecified times *were the precise customers* it lost to DeMassa as a result of DeMassa's unauthorized practice of law. *Id.* at 860. This, the court held, was not enough—even if those customers had gone to DeMassa, the "more reasonable inference" was that the *complaints about LegalForce* DeMassa testified about hearing were the reason DeMassa received *those complaining customers'* business. *Id.* Given that the people bitterly complaining about LegalForce were the very same customers LegalForce asserted it lost to DeMassa, the evidence indicated those customers would *not* have returned to LegalForce in any event, precluding a showing of causation. *Id.*

Here, the facts are quite different. Scrubs are consumer goods, not legal services. FIGS was a new market entrant that sought to appeal to consumers with claims that its scrubs reduced infection rates and killed bacteria and infection immediately on contact. And, unlike in *DeMassa*, SPI does not point to *unverified* lost sales from *unidentifiable* customers who were already *aggrieved and upset*—it points to data FIGS collected on what its new customers liked most about FIGS, which showed many individually identifiable past or current SPI customers named the health

claims as things they thought "best" about FIGS or were "important" to them. FIGS' expert Dr. Nowlis *confirmed* with his commissioned research that customers identified the health claims as a reason they purchased FIGS scrubs. In contrast to *DeMassa*, the evidence here establishes a "more reasonable inference" that FIGS' conduct *did* cause economic injury to SPI in the form of at least one lost customer or sale. It was more likely than not that the health claims played a part in a customer's decision to purchase FIGS' scrubs, and that decision came at SPI's expense.

## C. It Was More Likely Than Not That SPI Lost Customers and Sales to FIGS as a Result of FIGS' Unlawful and Unfair Conduct.

Under the governing state-law standing analysis, SPI has cleared the evidentiary bar to prove causation. The trial evidence strongly supports the Court's finding by a preponderance of the evidence that FIGS' health claims caused SPI to lose at least some customers and sales—and foremost among that evidence is survey data from actual customers that FIGS collected in the course of business and commissioned for trial. First is Exhibit 2187, an internal FIGS survey produced by FIGS in native format as an email attachment. In their responses, numerous FIGS customers identified SPI-brand scrubs as brands they had previously purchased or also purchased. Many of those same customers volunteered the antimicrobial, infection-killing health claims as "best" or important attributes of FIGS' scrubs. *See generally* Appx. Exh. H (Trial Exh. 2187).[2] One consumer explicitly identified "infection resistant" as one of FIGS' "best" qualities. *Id.* at Q278.

FIGS suggests that, because its "survey never asked any of the customers whether they stopped purchasing from any of FIGS' competitors," it is irrelevant, unhelpful, and cannot support an inference of causation. Dkt. 938 at 11. There are two problems with

---

[2] Although FIGS suggested in its Post-Trial Brief that SPI would rely on Exhibit 2233, which it says was "misleadingly edited" by SPI, Dkt. 938 at 11, that is not so—Exhibit 2187 is a FIGS spreadsheet maintained and produced to SPI in its native format.

that argument. The first is that it is contrary to consumer behavior. Unlike *DeMassa*, which concerned competing providers of specialized legal services, this case is about goods: competing brands of professional garments. It is unreasonable to infer that *all* customers who were currently or formerly buying SPI's scrubs and then started buying FIGS' scrubs suddenly started buying *more* scrubs overall because of FIGS' presence in the market—that is not what "growing the market" means. Put another way, if each individual consumer's purchases of scrubs constitute a pie, SPI's slice had to shrink when FIGS gained a toehold.[3] Sales of FIGS scrubs necessarily replaced sales of SPI scrubs. Some of those sales, as Exhibit 2187 indicates, were a result of the health claims FIGS did not have regulatory approval to make.

Second, the case FIGS cites to deem its own data "meaningless," *Ngethpharat v. State Farm Fire & Cas. Co.*, 2021 WL 2823245, at *2 (W.D. Wash. July 7, 2021), is nothing like this one. The survey at issue in *Ngethpharat* was conducted for litigation by an expert, who sent an eight-item questionnaire to policyholders (*e.g.*, "Were you satisfied or dissatisfied with the speed of the final settlement you received from State Farm? Were you satisfied or dissatisfied with the amount of the final settlement you received from State Farm?"). *Id.* at *2. But the issue for trial was narrow, technical, and specific: Whether an insured's "claim file contain[ed] an express agreement by the insured to the…use of a typical negotiation discount"—a question as to which *none* of the survey questions, which "merely gauge[d] customer satisfaction generally," reasonably pertained. *Id.* at *3. Here, by contrast, the questionnaire (1) was collected by FIGS contemporaneously with making its health claims in marketing and hangtags; (2) asked which other brands customers had previously or currently purchased; and (3) asked in open-ended fashion what individual customers "liked best" about FIGS' scrubs and

---

[3] The same is true of Inka's Uniforms. *See* Dkt. 938 at 11-12. Carrying a new brand at a physical retailer necessarily takes the place of inventory of brands that are sold there, even if they continue to be sold. It is also not clear why FIGS says Inka's Uniforms is the "sole example" SPI provided at trial. *See* Dkt. 895 at 4-5 (citing surveys).

factors "important to" them. *See* Trial Exh. 2187. Those are not generic questions about customer satisfaction. They supply real-world evidence bearing directly and immediately on the questions at hand—*whose* customers did FIGS win over, and *why*. *See* Appx. Exh. P (30:12-16) (Persechini testimony that "survey data from FIGS" and "Dr. Nowlis's data" "would bear on . . . how could these challenged claims be connected to sales).

FIGS also suggests that Dr. Simonson's materiality survey cannot "inform the finder of fact about any real-life causation or harm." Dkt. 938 at 14 n.4. While Dr. Simonson's surveys, alone, may not suffice to prove causation, they corroborate a conclusion evident from FIGS' customer data—FIGS' public health claims of antimicrobial, infection-killing properties were important to many consumers, including those who had purchased from SPI. Dr. Simonson similarly showed it was more likely that consumers would purchase FIGS' scrubs instead of Cherokee, a leading SPI brand, when customers saw the health claims. Appx. Exh. L at 294:6-17, 296:2-21. Data presented by FIGS' expert witness, Dr. Nowlis, showed much the same thing: in his survey of FIGS purchasers, 15.2% identified "a hundred percent antimicrobial fabric" as a reason for purchasing FIGS; 6.2% identified "kills bacteria and infection immediately on contact" as a reason for purchasing FIGS; and 2.6% identified reducing HAIs by 66% as a reason for purchasing FIGS. Appx. Exh. N at 139:4-140:15. Taken together with FIGS' naturalistic collection of data from *actual customers* who identified the health claims as the "best" or an "important" feature of FIGS, this is proof enough of causation to unlock the UCL's narrow band of injunctive relief.

FIGS itself considered these health claims to be crucial to its successful entry to and penetration of the scrubs market. *See* S.Appx. Exh. Z (Trial Exh. 136) at 1 (listing "anti-microbial" as first attribute to include in catalogs and on hangtags); S.Appx. Exh. CC (Trial Exh. 147) at 1 ("Main reasons to order FIGS for your office! 1) Antimicrobial scrubs – Bring down your hospital acquired infection rate!"); S.Appx. Exh. EE (Trial Exh. 165) at 2 ("It was also really important to us to protect our medical professionals from blood, liquids and other contaminants….These

treatments keep fluid from penetrating the fabric and kill bacteria and infection before coming into contact with our medical professionals."); *see also* S.Appx. Exh. UU (Duff Gago Testimony) 106:22-107:12 ("[W]e view [antimicrobial features] as…kind of like a baseline necessary feature…in modern healthcare apparel.").

To resist the conclusion that SPI has met the minimal standing threshold, FIGS must take a difficult position: That its health claims were *not* a substantial factor in *any* of the Exhibit 2187 customers' choice to buy a FIGS scrub, even though customers cited FIGS' "antimicrobial," bacteria-and-infection-killing properties as the feature they liked *best* about FIGS. FIGS must then further maintain that *none* of those current or former SPI customers would have purchased an SPI-brand scrub instead of a FIGS scrub. This strains credulity. Finding causation sufficient for standing does not require an attenuated chain of hypotheticals, speculation, and remote inferences; it takes only applying reason and equitable judgment to FIGS' internal data and expert evidence. For SPI's customers on Exhibit 2187—and likely many others—the inference of substantial-factor causation is inescapable. It is more likely than not that FIGS' health claims played a greater-than-trivial, non-theoretical part in those customers choosing FIGS over SPI.

**D.      FIGS's Cited Evidence Is Irrelevant to the Narrow Causation Inquiry.**

As it did at trial, FIGS floods the zone with dismissive arguments that SPI was solely responsible for any harm it suffered if it lost customers and sales to FIGS. *See* Dkt. 938 at 9-12, 15-18. This familiar refrain fails to address the question at hand. <u>First</u>, FIGS' assertion that SPI's finances have improved and market share grown since FIGS' entry to the market, *id.* at 9-10, carries no force here. SPI never sought to prove causation or injury this way. Rather, SPI focused at trial and focuses here on the individual instances (evident in FIGS-produced data) of customers who had been purchasing SPI's products, started buying FIGS' products, and identified FIGS' health claim attributes as features of FIGS that were "best" or "important" to them. <u>Second</u>, FIGS spends several pages discussing the *damages* testimony of Dr. Bell, whose analysis translated the results of Dr. Simonson's survey into calculations and projections of lost sales. *Id.* at 12-15. As

-13-

FIGS recognizes, this is not a damages claim. Recapitulating trial attacks on Dr. Bell does not bear on the issue at hand: Whether the trial testimony and evidence suffices as a whole to show that FIGS' unfair competition more likely than not caused SPI to lose at least one customer or sale to FIGS. Even one lost sale would supply concrete economic injury sufficient for standing to seek UCL injunctive relief to prevent and redress the effects of FIGS' unlawful and unfair conduct.

Finally, FIGS inveighs against a "frivolous" argument (one SPI has not made), apparently as a vehicle to discuss arguments FIGS would *prefer* to make about *other* possible causes of lost sales generally. *See* Dkt. 938 at 15-17. But this sideshow of narrative and rhetoric offers no insight on whether SPI lost any customers and sales to FIGS as a result of FIGS' *public health claims*. Whether there was "retailer tension," a "changing world," and a "revolution[s] in shopping preferences" is not probative of the narrow issue of whether SPI has standing. The evidence cited here and in SPI's Opening Brief, including Exhibit 2187 and Dr. Nowlis's purchase-factor survey, *is* probative of that issue, and powerfully so. It confirms that FIGS' health claims were at least a substantial factor in at least one SPI customer's decision to buy from FIGS.

### E.   SPI More Likely Than Not Lost Customers and Sales to FIGS as a Result of All Four Claims Alleged to Be False or Misleading.

For similar reasons—and those stated in SPI's Post-Trial Brief, Dkt. 895 at 15-17—SPI has established causation under the UCL-fraud and FAL standard. Ignoring SPI's regulatory UCL claim, FIGS contends that the jury's "unequivocal" verdict established the claims were "*not* false, misleading, or deceptive," Dkt. 939 at 6, maintaining that the briefing on causation ordered by the Court was unnecessary.[4] FIGS

---

[4] FIGS also asserts that the jury found SPI "filed suit with unclean hands," Dkt. 939 at 1, when it found no such thing; that is reserved for the Court's application. But unclean hands has no bearing on FIGS' liability: "equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct." *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 179 (2000).

**PLAINTIFF SPI'S POST-TRIAL REPLY BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

cites cases holding that UCL-fraud and FAL claims are considered "substantially congruent" with Lanham Act claims, leaning into the principle that a jury's factual findings on legal claims are ordinarily binding for purposes of companion equitable claims. *See, e.g.*, *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016).

FIGS goes too far. First, the jury did not reach an "unequivocal" verdict on falsity—it answered "no" to *combined falsity and deception* questions that are therefore ambiguous as to whether it found a lack of falsity and misleadingness *or* whether it found a lack of evidence that false or misleading claims deceived a substantial segment of the audience. Second, there is a meaningful difference in state and federal standards concerning whether *misleading* claims *could* deceive or *confuse* the audience. *See* Dkt. 939 at 15 n.10. Third, as the California Supreme Court has stressed, courts are uniquely positioned to undertake this "equitable judgment" of falsity and misleadingness, which "does not typically involve the type of ordinary factfinding assigned to a jury." *Nationwide Biweekly Admin, Inc. v. Sup. Ct. Alameda*, 9 Cal. 5th 279, 309 (2020).

The Court may and should assess falsity and misleadingness as to all four challenged claims in the first instance for purposes of SPI's UCL and FAL claims. To that end, SPI's proposed Findings of Fact and Conclusions of Law separately propose findings and conclusions for both SPI's *regulatory* UCL claim (under the unlawful and unfair prongs), chiefly briefed here, and its UCL-*fraud* and *FAL* claims (on a theory of false or misleading advertising). The same evidence supporting a finding of statutory standing for the unlawful and unfair UCL claim equally supports standing on this theory, too. Dkt. 939 at 16-17.

## III.   CONCLUSION

SPI respectfully submits that the evidence adduced at trial proves by a preponderance of the evidence that SPI lost customers and sales as a result of FIGS' unlawful and unfair violation of regulations. SPI has therefore established predicate liability and the element of causation, entitling it to appropriate injunctive relief.

**PLAINTIFF SPI'S POST-TRIAL REPLY BRIEF ON EQUITABLE CLAIMS AND CAUSATION**

1   Dated: January 20, 2023           MICHELMAN & ROBINSON, LLP

2
                                      By:    /s/ Mona Z. Hanna
3                                            Mona Z. Hanna, Esq.

4   Dated: January 20, 2023           KATTEN MUCHIN ROSENMAN LLP

5

6
                                      By:    /s/ Kristin J. Achterhof
7                                            Kristin J. Achterhof, Esq.

8                                            *Attorneys for Plaintiff*
9                                            STRATEGIC PARTNERS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28