1   MONA Z. HANNA (SBN 131439)
     mhanna@mrllp.com
2   JEFFREY D. FARROW (SBN 180019)
     jfarrow@mrllp.com
3   KEVIN S. KIM (SBN 275200)
     kkim@mrllp.com
4   ALLISON C. AGUIRRE (SBN 312544)
     aaguirre@mrllp.com
5   **MICHELMAN & ROBINSON, LLP**
    17901 Von Karman Avenue, Suite 1000
6   Irvine, CA 92614
    Telephone:   (714) 557-7990
7   Facsimile:   (714) 557-7991

8   KRISTIN J. ACHTERHOF
    (*Admitted Pro Hac Vice*)
9    kristin.achterhof@katten.com
    **KATTEN MUCHIN ROSENMAN**
10  **LLP**
    525 W. Monroe Street
11  Chicago, IL 60661-3693
    Telephone:   (312) 902-5296
12  Facsimile:   (312) 902-1061

13  *Additional Counsel on Next Page*

14

15            **UNITED STATES DISTRICT COURT**

16            **CENTRAL DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18   STRATEGIC PARTNERS, INC., | Case No. 2:19-cv-02286-JWH-KS |
| 19            Plaintiff, | **PLAINTIFF STRATEGIC PARTNERS INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 20       vs. | |
| 21   FIGS, INC., CATHERINE ("TRINA") SPEAR, HEATHER HASSON, | |
| 22            Defendants. | Trial:    October 17, 2022 |
| 23 | Time:    8:00 a.m. Crtrm.:  9D |
| 24 | Judge: Hon. John W. Holcomb |

25

26

27

28

*Additional Counsel:*

SANFORD L. MICHELMAN (SBN 179702)
  smichelman@mrllp.com
MARC R. JACOBS (SBN 185924)
  mjacobs@mrllp.com
JESSE J. CONTRERAS (SBN 190538)
  jcontreras@mrllp.com
JENNIFER S. GOLDSTEIN (SBN 10335)
  jgoldstein@mrllp.com
ADAM M. KORN (SBN 333270)
  akorn@mrllp.com
MICHELMAN & ROBINSON, LLP
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90024
Telephone: (310) 299-5500
Facsimile: (310) 201-2110

RICHARD H. ZELICHOV (SBN 193858)
  richard.zelichov@katten.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
T: (310) 788-4680
F: (310) 788-4471

TIMOTHY H. GRAY
(*Admitted Pro Hac Vice*)
  timothy.gray@katten.com
KATTEN MUCHIN ROSENMAN LLP
2900 K Street NW, North Tower, Suite 200
Washington, DC 20007-5118
T: (202) 625-3608
F: (202) 298-7570

PLAINTIFF SPI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Strategic Partners, Inc. ("Plaintiff" or "SPI"), by and through its undersigned counsel, hereby submits the following Proposed Findings of Fact and Conclusions of Law in this matter.[1]

# I.   PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING SPI'S REGULATORY UCL CLAIM

Based on the testimonial evidence, trial exhibits, and applicable law, Plaintiff Strategic Partners, Inc. respectfully submits for the Court's consideration the following proposed findings of fact and conclusions of law:

## A.   FINDINGS OF FACT

**The Parties.**

1.   Plaintiff Strategic Partners, Inc. ("SPI") is a medical apparel company that sells medical scrubs and other medical apparel. *See* S.Appx. Exh. YY (Singer Testimony, Oct. 27, 2022 Trial Transcript (Morning)) at 45:17-46:21.

2.   Defendant FIGS, Inc. ("FIGS") is a medical apparel company primarily selling medical scrubs. *See* S.Appx. Exh. TT (Hasson Testimony, Oct. 19, 2022 Trial Transcript) at 46:9-47:13.

3.   SPI and FIGS are competitors. S.Appx. Exh. ZZ (Ailawadi Testimony Oct. 27, 2022 PM Trial Transcript) at 115:2-9.

4.   FIGS specifically targeted SPI's customers for conversion. *See* Appx. Exh. L (Spear Testimony, Oct. 24, 2022 Trial Transcript) at 110:18-21;

**FIGS Publicly Disseminated Health Claims to Sell Its Scrubs.**

5.   From 2015 to 2019, FIGS publicly disseminated claims in marketing and promotion—including on each scrub's hangtag—that its scrubs "kill bacteria and

---

[1] Citations to the "Appx" refer to Exhibits contained in the Appendix submitted on January 6, 2023 (Dkt. 939-1). Citations to the "S.Appx." refer to Exhibits contained in the Supplemental Appendix submitted with these Proposed Findings and Conclusions.

**PLAINTIFF SPI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1   infection immediately upon contact." *See*, *e.g.,* Appx. Exh. G (Trial Exh. 650) at 3;
2   S.Appx. Exh. HH (Trial Exh. 233).

3        6.    From 2013 to at least 2019, FIGS publicly disseminated claims in
4   marketing and promotion conveying that its "scrubs reduce hospital acquired
5   infections by 66%." *See, e.g.,* Appx. Exh. E (Trial Exh. 409) at 2; Appx. Exh. G (Trial
6   Exh. 650) at 3; S.Appx. Exh. V (Trial Exh. 59) at 6.

7        7.    FIGS publicly disseminated numerous claims that its scrubs were
8   antimicrobial, without qualifying those claims or narrowing them to antimicrobial
9   effects on products. *See* Appx. Exh. A (Trial Exh. 198) at 3; Appx. Exh. B (Trial Exh.
10  211) at 4; Appx. Exh. C (Trial Exh. 248) at 4; Appx. Exh. D (Trial Exh. 327) at 3;
11  Appx. Exh. E (Trial Exh. 409) at 2; Appx. Exh. F (Trial Exh. 538) at 1.

12       8.    FIGS considered its claims of antimicrobial protection to pertain to
13  protection of health care professionals from disease, and deemed them important for
14  purposes of competing in the marketplace for scrubs. *See* S.Appx. Exh. Z (Trial Exh.
15  136) at 1; S.Appx. Exh. CC (Trial Exh. 147) at 1; S.Appx. Exh. EE (Trial Exh. 165)
16  at 2; S.Appx. Exh. UU (Designated Duff Gago Testimony) at 106:22-107:12.

17       9.    SPI did not make any claims that its products kill bacteria, prevent
18  diseases, or reduce infections. Appx. Exh. M (Singer Testimony, Oct. 27, 2022 Trial
19  Transcript (Morning)) at 74:8-75:19. SPI's claims of antimicrobial or antibacterial
20  properties did not concern the "killing" of bacteria, did not claim to kill or inhibit
21  infection, and did not implicitly or explicitly convey that its scrubs prevented diseases.
22  *See id.*

23       10.    FIGS' witnesses testified its scrubs were treated with generic
24  antimicrobial agents prior to 2016. *See* S.Appx. Exh. TT (Hasson Testimony, Oct. 19,
25  2022) at 63:9-21; S.Appx. Exh. UU (Designated Duff Gago Testimony) at 362:14-
26  363:03, 376:18-19, 378:13-18, 381:15-25.

27
28

**PLAINTIFF SPI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

11.     FIGS' witnesses also testified its scrubs have been treated with Silvadur, an antimicrobial agent, since 2016. *See* Appx. Exh. K (Hasson Testimony, Oct. 19, 2022 Trial Transcript) at 59:25-60:7.

12.     Silvadur is registered as a pesticide with the United States Environmental Protection Agency ("EPA"), EPA Registration Number 464-785. *See* Appx. Exh. R.

**Relevant Federal Regulations—FIFRA.**

13.     Under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), articles treated with a pesticide must be registered with the EPA unless they fall under the treated articles exemption.[2] Treated articles are exempt from registration under FIFRA if the antimicrobial used in the treatment is registered with the EPA for such use and the article does not bear any "health claims."

14.     A "health claim" includes "a claim for control of specific microorganisms or classes of microorganisms that are directly or indirectly infectious or pathogenic to man" or a "claim of 'antibacterial,' 'bactericidal,' or 'germicidal' activity or references in any context to activity against germs or human pathogenic organisms implying public health related protection is made."[3]

15.     Treated articles sold with public health claims are subject to the requirements of FIFRA and may not be legally sold or distributed unless registered with the EPA.[4]

16.     FIGS never registered its products with the EPA pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). Appx. Exh. G (Trial Exh. 650) at 4.

---

[2] *See* 40 C.F.R. §§ 152, *et seq.*; Pesticide Registration (PR) Notice 2000-1 (Appx. Exh. Q).

[3] PR Notice 2000-1, Unit II.A.

[4] *See* 40 C.F.R. 152.15; 7 U.S.C. § 136a.

**Relevant Federal Regulations—FDCA.**

17.     Medical "devices" must obtain clearance under Section 510(k) of the Food, Drug and Cosmetic Act ("FDCA") before they are marketed for sale and distribution.[5]

18.     Whether a device is regulated under FDCA and requires Section 510(k) clearance is dependent on the intended use of the product. A covered "device" is one that is "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease."[6]

19.     While scrubs are generally exempt from Section 510(k)'s requirement, this exception does not include scrubs that are "intended for a medical purpose, such as prevention of infectious disease transmission[.]"[7]

20.     When evaluating whether products are intended for a medical purpose, FDA will consider whether: (1) they are labeled or otherwise intended for use by a health care professional; (2) they are labeled or otherwise for use in a health care facility or environment; and (3) they include any drugs, biologics, or anti-microbial/anti-viral agents.[8]

21.     The United States Food and Drug Administration ("FDA") recently denied a petition to exempt antimicrobial scrubs from the scope of covered "devices" under the FDCA.[9]

22.     FIGS never obtained FDA clearance to make health claims about its products. Appx. Exh. G (Trial Exh. 650) at 4.

---

[5] *See* 21 CFR 807.100(a)(5).

[6] 21 U.S.C. § 321(h)(1)(B).

[7] *See* FDA, Enforcement Policy for Gowns, Other Apparel, and Gloves During the Coronavirus Disease (COVID-19) Public Health Emergency, Guidance for Industry and Food and Drug Administration Staff (March 2020), available at https://www.fda.gov/media/136540/download, at 5 (Appx. Exh. S).

[8] *See id.*

[9] *See* FDA, Response to Citizen Petition Docket No. FDA-2020-P-2289 (December 5, 2022), *available at* https://downloads.regulations.gov/FDA-2020-P-2289-0005/attachment_1.pdf (Appx. Exh. T).

**FIGS' Health Claims Influenced Consumers' Decisions to Purchase FIGS' Products Instead of SPI's Products.**

23.     In the ordinary course of business, FIGS collected data on the reasons its customers purchased its scrubs and which scrub brands consumers previously purchased or concurrently purchased. S.Appx. Exh. VV (Spear Testimony, Oct. 20, 2022 Trial Transcript) at 226:25-227:21.

24.     In particular, it conducted surveys of its customers in which customers were asked to identify the "best" or "important" features of FIGS' scrubs to them. One such survey of consumers was conducted in late 2016 and early 2017. *See* Appx. Exh. H (Trial. Exh. 2187).

25.     FIGS conducted this survey to obtain information regarding why customers purchased FIGS scrubs. S.Appx. Exh. VV (Spear Testimony, Oct. 20, 2022 Trial Transcript) at 227:3-7 (discussing survey data in Trial Exhibit 2187).

26.     In that survey, respondents identified attributes pertaining to FIGS' health claims as "important" scrub features, including those respondents who had previously purchased (or were also purchasing) SPI-brand scrubs. *See* Appx. Exh. H (Trial Exh. 2187) at Q26, Q158, Q225, Q369, Q670, U701, Q801, Q810, Q895, Q943, Q949, Q1273, Q1331, Q1355, Q1387; *id.* at P109, P335, P369, P654, P724, P810, P949, P968, P1249, P1272, P1331, P1363; *see also id.* at Q12, Q113, P491, Q491, Q558, Q559, Q568, P777, Q777, P983, P1124, P1168, P1299, P1306, P1319, P1377, P1401, Q1407.)

27.     One consumer explicitly identified "infection resistant" as one of FIGS' "best" qualities. (*Id.* at Q278.)

28.     In October 2020, a market research report entitled "Project Diamond" was prepared incorporating results of a survey of over 1,000 scrubs consumers. Appx. Exh. I (Trial Exh. 2825) at 4. Many respondents identified "health and safety" and infection control as a "key consideration" in their scrubs-purchasing decision, *id.* at 21, 88, and expressed interest in antimicrobial health protection claims. *Id.* at 101.

29.     FIGS' survey expert, Dr. Nowlis, credibly presented evidence that (i) 15.2% of FIGS' consumers purchased FIGS' scrubs based on the claim that its fabric was a hundred percent antimicrobial; (ii) 6.2% of FIGS' consumers purchased FIGS' scrubs based on the claim that its fabric "kills bacteria and infections immediately on contact"; and (iii) 2.8% of FIGS' consumers purchased FIGS' scrubs based on the claim that its products "[r]educe hospital-acquired infections by 66%." Appx. Exh. N (Nowlis Testimony, Oct. 31, 2022 Trial Transcript (Morning)) at 139:4-140:15.

30.     Dr. Nowlis's testimony in this regard constitutes a finding of fact.

31.     SPI's consumer survey expert, Dr. Simonson, credibly presented evidence that FIGS' kills-bacteria-and-infection claim increased consumers' likelihood of purchase by 15% among all surveyed consumers (even higher among past FIGS purchasers) and the reduces-hospital-acquired-infections claim increased the likelihood by 12% among all surveyed consumers (even higher among past FIGS purchasers). Appx. Exh. L (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 294:6-17, 296:10-21.

32.     Dr. Simonson's testimony in this regard constitutes a finding of fact.

33.     Dr. Simonson's survey also showed that in open-ended questions, nearly half (48%) of those surveyed identified the reduces-hospital-acquired-infections health claim as a reason for choosing FIGS; over half (54%) identified the kills-bacteria-and-infection health claim. *Id.* (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 296:2-7.

34.     Dr. Simonson's testimony in this regard constitutes a finding of fact.

35.     Consumer surveys are relevant to establishing the causal connection of FIGS' challenged claims to sales because they show what attributes consumers were seeking or valuing in scrubs, and whose customers FIGS was converting. *See* Appx. Exh. P (Persechini Testimony, Nov. 1, 2022 Trial Transcript) at 30:12-16; S.Appx. Exh. VV (Spear Testimony, Oct. 20, 2022 Trial Transcript) at 227:3-7.

**B.**   **CONCLUSIONS OF LAW**

36.    The UCL prohibits business acts or practices that are unlawful, unfair, or fraudulent. Cal. Bus. & Prof. Code § 17200. The "unlawful" prong prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

37.    The "unfair" prong proscribes a business practice that is unfair even if it does not violate some other law. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). In a suit by a competitor, "unfair" conduct is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or otherwise significantly threatens or harms competition*." *Cel-Tech,* 20 Cal. 4th 163, 187 (emphasis added).

38.    A plaintiff must have statutory standing to pursue a claim of unfair competition under the UCL. One component of the standing inquiry is whether the plaintiff has "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal Bus. & Prof. Code § 17204. This requires proof by a preponderance of the evidence that a plaintiff suffered an economic or monetary injury sufficient to supply Article III standing, and that the economic or monetary injury was caused by the defendant's unlawful or unfair conduct.

39.    Under California law, the "substantial factor" standard governs the UCL statutory-standing causation inquiry. *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1093 (N.D. Cal. 2019); *Tourgeman v. Collins Fin. Servs., Inc.*, 2009 WL 6527758, at *8 (S.D. Cal. Nov. 23, 2009).

**FIGS Violated FIFRA Regulations.**

40.    Under FIFRA, articles treated with a pesticide (*e.g.*, an antimicrobial agent like Silvadur) must be registered with the EPA unless they fall under the "treated articles" exemption. *See* 40 C.F.R. §§ 152.15, 152.25(a); EPA Pesticide Registration

(PR) Notice 2000-1 at 2 (Mar. 6, 2000), *available at* https://www.epa.gov/sites/default/files/2014-04/documents/pr2000-1.pdf.

41.  "Treated articles"—*i.e.*, articles or substances treated with antimicrobials solely for the *product*'s protection (such as for odor prevention), not for the health of the consumer—are exempt from registration under FIFRA if the *antimicrobial* used in the treatment is registered with the EPA for such use **and** the article does not bear any public health claims. *See* 40 C.F.R. § 152.25(a); PR Notice 2000-1 at 2 ("[P]roducts [that] ma[k]e public health claims that extend beyond the protection of the article itself . . . do not qualify for the treated articles exemption.").

42.  A "health claim" includes "a claim for control of specific microorganisms or classes of microorganisms that are directly or indirectly infectious or pathogenic to man," an "unqualified claim of 'antimicrobial' activity," or a "claim of 'antibacterial,' 'bactericidal,' or 'germicidal' activity or references in any context to activity against germs or human pathogenic organisms *implying public health related protection is made*." PR Notice 2000-1, at 2-3 (Unit II.A) (emphasis added).

43.  The EPA specifically identifies the following health claims as likely *unacceptable* under the treated articles exemptions when made in connection with antimicrobial-treated products: "Provides a germ-resistant surface"; "Provides a bacteria-resistant surface"; "Surface kills common gram positive and negative bacteria"; "Surface controls both gram positive and negative bacteria"; and "Surface minimizes the growth of both gram positive and negative bacteria." *Id.* at 5 (Unit IV.A).

44.  Treated articles accompanied by or promoted with public health claims are subject to the requirements of FIFRA and may not be legally sold or distributed unless registered with the EPA. *See* 40 C.F.R. § 152.15; 7 U.S.C. § 136a.

45.  The evidence presented at trial proves that FIGS violated FIFRA and its implementing regulations in violation of the "unlawful" and "unfair" prongs of the UCL.

46.     FIGS' witnesses testified that its scrubs have always been treated with antimicrobial agents. They testified its scrubs were treated with a "generic" antimicrobial prior to 2016 and have been treated with Silvadur—an EPA-registered antimicrobial agent—since 2016.

47.     FIGS publicly disseminated its claim that its scrubs "kill bacteria and infection immediately upon contact"—an assertion distributed on hangtags with each scrub—and its claim that its scrubs "reduce hospital acquired infections by 66%" in advertising and marketing. The killing-infection claim was made from 2015 to 2019 and the reduce-infection claim was made from 2013 to 2019.

48.     Both claims qualify on their face as "health claims" as defined by the EPA and encompassed by EPA regulations because they are assertions of bactericidal properties *expressly* conveying that FIGS' products "kill bacteria and *infection*" and confer health protection on the user by reducing hospital-acquired infections.

49.     FIGS' unqualified statements that its products were "antimicrobial" also constituted "health claims" that require EPA registration to be permissible. PR Notice 2000-1, at 7-8 (Unit IV.C).

50.     It is undisputed that FIGS failed to register its products with the EPA.

51.     FIGS' dissemination of health claims in marketing and promotion (including on each garment's hangtag) without EPA registration was therefore "unlawful."

52.     FIGS' sale and distribution of products with such health claims also constitute unfair business practices because its conduct harmed competition by providing FIGS an unfair advantage compared to competitors, like SPI, who followed the rules and avoided making prohibited health claims unless and until they had undertaken the process of EPA registration.

53.     Accordingly, FIGS' violation of EPA regulations constitutes unlawful and unfair business practices under the UCL

**FIGS Violated FDCA Regulations.**

54.    Under Section 510(k) of the FDCA, a manufacturer of medical "devices" may not sell or market them without obtaining premarket approval or following premarket notification and clearance procedures. *See* 21 U.S.C. § 360(k); 21 C.F.R. §§ 807.81(a), 807.100(a) ("Until the applicant receives an order declaring a device substantially equivalent [to an existing legally marketed, approved device], the applicant may not proceed to market the device").

55.    Whether a device is regulated under FDCA and requires at least Section 510(k) clearance hinges on the "intended use" of the product. Covered "devices" are those "*intended for use in* the diagnosis of disease or other conditions, or in the cure, *mitigation*, treatment, *or prevention of disease*." 21 U.S.C. § 321(h)(1)(B) (emphasis added).

56.    Scrubs that are "intended for a medical purpose, such as prevention of infectious disease transmission," are subject to Section 510(k) requirements. FDA Enforcement Policy for Gowns, Other Apparel, and Gloves During the Coronavirus Disease (COVID-19) Public Health Emergency, Guidance for Industry and Food and Drug Administration Staff, at 5 (March 2020), *available at* https://www.fda.gov/media/136540/download (noting "gowns and other apparel are devices when they meet the definition of a device set forth in section 201(h)").

57.    When evaluating whether products are intended for a medical purpose, the FDA considers whether: (1) they are labeled or otherwise intended for use by a health care professional; (2) they are labeled or otherwise intended for use in a health care facility or environment; and (3) they include any drugs, biologics, or anti-microbial/anti-viral agents. *Id.*; *see* 21 C.F.R. § 801.4 (assessment of "intended use" may take into account "labeling claims, advertising matter, or oral or written statements").

58.    FIGS' scrubs qualify as "medical devices" under the FDCA because they were accompanied by claims of protection from infection in advertising and

marketing, including on each scrub's hangtag. Specifically, (1) FIGS' scrubs are intended for use by healthcare professionals; (2) FIGS' scrubs advertised the presence of antimicrobial agents; and (3) FIGS claimed in advertising and on its products' hangtags that its scrubs prevent or mitigate infections immediately and reduce the spread of hospital-acquired infections.

59.   FIGS was accordingly required to obtain 510(k) clearance from the FDA before marketing its scrubs as capable of killing infection and reducing hospital-acquired infection.

60.   It is undisputed FIGS did not obtain clearance from the FDA to market and sell its products with health claims.

61.   FIGS' violation of the FDCA and implementing regulations separately constitutes unlawful and unfair business practices under the UCL.

**SPI Has Standing Because FIGS' Unlawful and Unfair Conduct Caused Economic Injury to SPI.**

62.   Based on the evidence presented at trial, it is more likely than not that FIGS' public health claims made in violation of federal regulations were, at a minimum, a substantial factor in diverting some consumers and sales from SPI to FIGS.

63.   Specifically, at least one of the SPI customers identified in Trial Exhibit 2187 who cited FIGS' health claims as the "best" or an "important" attribute of FIGS' scrubs actually purchased a FIGS scrub instead of an SPI scrub, and did so in whole or in part because of the attributes associated with FIGS' unlawful and unfair health claims.

64.   A lost sale constitutes a concrete economic injury sufficient to satisfy the statutory standing inquiry under California law. *See Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 324-25 (2011).

65.   The following findings of fact, weighed together, make the inference of causation more likely than not:

(i)   FIGS' own surveys, which reflect that FIGS' health claims were attributes of FIGS' scrubs that were important to scrubs consumers, and were

identified as such to FIGS by individual FIGS customers who were current or former purchasers of SPI-brand scrubs;

(ii)  FIGS' concession that it targeted SPI's customers (and specifically purchasers of Cherokee scrubs) to convert them into FIGS customers, or to replace purchases that those customers would otherwise have made from SPI;

(iii)  Survey evidence adduced at trial by Dr. Simonson, whose testimony established that exposure to FIGS' health claims made consumers more likely to purchase FIGS' scrubs instead of Cherokee scrubs;

(iv)  Survey evidence adduced at trial by Dr. Nowlis, whose testimony confirmed that many customers identified FIGS' health-claim-related attributes as a reason they purchased FIGS' scrubs; and

(v)  The results of the "Project Diamond" survey showing that explicit and implicit claims of health protection and disease prevention appealed to consumers of scrubs.

66.  Accordingly, the findings of fact set forth above and reasonable inferences from the record establish by a preponderance of the evidence that at least one of the individual consumers identified on Trial Exhibit 2187 purchased FIGS' scrubs instead of SPI's in whole or in part because FIGS unlawfully and unfairly marketed and sold them with health claims it was not authorized to make.

67.  FIGS is therefore liable under the unlawful and unfair prong of the UCL for violations of FIFRA, FDCA, and implementing regulations, and SPI has statutory standing to pursue injunctive relief for those violations.

## II.   PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING SPI'S UCL AND FAL CLAIMS RELATED TO FIGS' DECEPTIVE AND MISLEADING ADVERTISING CLAIMS.

Based on the testimonial evidence, trial exhibits, and applicable law, Plaintiff Strategic Partners, Inc. respectfully submits for the Court's consideration the following proposed findings of fact and conclusions of law:

### A.   FINDINGS OF FACT

**The Parties.**

1.     Plaintiff Strategic Partners, Inc. is a medical apparel company that sells medical scrubs and other medical apparel. S.Appx. Exh. YY (Singer Testimony, Oct. 27, 2022 Trial Transcript (Morning)) at 45:17-46:21.

2.     Defendant FIGS, Inc. is a medical apparel company primarily selling medical scrubs. *See* S.Appx. Exh. TT (Hasson Testimony, Oct. 19, 2022 Trial Transcript) at 46:9-47:13.

3.     SPI and FIGS are competitors. *See* S.Appx. Exh. ZZ (Ailawadi Testimony Oct. 27, 2022 PM Trial Transcript) at 115:3-10.

4.     FIGS specifically targeted SPI's customers for conversion. *See* Appx. Exh. L (Spear Testimony, Oct. 24, 2022 Trial Transcript) at 110:18-21;

5.     FIGS obtained SPI's customer list and targeted these SPI customers with marketing, including FIGS catalogs, from 2014 to 2015. S.Appx. Exh. W (Trial Exh. 104).

6.     FIGS' catalogs during this time contained the claim that FIGS' antimicrobial fabric "kill[s] bacteria immediately on contact and prevent[s] the spread of infections." S.Appx. Exh. FF (Trial Exh. 200) at 2.

**FIGS' Advertisements: Immediate Kill and 66% Claims**

7.     From 2015 to 2019, FIGS publicly disseminated claims in marketing and promotion—including on each scrub's hangtag—that its scrubs "kill bacteria and

infection immediately upon contact" (the "Immediate Kill Claim"). *See*, *e.g.,* Appx. Exh. G (Trial Exh. 650); S.Appx. Exh. HH (Trial Exh. 233).

8.      Scientific testing of FIGS fabrics under American Association of Textile Chemists and Colorists ("AATCC") Test Method 100 showed either no reduction or insignificant reduction of bacteria on contact with FIGS' scrubs. *See* S.Appx. Exh. NN (Trial Exhs. 697, 698, 700, 713-720); S.Appx. Exh. WW (Hauser Testimony, Oct. 25, 2022 Trial Transcript (Morning)) at 132:9-21.

9.      FIGS' own testing of its products showed that bacteria remained on FIGS' fabric after 24 hours and, in some tested fabrics, showed growth of bacteria. S.Appx. Exh. WW (Hauser Testimony, Oct. 25, 2022 Trial Transcript (Morning)) at 136:3-137:20.

10.      FIGS claimed its scrubs "*kill* bacteria *and infection immediately* on contact." It did not qualify its Immediate Kill Claim by stating that "some" bacteria are killed, nor did it indicate a timeframe for antimicrobial effects any shorter than "immediate."

11.      The Immediate Kill Claim implies on its face that *all* bacteria capable of causing infection are killed *instantaneously*.

12.      This finding is supported by FIGS' claim that "infection," in addition to bacteria, is killed on contact, which implies a degree of health protection incommensurate with the test results adduced at trial.

13.      From 2013 to at least 2019, FIGS publicly disseminated claims in marketing and promotion that its "scrubs reduce hospital acquired infections by 66%" (the "66% Claim"). *See, e.g.,* Appx. Exh. G (Trial Exh. 650) at 3; S.Appx. Exh. V (Trial Exh. 59) at 2.

14.      Consumers believed the 66% Claim to be supported by scientific studies or tests. S.Appx. Exh. VV (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 284:17-285:21.

15.     FIGS produced no testing or studies supporting its claim that its products reduce HAI by 66%. S.Appx. Exh. XX (Anderson Testimony, Oct. 26, 2022 Trial Transcript) at 101:11-15; 108:17-109:1.

16.     No testing or studies show Silvadur, the antimicrobial agent used on FIGS scrubs, reduces HAI by 66%. S.Appx. Exh. AAA (Designated Byers Testimony) at 69:3-15, 18-19.

17.     FIGS relied upon an early employee, Ben Chase, to research and provide substantiation for the 66% Claim. FIGS' corporate representative cited solely Mr. Chase as providing scientific support for the 66% Claim. *See* S.Appx. Exh. (Designated Duff Gago Testimony) at 144:08-145:19, 240:4-241:23.

18.     Mr. Chase did not perform any research or identify studies that show FIGS' products reduce HAI by 66%. S.Appx. Exh. SS (Designated Chase Testimony) at 120:22-125:05.

19.     Unrebutted testimony by Dr. Deverick Anderson established that "infection" refers to "something that happens to a person, to a human." S.Appx. Exh. XX (Anderson Testimony, Oct. 26, 2022 Trial Transcript) at 92:1-2. This includes "hospital-acquired infections." *Id.* at 91:1-21.

20.     FIGS adduced no evidence that FIGS' scrubs killed "infection" on contact, or at all. *See id.* at 101:11-15; 108:17-109:1.

21.     Dr. Anderson credibly testified that it would be incorrect to claim hospital scrubs treated with antimicrobial agents can kill infection and bacteria immediately on contact. *Id.* at 116:2-11.

22.     Dr. Anderson also credibly testified that, in the absence of any scientific support for the 66% Claim, it is incorrect to claim FIGS' scrubs reduce healthcare hospital-acquired infections by 66%. *Id.* at 112:17-113:1.

23.     Dr. Anderson's testimony as to the inaccuracy of FIGS' claim to kill or inhibit infection constitutes a finding of fact.

24.     FIGS' scrubs do not and did not "kill bacteria and infection immediately on contact" and cannot "reduce hospital-acquired infections by 66%."

25.     Consumers expressed interest in FIGS' purported antimicrobial properties and its capacity to reduce HAIs by 66%, making inquiries of FIGS about the scientific basis for the claims. *See, e.g.*, S.Appx. Exh. U (Trial Exh. 42); S.Appx. Exh. II (Trial Exh. 290); S.Appx. Exh. LL (Trial Exh. 606).

26.     FIGS' marketing efforts and customer messaging stressed that its products were antimicrobial and reduced hospital acquired infections. *See, e.g.*, S.Appx. Exh. X (Trial Exh. 128) at 7; S.Appx. Exh. AA (Trial Exh. 144) at 1; S.Appx. Exh. BB (Trial Exh. 146) at 1; S.Appx. Exh. CC (Trial Exh. 147) at 1; S.Appx. Exh. GG (Trial Exh. 204) at 2.

**FIGS' Advertisements: Liquid Repellent Claim**

27.     From 2014 to the present, FIGS publicly disseminated claims that its scrubs are "liquid repellent" ("Liquid Repellent Claim"). *See* Appx. Exh. G (Trial Exh. 650) at 4.

28.     FIGS made statements when promoting its products establishing its intention to convey that its scrubs protect against (among other things) bodily fluids, in order to shield the wearer from fluid-borne infection. *See, e.g.*, S.Appx. Exh. EE (Trial Exh. 165) at 2.

29.     Scientific testing under AATCC Test Method 22 of FIGS fabrics showed the absence of water repellency. S.Appx. Exh. WW (Hauser Testimony, Oct. 25, 2022 Trial Transcript (Morning)) at 137:21-140:2, 150:10-154:6; S.Appx. Exh. _ (Hauser Testimony, Oct. 26, 2022 Trial Transcript (Morning)) at 59:23-64:12; Exh. OO (Trial Exh. 711); S.Appx. Exh. PP (Trial Exhs. 721-735).

30.     Scientific testing under AATCC Test Method 118 of FIGS fabrics showed the absence of oil repellency. S.Appx. Exh. WW (Hauser Testimony, Oct. 25, 2022 Trial Transcript (Morning)) at 137:21-140:2, 154:7-157:7; S.Appx. Exh. _

1  (Hauser Testimony, Oct. 26, 2022 Trial Transcript (Morning)) at 59:23- 64:12; Exh.

2  OO (Trial Exh. 711); S.Appx. Exh. PP (Trial Exhs. 721-735).

3      31.    Scientific testing under American Society for Testing and Materials

4  ("ASTM Test Method") F-1670 of FIGS fabrics showed the absence of repellency to

5  synthetic blood. S.Appx. Exh. WW (Hauser Testimony, Oct. 25, 2022 Trial Transcript

6  (Morning)) at 137:21-150:9; S.Appx. Exh. _ (Hauser Testimony, Oct. 26, 2022 Trial

7  Transcript (Morning)) at 59:23- 64:12; S.Appx. Exh. OO (Trial Exh. 711); S.Appx.

8  Exh. PP (Trial Exhs. 721-735).

9      32.    Given the context in which the claims were made and FIGS' marketing

10 statements stressing protection from adverse health effects, FIGS' claims of "liquid

11 repellency" on their face imply protection against at least water and bodily fluids.

12     33.    FIGS' scrubs do not "repel" water, oil, or blood in any meaningful way.

13 **FIGS' Advertisements: Threads for Threads Claim**

14     34.    From 2013 to 2020, FIGS publicly disseminated claims that it donates

15 one set of scrubs for every set sold ("Threads for Threads Claim"). *See, e.g.*, Appx.

16 Exh. G (Trial Exh. 650) at 3; S.Appx. Exh. V (Trial Exh. 59) at 2; S.Appx. Exh. X

17 (Trial Exh. 128) at 4; S.Appx. Exh. Y (Trial Exh. 129); S.Appx. Exh. KK (Trial Exh.

18 593) at 2; S.Appx. Exh. MM (Trial Exh. 610) at 2 ("For every set of scrubs sold, FIGS

19 gives a set to a healthcare provider in need.").

20     35.    FIGS sold at least 4.8 million sets of scrubs up to 2020. *See* S.Appx. Exh.

21 JJ (Trial Exh. 587); S.Appx. Exh. QQ (Trial Exh. 782); S.Appx. Exh. RR (Trial Exh.

22 3348).

23     36.    FIGS claimed to have donated 610,000 scrubs up to 2020. *See* S.Appx.

24 Exh. DD (Trial Exh. 158); S.Appx. Exh. UU (Designated Duff Gago Testimony) at

25 313:07-314:04.

26     37.    The clear discrepancy between these figures demonstrates FIGS did not

27 donate one set of scrubs for every set of scrubs it sold.

28

38.     Further, FIGS' continued use of "Threads for Threads" branding, despite not donating on a one-for-one basis, nonetheless implies that FIGS donates one set of scrubs for every set of scrubs sold.

**Consumers Believed FIGS' Advertising Claims, Which Influenced Their Decisions to Purchase FIGS' Products Instead of SPI's Products.**

39.     In the ordinary course of business, FIGS collected data on the reasons its customers purchased its scrubs and which scrub brands consumers previously purchased or concurrently purchased. S.Appx. Exh. VV (Spear Testimony, Oct. 20, 2022 Trial Transcript) at 226:25-227:21.

40.     In particular, it conducted surveys of its customers in which customers were asked to identify what they considered to be the "best" or "important" features of FIGS' scrubs. One such survey of consumers was conducted in late 2016 and early 2017. *See* Appx. Exh. H (Trial Exh. 2187).

41.     FIGS specifically conducted this survey to obtain information regarding why customers purchased FIGS scrubs. *See* S.Appx. Exh. VV (Spear Testimony, Oct. 20, 2022 Trial Transcript) at 227:3-7 (referencing Trial Exhibit 2187).

42.     Survey respondents identified FIGS' health claims related to the ability to of its scrubs to kill bacteria and kill or reduce infections as "important" scrub features. *See* Appx. Exh. H (Trial Exh. 2187) at Q26, Q158, Q225, Q369, Q670, U701, Q801, Q810, Q895, Q943, Q949, Q1273, Q1331, Q1355, Q1387; *id.* at P109, P335, P369, P654, P724, P810, P949, P968, P1249, P1272, P1331, P1363; *see also id.* at Q12, Q113, P491, Q491, Q558, Q559, Q568, P777, Q777, P983, P1124, P1168, P1299, P1306, P1319, P1377, P1401, Q1407.

43.     In fact, one consumer explicitly identified "infection resistant" as one of FIGS' "best" qualities. *Id.* at Q278.

44.     These responses demonstrate a sufficiently significant portion of consumers believed FIGS' Immediate Kill and 66% Claims were true, and at least these consumers relied upon those representations as a reason to purchase FIGS' scrubs.

**PLAINTIFF SPI'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

45.     Survey respondents—including those who previously or concurrently purchased SPI's scrubs—also cited FIGS' Threads-for-Threads Claim as either the "best" or an "important" feature of FIGS' scrubs, including those who previously or concurrently purchased SPI-brand scrubs. *See* Appx. Exh. H (Trial Exh. 2187) at Q233, Q397 Q169, Q390, Q683.

46.     These responses demonstrate a sufficiently significant portion of consumers believed FIGS' Threads-for-Threads Claim was true, and at least these consumers relied upon that representation as a reason to purchase FIGS' scrubs.

47.     Survey respondents—including those who previously or concurrently purchased SPI's scrubs—cited FIGS' Liquid Repellent Claim and related attributes as an "important" feature, including those who previously or concurrently purchased SPI-brand scrubs. *See* Appx. Exh. H (Trial Exh. 2187) at P180 ("Q: Any other factors that are important to you? A: Repels liquid"); *see also id.* at P598 ("Q: Any other factors that are important to you? A: fluid resistant, no iron needed, soft hand feel, the gift to another of scrubs is important"); *id.* at P757 ("Q: Any other factors that are important to you? A: Water resistant"); *id.* at P819 ("Q: Any other factors that are important to you? A: Water resistance and flexibility."); *id.* at P968 ("Q: Any other factors that are important to you? A: splash resistant"); *id.* at Q414 ("Q: What do you like best about FIGS? A: Moisture repellent").

48.     These responses demonstrate a sufficiently significant portion of consumers believed FIGS' Liquid Repellent claim was true, and at least these consumers relied upon that representation as a reason to purchase FIGS' scrubs.

49.     In October 2020, a market research report entitled "Project Diamond" was conducted based on a survey of over 1,000 scrubs consumers. Appx. Exh. J (Trial Exh. 2825) at 4. Many respondents identified "health and safety" and infection control as a "key consideration" in their scrubs-purchasing decision, *id.* at 21, 88, and expressed interest in antimicrobial health protection claims. *Id.* at 101.

50.     SPI's consumer survey expert, Dr. Itamar Simonson, credibly testified that: (i) the Immediate Kill Claim increased the likelihood of purchasing FIGS scrubs by 15% among all surveyed consumers (higher among FIGS' purchasers); (ii) the 66% Claim increased the likelihood purchasing FIGS scrubs by 12% among all surveyed consumers (even higher among FIGS' purchasers); (iii) the Liquid Repellent Claim increased the likelihood of purchasing FIGS scrubs by 20% among all surveyed consumers (even higher among FIGS' purchasers); (iv) the Threads-for-Threads Claim increased the likelihood of purchasing FIGS scrubs by 13% among all surveyed consumers (higher among FIGS' purchasers); and (v) all of the claims combined increased the likelihood of purchasing FIGS scrubs by 30% among all surveyed consumers. Appx. Exh. L (Simonson Testimony, Oct. 24, 2022 Trial Transcript) at 294:6-17, 296:10-21.

51.     Dr. Simonson's testimony in this regard constitutes a finding of fact.

52.     FIGS' survey expert, Dr. Stephen Nowlis, credibly testified that (i) 15.2 % of FIGS' consumers purchased FIGS' scrubs based on the claim that its fabric was a hundred percent antimicrobial; (ii) 6.2 % of FIGS' consumers purchased FIGS' scrubs based on the claim that its fabric "kills bacteria and infections immediately on contact"; (iii) 2.8 % of FIGS' consumers purchased FIGS' scrubs based on the claim that its products "Reduce hospital-acquired infections by 66%"; and (iv) 5.2 % of FIGS' consumers purchased FIGS' scrubs based on FIGS' claim of "charitable scrub donations Appx. Exh. N (Nowlis Testimony, Oct. 31, 2022 Trial Transcript (Morning)) at 139:4-140:15.

53.     Dr. Nowlis's testimony in this regard constitutes a finding of fact.

54.     Consumer surveys are relevant both to the fact of consumer deception and to establishing the causal connection of FIGS' challenged claims to lost sales, because they show what attributes consumers were seeking or valuing in scrubs, and whose customers FIGS was converting. *See* Appx. Exh. P (Persechini Testimony, Nov. 1, 2022 Trial Transcript) at 30:12-16; S.Appx. Exh. VV (Spear Testimony, Oct. 20, 2022 Trial Transcript) at 227:3-7.

**B.    CONCLUSIONS OF LAW**

55.    Claims based on deceptive or misleading advertisements under the FAL and UCL are governed by the reasonable consumer test. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citations omitted). This standard requires a court to determine whether a "reasonable consumer" is likely to be deceived. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015).

56.    Likelihood of deception means that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled by the advertisement. *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

57.    This inquiry "calls for an equitable judgment to determine whether an often undisputed advertising or promotional practice presents a sufficient tendency to deceive or confuse the public so as to support invocation of the [UCL or] FAL's remedies." *Nationwide Biweekly Admin, Inc. v. Sup. Ct. Alameda*, 9 Cal. 5th 279, 309 (2020).

58.    Because the UCL and FAL only require a showing that members of the public "are ***likely*** to be deceived," a violation "can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage." *Battle v. Taylor James, LLC*, 2022 WL 2162930, at *10 (C.D. Cal. June 15, 2022); *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 888 (1999).

59.    A plaintiff must have statutory standing to pursue a claim of false or misleading advertising under the UCL and FAL. One component of the standing inquiry is whether the plaintiff has "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal Bus. & Prof. Code § 17204. This requires proof by a preponderance of the evidence that a plaintiff suffered an economic or monetary injury sufficient for Article III standing, and that the economic or monetary injury was caused by the defendant's unlawful or unfair conduct.

60.    Unlike consumers, competitors bringing UCL or FAL claims based on

false advertising do not need to show their own reliance on the challenged statements. *Lona's Lil Eats, LLC v. DoorDash, Inc.*, 2021 WL 151978, at *12 (N.D. Cal. Jan. 18, 2021). Consumers must still have relied upon the statements, but this does not require "reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing" the harmful result. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326–27, 207 P.3d 20, 39 (2009).

61.     Accordingly, a consumer's reliance, in whole or in part, on misleading advertisements must be a substantial factor resulting in injury to the plaintiff to establish competitor standing for UCL and FAL claims based on a theory of false advertising.

**FIGS' 66% Claim Was Likely to Deceive or Confuse.**

62.     Applying equitable judgment to the findings of fact, SPI has proven by a preponderance of the evidence that FIGS' claim of reducing hospital-acquired infections by 66% was likely to deceive or confuse consumers of scrubs.

63.     This conclusion is based on the following factual findings, as set forth above, and reasonable inferences therefrom:

(i)     Consumers believed the 66% Claim to be supported by scientific studies or tests, but there are no scientific tests supporting the claim that FIGS' scrubs have that effect;

(ii)    Dr. Anderson credibly testified that FIGS' 66% Claim was not true;

(iii)   FIGS received many inquiries from consumers and potential consumers about the scientific and medical basis for the 66% Claim; and

(iv)    Many purchasers of FIGS' scrubs cited its advertised antimicrobial properties in survey responses, demonstrating that they believed the claim was true.

64.     Consumers of scrubs were likely to be confused or misled by the 66% Claim in two ways: First, consumers were likely to believe that there were reliable scientific studies or tests supporting the claim that FIGS' scrubs were proven to reduce

HAIs by 66%, but no such studies or tests existed. <u>Second</u>, and relatedly, consumers were likely to believe that FIGS' scrubs *did* reduce HAIs by 66%.

**FIGS' Immediate Kill Claim Was Likely to Deceive or Confuse.**

65.     Applying equitable judgment to the findings of fact, SPI has proven by a preponderance of the evidence that FIGS' claim of killing bacteria and infection immediately on contact was likely to deceive or confuse consumers.

66.     This conclusion is based on the following factual findings, as set forth above, and reasonable inferences therefrom:

(i)     AATCC testing showed either no reduction or insignificant reduction of bacteria on contact with FIGS' scrubs;

(ii)    FIGS' own testing showed that bacteria remained on its scrubs 24 hours after contact;

(iii)   Dr. Anderson credibly testified that it is incorrect to claim that a scrub treated with antimicrobial agents is capable of killing infection on contact; and

(iv)    Consumers cited FIGS scrubs' antimicrobial properties—including "infection resistan[ce]"—as some of its "best" attributes, demonstrating their belief that the claim of health protection was true.

**FIGS' Liquid Repellent Claim Was Likely to Deceive or Confuse.**

67.     Applying equitable judgment to the findings of fact, SPI has proven by a preponderance of the evidence that FIGS' claim of liquid repellency was likely to deceive or confuse consumers.

68.     This conclusion is based on the following factual findings, as set forth above, and reasonable inferences therefrom:

(i)     AATCC testing under a variety of methods showed that FIGS' fabrics were not meaningfully repellent to water, oil, or synthetic blood; but

(ii)   FIGS' advertising claims of "liquid repellency" implied on their face protection from, *inter alia*, bodily fluids, such that no fluid would ever touch the skin of a person wearing FIGS' scrubs.

**FIGS' Threads for Threads Claim Was Likely to Deceive or Confuse.**

69.   Applying equitable judgment to the findings of fact, SPI has proven by a preponderance of the evidence that FIGS' claim of donating one set of scrubs for every set it sold was likely to deceive or confuse consumers.

70.   This conclusion is based on the following factual findings, as set forth above, and reasonable inferences therefrom:

(i)   FIGS' records reflect that, during the time it made its "Threads for Threads" claim, it sold at least 4.8 million sets of scrubs, but donated only 610,000 sets of scrubs during that time;

(ii)   consumers cited FIGS scrubs' purported one-for-one donation policy as one of FIGS' "best" qualities or one that was important to them, demonstrating they believed the claim that every sale was paired with a donation; and

(iii)   FIGS continues to use "Threads for Threads" branding to promote its products, such that the misleading "one-for-one" message continues to be conveyed to consumers.

71.   Accordingly, as a matter of equitable judgment, all four challenged claims were likely to deceive consumers under the UCL and FAL.

**SPI Has Standing to Pursue Its UCL and FAL Claim Because FIGS' Claims Diverted Consumers and Sales, Causing Economic Injury to SPI.**

72.   Based on the evidence presented at trial, it is more likely than not that FIGS' four challenged claims were, at a minimum, a substantial factor in diverting some consumers and sales from SPI to FIGS.

73.   Specifically, at least one of the SPI customers identified in Trial Exhibit 2187 who cited FIGS' health claims, one-for-one donations, or liquid repellency as the

"best" or an "important" attribute of FIGS' scrubs actually purchased a FIGS scrub instead of an SPI scrub, and did so in whole or in part because they were deceived or confused by FIGS' deceptive claims.

68.     A lost sale constitutes a concrete economic injury sufficient to satisfy the statutory standing inquiry under California law. *See Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 324-25 (2011).

69.     The following findings of fact, weighed together, make the inference of causation more likely than not:

(i)     FIGS' own surveys, which reflect that FIGS' deceptive claims conveyed attributes of FIGS' scrubs that were important to scrubs consumers, and those attributes were volunteered as "best" or "important" by individual FIGS customers who were current or former purchasers of SPI-brand scrubs;

(ii)    FIGS' concession that it targeted SPI's customers (and specifically purchasers of Cherokee scrubs) to convert them into FIGS customers, or to replace purchases that those customers would otherwise have made from SPI;

(iii)   Survey evidence adduced at trial by Dr. Simonson, whose testimony established that exposure to FIGS' claims—separately and collectively—made consumers more likely to purchase FIGS' scrubs instead of Cherokee scrubs;

(iv)    Survey evidence adduced at trial by Dr. Nowlis, whose testimony confirmed that many customers identified deceptive-claim-related attributes as a reason they purchased FIGS' scrubs; and

(v)     The results of the "Project Diamond" survey showing that explicit and implicit claims of health protection and disease prevention appealed to consumers of scrubs.

74.     FIGS' four claims were therefore (a) likely to deceive or confuse

consumers; (b) relied upon by consumers when they chose to purchase a FIGS scrub; and (c) a substantial factor in causing SPI to lose at least one sale.

75.     Accordingly, FIGS is liable under both the UCL and FAL, and SPI has standing to pursue equitable relief.

## III.   **CONCLUSION**

Given the above findings of fact and conclusions of law, SPI submits that judgment should be entered in favor of SPI and against FIGS with respect to SPI's equitable claims arising under the UCL and/or FAL. Accordingly, an appropriate injunction may issue pursuant to California Business and Professions Code Section 17203.

Dated: January 20, 2023          MICHELMAN & ROBINSON, LLP

By:   */s/ Mona Z. Hanna*
      Mona Z. Hanna, Esq.

Dated: January 20, 2023          KATTEN MUCHIN ROSENMAN LLP

By:   */s/ Kristin J. Achterhof*
      Kristin J. Achterhof, Esq.

*Attorneys for Plaintiff*
STRATEGIC PARTNERS, INC.